UNITED STATES DISTRICT COURT
FOR THE WESTERN DIVISION
Abingdon Division

KYMBERLY HOBBS, ADMINISTRATOR
OF THE ESTATE OF CHARLES JAMES GIVENS,
DECEASED,

    Plaintiff,

v.

ANTHONY RAYMOND KELLY,

GREGORY SCOTT PLUMMER,

JOSHUA CALEB JACKSON,

WILLIAM ZACHARY MONTGOMERY, and

SAMUEL DALE OSBORNE,

    Serve all of the foregoing at:

    Marion Correctional Treatment Center
    140 Finley Gayle Drive
    Marion, VA 24354

    Defendants.

Civil Action No.: 1:23CV00003

**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW Plaintiff Kymberly Hobbs, Administrator of the Estate of Charles James Givens, Deceased, by counsel, and moves this Court for judgment against Defendants Anthony Raymond Kelly, Gregory Scott Plummer, Joshua Caleb Jackson, William Zachary Montgomery, and Samuel Dale Osborne, stating as follows:

**I.    INTRODUCTION**

1.    Charles J. Givens, a disabled 52-year-old inmate who had suffered a traumatic brain injury as a child, was brutally beaten to death by correctional officers at Marion

Correctional Treatment Center. The Defendant correctional officers attacked Mr. Givens in the shower following Mr. Givens having accidentally defecated on himself. A mere hour after the correctional officers brutally beat and sadistically tortured Mr. Givens in the shower, Mr. Givens was found unresponsive in his cell, where he would later be declared dead. The Assistant Chief Medical Examiner determined that Mr. Givens suffered "blunt force trauma" to his torso/acute rib fractures, resulting in laceration of the spleen and "massive associated internal bleeding." Despite a deluge of evidence indicating that this brutal attack was simply one instance of Treatment Center staff abusing Mr. Givens, this vicious assault was then covered up, not only by the Defendant correctional officers, but also by Treatment Center officials. Efforts to impede the Plaintiff's inquiry into Mr. Givens' death continue to this day. Despite multiple requests made over many months by Estate Administrator Mrs. Hobbs for relevant prison documents, the Virginia Department of Corrections has continually failed to produce relevant requested documents.

## II. JURISDICTION

2. Jurisdiction exists in this case pursuant to the Eighth and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 1331, 1343. Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C.§ 1367 (a), over the state law claims, including claims alleged pursuant to Virginia Code § 8.01-50 *et seq*. (wrongful-death statute), or, alternatively, pursuant to Virginia Code § 8.01-25 *et seq*. (survival statute). All relief available under the foregoing statutes is sought herein by Plaintiff.

## III. VENUE

3. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

4. Assignment to the Abingdon Division of the Western District of Virginia is proper pursuant to Western District of Virginia Local Rules 2(a)(3) and 2(b), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## IV. PARTIES

5. Plaintiff KYMBERLY HOBBS, is, and was at all relevant times, a resident of Alabama. On May 13, 2022, Mrs. Hobbs duly qualified as Administrator of the Estate of Charles James Givens, Deceased, in the Smyth County Circuit Court, under the applicable provisions of law. A copy of the Certificate/Letter of Qualification is attached hereto, marked as **Exhibit A**. Plaintiff brings this action in her capacity as ADMINISTRATOR OF THE ESTATE OF CHARLES JAMES GIVENS, DECEASED, pursuant to, among other statutes, Virginia Code § 8.01-50 *et seq.* (wrongful-death statute), and, alternatively, pursuant to Virginia Code § 8.01-25 *et seq.* (survival statute). All relief available under the foregoing statutes is sought herein by Plaintiff.

6. Defendant ANTHONY RAYMOND KELLY was, at all relevant times, an agent and/or employee of the Virginia Department of Corrections ("VDOC") working as a sergeant at the Treatment Center. At all relevant times, Defendant Kelly was acting within the scope of his employment and/or agency with VDOC and under color of state law. Defendant Kelly is sued in his individual capacity.

7. Defendants GREGORY SCOTT PLUMMER, and JOSHUA CALEB JACKSON, were, at all relevant times, agents and/or employees of VDOC working as "treatment officers" at the Treatment Center. At all relevant times, Defendants Plummer and Jackson were acting within the scope of their employment and/or agency with VDOC and under color of state law. Defendants Plummer and Jackson are sued in their individual capacities.

3

8. Defendants WILLIAM ZACHARY MONTGOMERY and SAMUEL DALE OSBORNE were, at all relevant times, agents and/or employees of VDOC working as correctional officers at the Treatment Center. At all relevant times, Defendants Montgomery and Osborne were acting within the scope of their employment and/or agency with VDOC and under color of state law. Defendants Montgomery and Osborne are sued in their individual capacities.

9. Defendants Kelly, Plummer, Jackson, Montgomery, and Osborne are collectively referred to herein as "the Defendants." All were working at the Treatment Center on the morning of February 5, 2022 and at other times.

## V. FACTS

10. In or around February 2013, Mr. Givens pleaded guilty to two felonies. Shortly thereafter, he was transported to Marion Correctional Treatment Center, a state mental hospital in Marion (Smyth County), Virginia (hereafter, "Treatment Center").

11. The Treatment Center is located in a single two-story building surrounded by a security perimeter fence. Housing is mostly in single cells. In addition to housing inmates with mental-health issues and/or limited intellectual development, the Treatment Center houses general population inmates who provide support services at the Treatment Center such as working in the kitchen, assisting with laundry, and providing maintenance services, among other discrete tasks. These inmates are referred to as "cadre."

12. Mr. Givens was housed at Marion Correctional Treatment Center due to his limited intellectual capacity. At age four or five, Mr. Givens suffered a traumatic brain injury after falling down a flight of stairs. Mr. Givens was in a coma for an extended period of time after his fall. Further testing indicated that Mr. Givens had suffered widespread, permanent damage to his brain such that his intellectual and emotional development would never exceed that of a 2nd or 3rd grade child. These injuries permanently stunted Mr. Givens' cognitive

4

development and trajectory, inhibiting, among other things, his communication skills, emotional intelligence, and executive functioning. For the remainder of Mr. Givens' life, he would require assistance and supervision with daily functioning and tasks.

13. In addition to his traumatic brain injury, Mr. Givens also suffered from Crohn's disease, a chronic form of inflammatory bowel disease that can cause debilitating abdominal pain and cramps, as well as chronic diarrhea. Mr. Givens was prescribed medications to manage his symptoms, some of which caused loose, watery stools. As a result, Mr. Givens sometimes defecated on himself.

14. Although some correctional officers understood that Mr. Givens could not fully control his bowels, others asserted that Mr. Givens defecated on himself intentionally, and, upon information and belief, became angry at having to assist Mr. Givens' clean up, making Mr. Givens the target of the Defendant correctional officers' abuse.

15. Despite being confined in a facility intended to ensure the safety and well-being of disabled inmates, information and belief suggest that Mr. Givens was subject to regular, harsh physical and emotional abuse by the Treatment Center staff. In the weeks, months, and years preceding the coordinated attack upon Mr. Givens which caused his death, records show that Mr. Givens was brought to the local Smyth County Community Hospital Emergency Department ("ED") many times for injuries that are highly suggestive of correctional officer abuse and/or neglect.

16. On April 25, 2018, Mr. Givens was taken to the Smyth County Community Hospital Emergency Department for "Assault by hot tap water." The circumstances of his injuries led to a Virginia State Police investigation and review by the Smyth County Commonwealth's Attorney Office. The Treatment Center Warden reported to Mrs. Hobbs that

Mr. Givens had been injured by inmate(s). However, the State Police report (the "Scalding Incident Report") indicated that correctional and/or treatment officers had been involved.

17. Indicative of the abhorrent, abusive treatment of the mentally ill/intellectually disabled Treatment Center inmate population by correctional officers, staff members regularly pushed open windows (that were not reachable by the inmates) and lowered the temperature in the building even in the coldest months. **This led to Mr. Givens, as well as other inmates, being hospitalized multiple times for hypothermia.** Indeed, Mr. Givens was hospitalized for hypothermia and then released just days prior to his death.

18. On February 8, 2021, Mr. Givens was brought to the Smyth County Community Hospital ED for "hypothermia" and "hypothermic shock." Mr. Givens' initial temperature was found to be 87.2 degrees and blood pressure of 60/46, the latter of which is almost half the normal range. A hospital admission record reflect that Mr. Givens was "found down on the cold concrete and hypothermic."

19. On June 17, 2021, Mr. Givens was seen in the Smyth County Community Hospital ED for right leg bruising, swelling, and pain. A Treatment Center physician called the ED to say that Mr. Givens had fallen about a week and a half ago. The circumstances of the alleged fall were not specified.

20. On October 26, 2021, Mr. Givens was once again taken to the Smyth County Community Hospital ED for hypothermia and "cold exposure." His rectal temperature was 89.4 degrees.

21. On October 29, 2021, Mr. Givens was, once again, taken to the Smyth County Community Hospital ED for hypothermia, as well as shortness of breath. The ED physician noted "increased acuity of illness and likely septic."

22. Approximately one month later, on December 1, 2021, Mr. Givens was once again – this time the fourth time – taken to the Smyth County Community Hospital for cold exposure/hypothermia. Mr. Givens was found "unresponsive" with very low body temperature and blood pressure.

23. Still further, Mr. Givens' autopsy report shows **prior** bruising and unexplained red welts on Mr. Givens' arms and legs. Upon information and belief, the prior bruising was caused by a previous attack(s) upon Mr. Givens by Treatment Center staff. Evidence suggests that the red welts were from Defendant Plummer whipping Mr. Givens with a wet towel.

24. On the morning of February 5, 2022, Mr. Givens was found to have defecated on himself. Upon information and belief, Mr. Givens, once again, did so accidentally. Smyth County Community Hospital records indicate that Mr. Givens suffered from chronic, and at times, acute gastrointestinal problems.

25. At 7:18 a.m. on February 5, 2022, the five Defendants – Sergeant Kelly, Treatment Officers Plummer and Jackson, and Correctional Officers Montgomery and Osborne – took Mr. Givens to the shower area allegedly to be cleaned up. A "cadre" inmate (hereafter, "Cadre 01") was assigned to clean Mr. Givens' cell after his accident.

26. This show of force was unusual. Normally just one or two officers would escort an inmate to the shower. Also, Mr. Givens was a "low risk" inmate who did not require shackles. Further still, Mr. Givens was still recovering from having just been released from the hospital for hypothermia. Additionally, the shower area in question was a mere five (5) cells away from Mr. Givens' – a very short walk. Cadre 01, who witnessed the exchange between the five Defendants and Mr. Givens, recalls that Mr. Givens– despite his limited verbal capabilities – explicitly expressed that he did **not** want to be taken to the shower room.

27. Deviating from standard procedure, officers came from throughout the Treatment Center all to accompany Mr. Givens to the shower. Only one of the Defendants, Officer Osborne, was assigned to Mr. Givens' cell area.

28. Grainy, marginal-quality video footage captured Mr. Givens being escorted by the five Defendants from his cell area to the shower area, with only one officer holding Mr. Givens by the arm.

29. The shower room (in addition to Mr. Given's cell itself) was off-camera, which the Defendants would have known. Among other things, the camera placements were known by all in the Treatment Center.

30. Upon arrival at the shower room, video footage shows Defendants Plummer, Jackson, Montgomery, and Osborne take Mr. Givens into the off-camera shower room. Defendant Sergeant Kelly can be seen standing outside the shower room in the hallway at times, but then going in and out of the same. Information and belief suggest that Sergeant Kelly was functioning at times as a lookout for group.

31. While in the shower room, Defendant Plummer repeatedly snapped a wet towel at Mr. Givens. Meanwhile, Defendants Jackson and Montgomery threw/dumped ice-cold water at Mr. Givens. Then, on multiple occasions, Defendant Sergeant Kelly entered the shower room and violently punched Mr. Givens in the torso. Defendant officers Plummer, Jackson, Montgomery, and Osborne did not intervene to stop Sergeant Kelly's violent blows or the barbaric actions of the others. Osborne was chided by the others for not taking part in the abuse. However, Osborne also did not seek to protect Mr. Givens from the attacks of the others; his position required that he do so, or at least attempt to do so, which he did not.

32. During this time, Cadre 01, the member of the "cadre" inmate work crew assigned to clean Mr. Givens' cell, walked backed and forth past the shower room, among other things, retrieving cleaning supplies.

33. Despite their violent, abusive conduct, the Defendants later prepared written statements *indicating that nothing out of the ordinary occurred in the shower room,* and Mr. Givens appeared to be normal when he was returned to his cell, where he remained by himself until he was found unresponsive.

34. But contrary to that characterization, and indicative of the abuse that he suffered at the hands of the Defendant correctional officers, video footage shows Mr. Givens with a **different, hunched-over** posture as he returned to his cell some 20 minutes later. According to Cadre 01, Mr. Givens asked to be taken to the medical ward of the Treatment Center, but his request was denied.

35. Defendant Osborne conducted at least one surveillance round where he passed by Mr. Givens' cell, and noted nothing with regards to Mr. Givens. However, less than an hour later, prison officials report that Defendant Osborne found Mr. Givens unresponsive, lying face up in his bed, with both feet off the side of the bed on the floor.

36. Video footage at or about 9:30 a.m. shows Defendant Osborne turning to peer into Mr. Givens' cell in a manner different than how he passed the other cells. Osborne's action indicated his knowledge that Mr. Givens was badly injured.

37. Mr. Givens was declared dead at the Treatment Center at 9:35 a.m. on February 5, 2022.

38. On February 5, 2022 at approximately 11:30 a.m., Mrs. Hobbs was contacted by the Treatment Center and told by the Warden Jeffery Artrip that her brother had passed away due to "natural causes." The Treatment Center publicly reported the death with the same falsehood.

39. A Virginia Department of Corrections investigator was assigned to investigate Mr. Givens' death, but was removed from the investigation after the Warden Jeffery Artrip falsely accused the investigator of using abusive language over the phone.

40. The Smyth County Commonwealth Attorney's office knew this initial investigator from prior work outside of VDOC and later recognized the Warden's actions as manufactured. Nonetheless, Warden Artrip was successful in having another investigator assigned to the matter; Special Agent Health Seagle was selected by the Virginia State Police as the new investigator.

41. On February 12, 2022, Mrs. Hobbs was called by a woman who was a close friend of another Treatment Center inmate, Cadre 02. She conveyed that she had been told by Cadre 02 that Mr. Givens was beaten to death by Treatment Center personnel, and that Cadre 02 and another inmate, Cadre 01, knew of, or had witnessed, the beating.

42. The friend of Cadre 02 told Mrs. Hobbs that Mr. Givens was savagely beaten in the stomach area. This particularity indicates that the source of the information, indeed, had first-hand knowledge of the incident. At the time, no autopsy report had been prepared or generated.

43. In fact, prior to this conversation, the friend of Cadre 02 did not know Mrs. Hobbs, but was so upset by the events disclosed to her by her inmate friend that she paid for an internet search to locate a telephone number in hopes of contacting Mrs. Hobbs.

44. Following the February 5, 2022 assault upon Mr. Givens, the two inmates who knew of the circumstances of Mr. Givens' death (and one whom had witnessed a portion of the assault) – Cadre 01 and Cadre 02 – were each suspiciously charged with committing institutional crimes by Treatment Center staff for events that had transpired several months earlier without complaint by Treatment Center staff. Upon information and belief, the charges were brought

principally in an effort to discourage/suppress any cooperation by the two cadres with the investigation. These bogus charges were later recognized by the Virginia State Police and Commonwealth Attorney's office as an attempt to prevent the cooperation of both cadres in the investigation.

45. Mrs. Hobbs contacted Virginia State Police with the foregoing information. Mrs. Hobbs also discussed the autopsy report with Assistant Chief Medical Examiner Eli Goodman, MD, who considered the death suspicious; however, at the time, Dr. Goodman felt that he lacked sufficient proof to rule the death a homicide. Dr. Goodman did, however, state in his report, "...opinions expressed herein are amenable to change should new, reliable and pertinent information come to light in the future." As noted above, the cause of death was explained as blunt force trauma to Mr. Givens' torso, resulting in laceration of the spleen and massive associated internal bleeding.

46. An employee of Bradley's Funeral Home who had accepted Mr. Givens' body then sent Mrs. Hobbs a copy of the death certificate with "blunt force trauma" highlighted.

47. The autopsy report prepared by Dr. Goodman and dated March 29, 2022 found fractures to Mr. Givens' ribs numbers 8, 9, 10, 11, which caused laceration to Mr. Givens' spleen and massive associated internal bleeding, leading to death.

48. At the outset of his investigation, Special Agent Seagle met with Cadre 01 at the Treatment Center, but Cadre 01 would not provide information about what had happened to Mr. Givens. Cadre 01 stated that he could not talk to Special Agent Seagle about the circumstances. Cadre 01's response is exceedingly understandable considering that the foregoing conversation was not conducted in a secure or private area, and that the Treatment Center personnel had recently levied institutional charges against Cadre 01 in hopes of curtailing his cooperation in the

investigation. Notably, Cadre 01 did not deny knowledge of the events – he only said that he could not discuss the incident.

49. Revealingly, after Special Agent Seagle completed his interview of Cadre 01, Warden Artrip chastised Cadre 01 for his comments to Special Agent Seagle, imploring, "why didn't you say you didn't see anything?"

50. Under the direction of the Virginia State Police, Cadre 01 was later removed from Treatment Center and moved to Bland Correctional Center without Cadre 01 being informed of the reason for his relocation. In an unannounced, rare extraction, the Virginia State Police later took Cadre 01 from Bland Correctional Center to Virginia State Police Headquarters in Wytheville where he was questioned about the circumstances of Mr. Givens' death. Cadre 01 agreed to submit to a polygraph examination. All interviews were preserved by audio/video recording. Examiner Travis Sykes reported that Cadre 01 had achieved the second highest truthfulness score ever obtained at that facility.

51. Cadre 01 identified the Defendants as the five officers who escorted Mr. Givens to the shower. He specifically identified the actions of each as noted above: Defendant Plummer snapped a rolled-up wet towel at Mr. Givens' genitals and other parts of his body; Defendants Jackson and Montgomery threw/dumped ice-cold water at/over Mr. Givens; and on multiple occasions, Defendant Sergeant Kelly entered the shower room and violently punched Mr. Givens in the ribs and torso area.

52. At the time of his interview, Cadre 01 did not know the medical examiner's determination of Mr. Givens' cause of death.

53. Cadre 01 stated that pictures of Mr. Givens' body after his death were circulated among the correctional officers on their cell phones, with "drawings" imposed over Mr. Givens' body.

54. Following the polygraph examination of Cadre 01, Special Agent Seagle quickly contacted the Office of the Chief Medical Examiner and learned that Dr. Goodman was no longer employed there, as he had left along with several other doctors. Special Agent Seagle requested contact information for Dr. Goodman, but he was told that the office could not provide him with the information.

55. The Assistant Chief Medical Examiner who took over Mr. Givens' case was Dr. Amy Tharp; on several occasions, she advised Special Agent Seagle and Mrs. Hobbs that she was unable to amend or change Dr. Goodman's report/findings without "overwhelming evidence." She asserted that new information from Cadre 01's interview, verified by video and polygraph evidence, was insufficient to change the report.

56. Counsel hired a private investigator to locate Dr. Goodman. Thereafter, counsel called Dr. Goodman and was told that the "policy" as explained by his successor Dr. Tharp was incorrect. He stated he would immediately call the State Police Investigator and the Commonwealth's Attorney Office in Smyth County. Dr. Goodman updated his findings and testified before a Smyth County Special Grand Jury where, upon information and belief, he opined that Mr. Givens' death was in fact **a homicide.**

57. Weeks prior to the Smyth County Special Grand Jury, Special Agent Seagle interviewed Defendant Osborne, who denied that anything of note occurred and stated that he was not in the area of the shower very long and was, instead, doing paperwork in the office. However, video evidence refutes this, showing Defendant Osborne in and around the shower room for almost the entirety of the incident.

58. In their written reports, the Defendants all denied the events described by Cadre 01. All described the process before, during and after Mr. Givens' shower as uneventful. None,

13

for example, said that Mr. Givens fell in the shower or his cell.  Further, the floors in the shower room and cells are flat.

59. Some of the Defendants testified that water could not be dumped on Mr. Givens from above the shower stall due to lack of clearance between it and the ceiling.  However, Special Agent Seagle took photographs of the area following this testimony and found their statements to be patently false regarding the clearance above the stall.  Correctional officers also stated that there were no buckets that could be used to dump cold water as the custodian had reported, but Special Agent Seagle's photographs included mop buckets in the shower area.

60. To date, the Office of the Chief Medical Examiner has not updated or changed Dr. Goodman's original report.

## VI. COUNTS

### COUNT I

### EXCESSIVE FORCE (in Violation of 42 U.S.C. § 1983)

### (Against Defendants Kelly, Plummer, Jackson, and Montgomery)

61. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

62. Defendants Kelly, Plummer, Jackson, and Montgomery's (the "Foregoing Defendants" in this count only) acts and omissions were conducted within the scope of their duties and employment and under color of state law.

63. The Foregoing Defendants' actions alleged in the foregoing Paragraphs of this Complaint constituted the use of excessive force against Mr. Givens in violation of the Eighth Amendment's prohibition against cruel and unusual punishment as incorporated against the states by the Fourteenth Amendment.

64. The Foregoing Defendants applied force to Mr. Givens maliciously and sadistically for the very purpose of causing harm, rather than in a good-faith effort to maintain or restore discipline.

65. As a direct and proximate result of the Foregoing Defendants' conduct, Mr. Givens was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of Foregoing Defendants' actions.

66. As a direct and proximate result of Foregoing Defendants' conduct, Mr. Givens died.

67. The Foregoing Defendants' actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Givens' rights, by reason of which Plaintiff is entitled to recover punitive damages.

68. The Foregoing Defendants' violations of the Eighth Amendment (as incorporated by the Fourteenth Amendment) establish a cause of action pursuant to 42 U.S.C. § 1983 for monetary relief consisting of compensatory damages, punitive damages, attorney's fees, and costs to the Plaintiff.

## COUNT II

## FAILURE TO INTERVENE (in Violation of 42 U.S.C. §1983)

### (Against Defendant Osborne)

69. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

70. Defendant Osborne's actions alleged in the foregoing Paragraphs of this Complaint demonstrate that he witnessed his colleagues' ongoing illegal acts, that he could have stopped his colleagues from attacking Mr. Givens, but failed to make any effort to do so in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

71. As a direct and proximate result of the failure to intervene by the Defendant Osborne, Mr. Givens sustained the injuries and damages previously described in this Complaint and died.

72. Defendant Osborne's failure to intervene to prevent the use of excessive force against Mr. Givens establishes causes of action for monetary relief consisting of compensatory damages, punitive damages, and costs (including attorneys' fees) to the Plaintiff.

## COUNT III

## STATE LAW BATTERY

**(Against Defendants Kelly, Plummer, Jackson, and Montgomery)**

73. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

74. Defendants Kelly, Plummer, Jackson, and Montgomery's (the "Foregoing Defendants" in this count only) actions alleged in the foregoing paragraphs of this Complaint constituted and caused an intentional, unlawful, unwanted and harmful touching (and/or touchings), without legal justification, which constitutes a battery.

75. The Foregoing Defendants acted consciously in disregard of Mr. Givens' rights, or with reckless indifference to the consequences, and was aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to Mr. Givens.

76. As a direct and proximate result of the battery by the Foregoing Defendants, Mr. Givens sustained the injuries and damages previously described in this Complaint and died.

77. As a direct and proximate cause of the battery by the Foregoing Defendants, which contributed to and was the proximate cause of Mr. Given's injuries and death, the Statutory Beneficiary has sustained damages, including, but not limited to: sorrow, mental

anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent.

90. As a direct and proximate cause of the battery by the Foregoing Defendants, which was the proximate cause of Mr. Given's injuries and death, the Estate of Mr. Givens sustained damages, including, but not limited:

    a. Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

    b. Reasonable funeral/cremation expenses.

91. The Foregoing Defendants' battery establishes a cause of action for monetary relief consisting of compensatory damages, punitive damages, and costs to the Plaintiff.

## COUNT IV

## GROSS NEGLIGENCE

**(Against Defendant Osborne)**

92. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

93. Defendant Osborne, in violation of the duties he owed to Mr. Givens, allowed Defendants Kelly, Plummer, Jackson, and Montgomery to savagely beat Mr. Givens. Defendant Osborne's failure to act to assist Mr. Givens would shock fair minded people and demonstrates a lack of even some degree of care being exhibited towards Mr. Givens.

94. As a direct and proximate cause of Defendant Osborne's gross negligence, Mr. Givens sustained the injuries and damages previously described in this Complaint and died.

95. As a direct and proximate cause of the Defendant Osborne's gross negligence, which contributed to and was a proximate cause of Mr. Given's injuries and death, the Statutory Beneficiary has sustained damages, including, but not limited to: sorrow, mental anguish, and

17

solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent.

96. As a direct and proximate cause of the Defendant Osborne's gross negligence, which was a proximate cause of Mr. Given's injuries and death, the Estate of Mr. Givens sustained damages, including, but not limited:

    a. Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

    b. Reasonable funeral/cremation expenses.

97. Defendant Osborne's gross negligence establishes a cause of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

## COUNT V
## WILLFUL AND WANTON NEGLIGENCE
### (Against Defendant Osborne)

98. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

99. Defendant Osborne, in violation of the duties he owed to Mr. Givens, allowed Defendants Kelly, Plummer, Jackson, and Montgomery to savagely torture and beat Mr. Givens.

100. Due to the prolonged nature of the abuse and Defendant Osborne's knowledge of Mr. Givens' circumstances and history, Defendant Osborne knew that his failure to stop, or attempt to stop, the beating of Mr. Givens would cause great harm to Mr. Givens. His failure to take any action constitutes willful and wanton negligence and entitles the Plaintiff to recover punitive damages.

101. As a direct and proximate cause of Defendant Osborne's willful and wanton negligence, Mr. Givens sustained the injuries and damages previously described in this Complaint and died.

102. As a direct and proximate cause of the Defendant Osborne's willful and wanton negligence, which contributed to and was a proximate cause of Mr. Given's injuries and death, the Statutory Beneficiary has sustained damages, including, but not limited to: sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent.

103. As a direct and proximate cause of the Defendant Osborne's willful and wanton negligence, which was a proximate cause of Mr. Given's injuries and death, the Estate of Mr. Givens sustained damages, including, but not limited:

   a. Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

   b. Reasonable funeral/cremation expenses.

104. Defendant Osborne's willful and wanton negligence establishes a cause of action for monetary relief consisting of compensatory damages, punitive damages, and costs to the Plaintiff.

## VII. JURY TRIAL DEMANDED

105. Plaintiff demands that all issues of fact of this case be tried to a properly impaneled jury to the extent permitted under the law.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants Anthony Raymond Kelly, Gregory Scott Plummer, Joshua Caleb Jackson, William Zachary Montgomery, and Samuel Dale Osborne in the amount of $15

19

million, or in such greater amount to be determined at trial, costs, pre-judgment interest, attorneys' fees (in connection with the federal civil rights claims), punitive damages in an amount to be determined at trial (in connection with the federal civil rights claims and the state battery and willful and wanton negligence claims) asserted herein and grant such other and further relief that the Court may deem appropriate.

**TRIAL BY JURY IS DEMANDED.**

KYMBERLY HOBBS, ADMINISTRATOR
OF THE ESTATE OF CHARLES JAMES
GIVENS, DECEASED,

By: /s/ Mark J. Krudys
 Counsel

| | | |
|---|---|---|
| C. Paul Stanley, III | Thomas M. Jackson, Jr. | Mark J. Krudys |
| VSB No. 36789 | VSB No. 21804 | VSB No. 30718 |
| C. PAUL STANLEY ATTORNEY AT LAW | THE JACKSON LAW GROUP, PLLC | Danny Zemel |
| 390 West Spring Street | P.O. Box 845 | VSB No. 95073 |
| Wytheville, VA 24382 | Wytheville, VA 24382 | THE KRUDYS LAW FIRM, PLC |
| Phone: (276) 228-4003 | Phone: (276) 228-2323 | 919 East Main Street, Suite 2020 |
| Fax: (276) 276-228-2984 | Fax: (276) 625-0613 | Richmond, VA 23219 |
| Email: cpst3d@gmail.com | Email: tom.jackson@tomjacksonlaw.com | Phone: (804) 774-7950 |
| | | Fax: (804) 381-4458 |
| | | Email: mkrudys@krudys.com; dzemel@krudys.com |

*Counsel for Plaintiff Kymberly Hobbs, Administrator of the Estate of Charles James Givens, Deceased*