UNITED STATES DISTRICT COURT
FOR THE WESTERN DIVISION
Abingdon Division

KYMBERLY HOBBS, ADMINISTRATOR
OF THE ESTATE OF CHARLES JAMES GIVENS,
DECEASED,

      Plaintiff,

                                                                  Civil Action No.: 1:23-cv-00003

v.

ANTHONY RAYMOND KELLY, et al.,

      Defendants.

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT OSBORNE'S PARTIAL MOTION TO DISMISS**

Plaintiff Kymberly Hobbs, Administrator of the Estate of Charles James Givens, deceased, by counsel, and for her Memorandum in Opposition to Defendant Samuel Dale Osborne's Partial Motion to Dismiss, states:

**INTRODUCTION**

Charles J. Givens was beaten to death on February 5, 2022, by correctional officers at the Marion Correctional Treatment Center ("the Prison"). Defendant Samuel Osborne helped his fellow Defendants Officers Kelly, Plummer, Jackson, and Montgomery take Mr. Givens to the shower after he defecated on himself due to his illnesses. Defendant Osborne sat by and watched as those officers beat Mr. Givens mercilessly. Osborne then took Mr. Givens back to his cell and left him there to bleed to death. Defendant Osborne now seeks to dismiss the state law gross and willful and wanton negligence claims against him on the basis that he owed no legal duty to Mr. Givens. That assertion is false. Virginia recognizes, as a matter of law, that correctional officers owe a duty to protect those they incarcerate. And even if this Court finds that duty did not exist

as a matter of law, the facts of this case have created a special relationship between Defendant Osborne and Mr. Givens that created a duty.  Plaintiff has adequately pled claims for gross and willful and wanton negligence against Defendant Osborne and his claims should be allowed to proceed to discovery.

## RELEVANT FACTS FROM THE COMPLAINT

Charles Givens had a limited intellectual capacity. ¶ 12.[1]  Mr. Givens' intellectual and emotional development never exceeded that of a second or third grade child. *Id*.  He also suffered from Crohn's disease and would sometimes defecate on himself. ¶ 13.  The correctional officers at the Prison knew Mr. Givens could not fully control his bowels. ¶ 14.  But some of them would become angry at having to assist in cleaning him up and assert, without basis, that Mr. Givens was doing it on purpose. ¶ 14.

Mr. Givens was abused constantly at the Prison.  Staff assaulted Mr. Givens with hot tap water. ¶ 16.  On cold nights, they opened windows in his cell that he could not reach, causing him to go into hypothermic shock and be sent to the hospital numerous times. ¶¶ 17-22.  Hospital and autopsy records indicate that Mr. Givens had been beaten numerous times before the fatal attack. ¶¶ 19, 23.  Correctional officers and other treatment center staff lied to Mr. Givens' sister and to emergency room staff about the cause of Mr. Givens' injuries. ¶¶ 15, 16, 19.

The morning of February 5, 2022, Mr. Givens defecated on himself. ¶ 25.  The five Defendants came to Mr. Givens' cell at 7:18 a.m. to take him to the shower area.  The alleged purpose of the shower was to clean Mr. Givens up. *Id.*  This task usually only required one or two officers, not five. ¶ 26.  Of the Defendants, only Defendant Osborne was assigned to Mr. Givens' cell area. ¶ 27.  Once in the shower area—which the Defendants, including Osborne, knew had no

---

[1] All paragraph citations are to Plaintiff's Complaint, ECF Number 1.

cameras—Mr. Givens was savagely beaten. ¶¶ 29-31. Defendant Osborne sat by and watched as the other four Defendants, right in front of Osborne, dumped ice-cold water on Mr. Givens, punched him in the torso, and snapped a wet towel on him leaving welts. ¶¶ 23, 31. Osborne did not alert superiors, attempt to intervene, or take any other action for Mr. Givens.

This occurred for roughly twenty minutes until Mr. Givens was returned to his cell. ¶ 34. He requested medical attention but was denied by the Defendants. *Id*. Defendant Osborne performed at least one surveillance round after this, but he provided no care to Mr. Givens. ¶ 35. He left him to bleed to death in his cell. ¶ 45. Approximately an hour later, Mr. Givens would be found unresponsive. *Id*. He would be declared dead at 9:35 a.m. on February 5, 2022.

Indicative of their knowledge of their wrongdoing, the Defendants all lied about their involvement in Mr. Givens' murder.[2] The Defendants wrote statements asserting that nothing out of the ordinary happened in the shower room that day. ¶ 33. When interviewed by a Special Agent from the Virginia State Police, Defendant Osborne said he was barely in the shower area and spent most of the time in the office doing paperwork. ¶ 57. Video evidence shows this to be a lie; Defendant Osborne was in the vicinity of the shower room for the vast majority of the attack. *Id*.

The coverup of the murder went beyond just that dishonesty. A few hours after Mr. Givens' death, the Warden of the Prison, Jeffery Artrip, called Mr. Givens' sister (and the administrator of his estate), Kymberly Hobbs, and told her that her brother died of "natural causes." ¶ 38. An investigation was eventually opened into Mr. Givens' death, but the Warden of the Prison, Warden Artrip, made false accusations of bias and was able to have the Virginia Department of Corrections investigator removed from the investigation. ¶ 39. A new investigator from the Virginia State

---

[2] While the Office of the Chief Medical Examiner has not declared the death to be a homicide, ¶ 60, the doctor who performed the autopsy, Dr. Goodman, testified to a Smyth County Special Grand Jury that the death was in fact a homicide. ¶ 56.

Police, Special Agent Seagle, was selected. ¶ 40. Inmates who had witnessed what happened to Mr. Givens and tried to assist the investigation were mysteriously charged with institutional violations that had alleged occurred months earlier. ¶ 44. One of witnesses was even chastised by the Warden for not lying to investigators. ¶ 49. Correctional officers even circulated pictures of Mr. Givens' dead body on their cell phones. ¶ 53. So far, no criminal charges have been brought against these officers.

## ARGUMENT

Mr. Givens was "a vulnerable individual in a custodial relationship" with, among others, Defendants Osborne. *A.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 622 (2019). That relationship "imposes a duty of reasonable care upon" Defendant Osborne to "protect the vulnerable individual in his custody"—Mr. Givens. *Id*. This relationship is described in the Second Restatement of Torts, which Virginia follows. And even if this Court finds such a relationship does not exist as a matter of law, the facts alleged in the Complaint created a special relationship between Defendant Osborne and Mr. Givens "which imposed a duty upon [Osborne] to render assistance to [Mr. Givens]." *Burdette v. Marks*, 244 Va. 309, 312 (1992). At the very least, Osborne owed Mr. Givens the same duty he "owed to mankind generally"—a duty of ordinary care. *Overstreet v. Sec. Storage & Safe Deposit Co.*, 148 Va. 306, 317 (1927). Lastly, Defendant Osborne's actions and inactions as described in the Complaint state a claim for gross and willful and wanton negligence. His Partial Motion to Dismiss should be denied.

### I.      Standard of Review

To satisfy Federal Rule of Civil Procedure 8(a)(2), a complaint simply must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A Rule 12(b)(6) motion "tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding

4

the facts, the merits of a claim, or applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). To survive a motion to dismiss, a complaint must contain "sufficient factual matter…to state a claim to relief that is plausible on its face." *Acorn Land, LLC v. Balt. County,* 402 Fed. Appx. 809, 816 (4th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Smith v. Parker*, No. 7:19-cv-410, 2020 U.S. Dist. LEXIS 94831, at *3 (W.D. Va. May 31, 2020) (quoting *Ashcroft*, at 678).

## II.     Defendant Osborne had a duty to protect Mr. Givens.

A negligence case requires "a legal duty, a violation of the duty, and consequent damage." *Fox v. Custis*, 236 Va. 69, 73 (1988). Defendant Osborne challenges only the first requirement. He argues that he did not owe any legal duty to Mr. Givens and therefore cannot be held responsible for the actions of third parties. *See* ECF 20.1, at 4-5. Contrary to that assertion, Defendant Osborne did have a special relationship with Mr. Givens such that he had a duty to protect Mr. Givens from harm.

Ordinarily, "a person has no duty to control the conduct of third persons in order to prevent physical harm to another." *Burdette v. Marks*, 244 Va. 309, 311 (1992). Of relevance here, that rule does not apply when a "special relationship exists…between the defendant and the plaintiff which gives a right to protection to the plaintiff." *Id*. at 312. These special relationships can exist "as a matter of law" (*de jure*) or due to the "particular factual circumstances in a given case" (*de facto*). *Thompson v. Skate Am., Inc.*, 261 Va. 121, 129 (2001).

Under Virginia law, correctional officers have a special relationship with the inmates in their charge. And, even if that relationship does not exist as a matter of law, the facts in this

circumstance gave rise to one. Lastly, even if this Court finds that no special relationship existed, Defendant Osborne still owed the common law duty to act with ordinary care towards Mr. Givens.

> **A.     Defendant Osborne had a special relationship with Mr. Givens by nature of his position as a correctional officer.**

Prison staff have a special relationship with the people they incarcerate. To determine whether a special relationship exists, the Supreme Court of Virginia has routinely used the Second Restatement of Torts. *See Shoemaker v. Funkhouser*, 299 Va. 471, 480 (2021); *A.H. v. Rockingham Publ'g Co.*, 255 Va. 216, 220 (1998); *Fox v. Custis*, 236 Va. 69, 74 (1988). Section 315 of the Restatement sets out the basic principles governing special relationships. It holds:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless:
>
> > (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> >
> > (b) a special relation exists between the actor and the other which gives to the other a right to protection.

Restatement (Second) of Torts § 315 (1977).

In the comments to this Section, the Restatement provides elaboration on what relationships count as special relationships. Comment C states that "relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314A and 320." Restatement (Second) of Torts § 315, cmt. c (1977). Section 320, in turn, states that taking someone into custody creates a special relationship:

> One who is required by law to take or who voluntarily takes the custody of another under circumstances as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor:
>
> > (a) knows or has reason to know that he has the ability to control the

6

>     conduct of the third persons, and
>
>     (b) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 320 (1977).[3]

Here, Defendant Osborne had custody of Mr. Givens, thus depriving Mr. Givens of his ability to protect himself. As a correctional officer, Defendant Osborne was in a position of authority at the Prison and had the ability to take actions and precautions[4] to protect Mr. Givens. He knew, or should have known, that Mr. Givens was at risk of serious injury and needed to be protected. Defendant Osborne therefore had a legal duty to protect Mr. Givens from violence perpetrated by third parties.

> i. **Virginia caselaw recognizes a *de jure* special relationship between inmates and those who incarcerate them as laid out in the Restatement (Second) of Torts.**

Defendant Osborne contends, without a single citation, that "the Virginia Supreme Court, despite being given numerous opportunities to do so has never found that" a special relationship between correctional officers and inmates exists. ECF 20,1, at 4-5. This is not an accurate statement of the law. First, Plaintiff is unaware of the "numerous opportunities" Defendant Osborne is referring to and he provides no citations to support this assertion. Second, and more importantly, Virginia has recognized a *de jure* special relationship between correctional officers

---

[3] The Third Restatement has simplified this to: "a custodian with those in its custody, if: (a) the custodian is required by law to take custody or voluntarily takes custody of the other; and (b) the custodian has a superior ability to protect the other." Restatement (Third) of Torts § 40 (b)(7) (2010).

[4] Comment d to Section 320 of the Second Restatement explains that: "One who has taken custody of another may not only be required to exercise reasonable care for the other's protection when he knows or has reason to know that the other is in immediate need of it, but also to make careful preparations to enable him to give effective protection when the need arises, and to exercise reasonable vigilance to ascertain the need of giving it." Restatement (Second) of Torts § 320 (1977).

and inmates.  In addition to the sections of the Second Restatement of Torts referenced above, which Virginia follows, caselaw from the Supreme Court of Virginia ("SCV") has recognized this special relationship between prison staff and those they incarcerate.

In *Williams v. Commonwealth*, the SCV addressed whether an error that caused an individual to spend time in prison before involuntary commitment, as opposed to receiving time for their prison sentence while involuntary committed, resulted "in a grave injustice." 294 Va. 25, 28 (2017).[5]  Williams argued that "imposing his incarceration before his involuntary civil commitment is manifestly unjust because it deprives him of mental health treatment that he needs." *Id*. at 29.  In rejecting this argument, the SCV noted that prisons are "required to provide inmates with medical care and treatment." *Id*.  While arguably dicta, the SCV also stated that the Department of Corrections is "*responsible for Williams' safety* and the safety of others with whom he comes into contact during his period of incarceration." *Id*. at 29 n. 3 (emphasis added). *See also Shoemaker v. Funkhouser*, 299 Va. 471, 480 n. 3 (2021) (noting that the Second Restatement, which Virginia follows, recognizes the "duty of person having custody of another to control conduct of third persons") *A.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 622 (2019) (holding that Virginia law recognizes "a special relationship exists between a vulnerable individual in a custodial relationship and his or her custodian"); *Delk v. Colombia/HCA Healthcare Corp.*, 259 Va. 125, 132-36 (2000) (finding a special relationship between a woman and the psychiatric hospital she was committed to).

Federal courts in Virginia applying state law have held that prison officials have a duty to protect those in their case from third-party assaults.  The most exhaustive analysis was performed

---

[5] This determination was being made in the context of whether the Court could review the alleged error as it had not been raised below.

Chief Judge Mark Davis in *Wright v. Peninsula Reg'l Jail Auth.*, No. 2:19-cv-189, 2020 U.S. Dist. LEXIS 38155 (E.D. Va. March 4, 2020).  After noting that the SCV has never "specifically addressed the duty of care owed by a prison official to a prisoner," Chief Judge Davis went on to note that "a review of Virginia's existing duty of care case law is instructive." *Id*. at *43.[6]  Citing to *A.H. v. Church of God* and *Delk v. Columbia/HCA Healthcare* and the lack of "any case that has held that prison officials do not owe a duty of care to their prisoners," Chief Judge Davis concluded that there is "no reason to depart from the reasoning of the Restatement, the decisions directly on point by other courts, and Virginia's recognition of a custodian/vulnerable individual special relationship." *Id*. at *44.  The reasoning in *Wright* was then adopted in *Rucker v. Piedmont Regional Jail*, No. 3:21-cv-412, 2021 U.S. Dist. LEXIS 164359, at *21 (E.D. Va. Aug. 30, 2021). And in *Singleton v. Wade*, the district court accepted the plaintiff's assertion that the defendants had a duty to "protect inmates from harm from other prisoners." No. 3:21-cv-553, 2022 U.S. Dist. LEXIS 169825, at *22 (E.D. Va. Sept. 19, 2022).

Lastly, while certainly not binding authority, the discussion by the United States Supreme Court in *Minneci v. Pollard*, 565 U.S. 118 (2012), is instructive.  In *Minneci*, the US Supreme Court addressed whether to "imply the existence of an Eighth Amendment-based damages action (a *Bivens* action) against employees of a privately operated federal prison." *Id*. at 120 (citing *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 389 (1971)).  The Court ruled that no implied cause of action exists because "state tort law authorizes adequate alternative damages actions." *Id*. The plaintiff in *Minneci*, Richard Pollard, had brought a claim for denial of medical care against a privately-operated prison holding federal prisoners. *Id*. at 121-22.  As a part of its ruling, the Court

---

[6] Chief Judge Davis also noted that courts that have considered this issue have found that prison officials are in a special relationship with inmates as that is defined in the Second Restatement of Torts. *Id*. at 42-43 (collecting cases).

discussed Mr. Pollard's potential remedies under state tort law. *Id*. at 126-129.  Mr. Pollard's claims would have to be brought in California state court, but the Supreme Court noted that "California's tort law basically reflects general principles of tort law present, as far as we can tell, in the law of every State." *Id*. 128.  As support for this, the Court cited to Section 314 of the Restatement (Second) of Torts. *Id*.  While Virginia was not in this list, the Court provided specific citations for this statement of law for all eight states where private federal prisons were located at the time. *Id*. at 128-29 (collecting cases).  *Minneci* demonstrates that a holding that a special relationship existed in this case is merely a recognition of well-established common law principles.

Defendant Osborne owed a duty to protect the helpless Mr. Givens.  The Supreme Court of Virginia looks to the Second Restatement of Torts when determining whether a special relationship exists in a certain circumstance.  Restatement Section 320 restates the common law rule that "the actor who takes custody of a prisoner…is properly required to give him the protection which the custody or the manner in which it is taken has deprived him." Restatement (Second) of Torts § 320, cmt. b (1977).  The Supreme Court of Virginia has, albeit in dicta, affirmed this principle.  And numerous federal courts, applying Virginia law, have found a special relationship exists between prison staff and those they incarcerate.

          ii.        **The fact that the assault was performed by fellow officers here as opposed to other inmates is a distinction without a difference.**

It makes no difference here that the risk of harm faced by the Plaintiff originated with a correctional officer rather than fellow prisoner.  Defendant Osborne had a duty to protect the Mr. Givens from a risk of harm regardless of the source.  Suppose that a correctional officer overhears two conversations, one in which a *prisoner* is planning to "rough up" a prisoner, and another one in which a *guard* is planning to kill a prisoner.  It would be patently absurd to hold that the officer must protect the prisoner from being roughed up but can stand by and watch as the prisoner is

murdered. Thankfully, the law does not compel such an absurd result.

### iii. Even if a *de jure* special relationship does not exist, the circumstances created a *de facto* special relationship.

A special relationship can be temporarily established based on the specific circumstances of a case. In determining whether one has been established, the SCV has instructed courts to consider whether the defendant "reasonably could have foreseen that he would be expected to take affirmative action to protect [the plaintiff] from harm." *Burdette v. Marks*, 244 Va. 309, 312 (1992). In *Burdette*, the SCV ruled that a special relationship did exist in that case because the defendant has the capacity to subdue the assailant and knew or should have known that the plaintiff was in "great danger of serious bodily injury or death." *Id*.

If this Court finds that a special relationship does not exist as a matter of law, it should follow the reasoning in *Burdette* and find that Defendant Osborne knew (or should have known) of the risk to Mr. Givens and had the capacity to render assistance to him, thus creating a special relationship. Mr. Givens had previously been attacked by correctional officers at the Prison. ¶¶ 15-23. Defendant Osborne worked at the Prison during this time and at times was assigned to the area where Mr. Givens' cell was located. ¶ 27. The previous attacks on Mr. Givens gave Defendant Osborne warning that future attacks would occur. *See* ¶¶ 15-23. As a correctional guard at the Prison, Defendant Osborne had the capacity to assist Mr. Givens, creating a *de facto* special relationship in these circumstances.

Moreover, while normally whether a duty exists is a pure question of law, *Quisenberry v. Record No. 171494 Huntington Ingalls, Inc.*, 296 Va. 233, 241 (2018), here the existence of a duty turns on questions of fact, making it a mixed question of law and fact. *See MicroStrategy Inc. v. Li*, 268 Va. 249, 264 (2004). If the Court finds that questions of fact here would determine whether a duty exists, the Court may defer ruling on this issue until a more thorough factual record is

11

available at the summary judgment stage.

### B. In the alternative, Defendant Osborne owed Mr. Givens a general duty to act with ordinary care.

Even assuming for the sake of argument that a special relationship did not exist between Defendant Osborne and Mr. Givens, Defendant Osborne still owed a duty of ordinary care to Mr. Givens.  Virginia follows the established common-law rule that when "the circumstances attending the situation are such that an ordinary prudent person could reasonably apprehend that, as a natural and probably consequence of his act, another person rightfully there will be in danger of receiving an injury, a duty to exercise ordinary care to prevent such injury arises." *Overstreet v. Sec. Storage & Safe Deposit Co.*, 148 Va. 306, 318 (1927).  Here, Defendant Osborne "owed a duty of ordinary care to [Mr. Givens] based on the recognizable risk of harm to [Mr. Givens] that could result from his inactions." *Amisi v. Riverside Reg'l Jail Auth.*, 469 F. Supp. 3d 545, 573 (E.D. Va. 2020) (cleaned up).  This is especially true because he could reasonably foresee the harm that would befall Mr. Givens if he did not act. *See id*. (citing *Overstreet*, at 317).

The duty of ordinary care is not an abstract one: "a specific course of conduct gives rise to a specific duty extending to specific persons." *Quisenberry*, at 242.  This duty does not rely on any special relationship.  All that is required "is a sufficient juxtaposition of the parties in time and space *to place the plaintiff in danger from the defendant's acts*." *Id*. at 244 (quoting *RGR, LLC v. Settle*, 288 Va. 260, 280 (2014)) (emphasis in original).  The specific circumstances here—that Mr. Givens had limited mental capacity, Defendant Osborne was aware of previous attacks on Mr. Givens and could reasonably foresee them happening again, and Defendant Osborne's position of authority—created a duty by Defendant Osborne to specifically protect Mr. Givens from being attacked by other correctional officers.  And an ordinarily prudent person would have known that taking Mr. Givens to the shower and failing to protect him from the other officers would put Mr.

12

Givens in danger of severe injury.  Or even death, as unfortunately did happen.  Defendant Osborne owed a duty to protect Mr. Givens and he breached that duty in an abhorrent fashion.

### III. Plaintiff has adequately pled claims of gross and willful and wanton negligence.

Defendant Osborne only addressed whether a duty exists in his Partial Motion to Dismiss.[7]  Accordingly, if this Court finds that Defendant Osborne owed Mr. Givens a duty then the present Motion to Dismiss should be denied.  However, out of an abundance of caution, Plaintiff will briefly address why the facts demonstrate that Defendant Osborne did breach his duty to Mr. Givens and acted with gross negligence and willful and wanton negligence.

#### A. Legal Standards.

Gross negligence is "such a degree of negligence as would shock fair minded [people] although something less than willful recklessness." *Ferguson v. Ferguson*, 212 Va. 86, 92 (1971). "Several acts of negligence which separately may not amount to gross negligence, when combined may have a cumulative effect of showing a form of reckless or total disregard for another's safety." *Elliott v. Carter*, 292 Va. 618, 622 (2016) (quoting *Chapman v. City of Virginia Beach*, 252 Va. 186, 190 (1996)).  The distinction between "ordinary negligence and gross negligence is one of degree," not one of "kind." *Green v. Ingram*, 269 Va. 281, 292 (2005).  Gross negligence claims are evaluated based on an objective, reasonable person standard, *Hixson v. Hutcheson*, No. 5:17-cv-032, 2019 U.S. Dist. LEXIS 11326 *19 (W.D. Va. Jan. 23, 2019).  Whether a defendant has acted with gross negligence is a question of fact normally reserved for the jury. *See Griffin v.*

---

[7] Even if the Court finds no duty to protect Mr. Givens, Defendant Osborne violated his duty to provide Mr. Givens with medical care when he left Mr. Givens to die in his cell after being beaten by the other Defendants.  Defendant Osborne was responsible for conducting surveillance rounds, including of Mr. Givens' cell. ¶ 35.  He walked by Mr. Givens cell and knew that Mr. Givens was hurt and needed medical assistance.  Mr. Givens had asked for medical assistance but was denied.  He would be dead within the hour.  The failure by Defendant Osborne to provide Mr. Givens with access to medical care constitutes gross and willful and wanton negligence.

*Shively*, 227 Va. 317, 320 (1984).

Willful and wanton negligence is defined as an "action taken in conscious disregard of another's rights, or with reckless indifference to consequences that the defendant is aware, from his knowledge of existing circumstances and conditions, would probably result from his conduct and cause injury to another." *Kaltman v. All American Pest Control, Inc.*, 281 Va. 483, 494 (2011) (quoting *Alfonso v. Robinson*, 257 Va. 540, 545 (1999)). Additionally, "evidence that a defendant had prior knowledge or notice that his actions or omissions would likely cause injury to others is a significant factor in considering issues of willful and wanton negligence." *Alfonso*, at 546. Willful and wanton negligence also is normally an issue of fact for the jury to determine. *See Griffin v. Shively*, 227 Va. 317, 320 (1984).

> **B.   The Complaint contains sufficient facts to make the claims for gross negligence and willful and wanton negligence against Defendant Osborne plausible.**

Defendant Osborne sat by and watched Mr. Givens get beaten to death in front of his eyes. His failure to act would certainly shock fair minded people. Defendant Osborne took absolutely no action to aid Mr. Givens. In the words of *Elliott v. Carter*, he did not even provide "some care." He just watched the beating and then dumped Mr. Givens back in his cell to finish bleeding to death. Defendant Osborne knew that Mr. Givens was attacked and abused by staff the Prison. He knew what was going to happen to Mr. Givens in that shower. But he did absolutely nothing to try to stop the attack or aid Mr. Givens afterwards. He even helped the attackers try to cover up their murder. Those facts state a claim for gross negligence and willful and wanton negligence.

## CONCLUSION

Virginia common law recognizes a special relationship between correctional officers and prisoners such that the officers, like Defendant Osborne here, owe the inmates in their charge a duty to protect them. Even if the Court disagrees with this conclusion, the circumstances here

14

created a temporary special relationship between Defendant Osborne and Mr. Givens. Defendant Osborne had a duty to protect Mr. Givens. Instead, he watched Mr. Givens be beaten to death and did nothing. His Partial Motion to Dismiss should be denied.

Respectfully submitted,

By: \_\_\_\_/s/ Danny Zemel_____
                    Counsel

Mark J. Krudys (VSB No. 30718)
Daniel Zemel (VSB No. 95073)
THE KRUDYS LAW FIRM, PLC
919 East Main Street, Suite 2020
Richmond, Virginia 23219
Phone: (804) 774.7950
Fax: (804) 381.4458
Email mkrudys@krudys.com; dzemel@krudys.com

C. Paul Stanley, III (VSB No. 36789)
C. PAUL STANLEY ATTORNEY AT LAW
390 West Spring Street
Wytheville, VA 24382
Phone: (276) 228-4003
Fax: (276) 276-228-2984
Email: cpst3d@gmail.com

Thomas M. Jackson, Jr. (VSB No. 21804)
THE JACKSON LAW GROUP, PLLC
P.O. Box 845
Wytheville, VA 24382
Phone: (276) 228-2323
Fax: (276) 625-0614
Email: tom.jackson@tomjacksonlaw.com

*Counsel for Plaintiff Kymberly Hobbs, Administrator of the Estate of Charles James Givens, Deceased*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of March 2023, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing all counsel of record.

         /s/ Danny Zemel
      Daniel Zemel (VSB# 95073)
      THE KRUDYS LAW FIRM, PLC
      919 East Main Street, Suite 2020
      Richmond, Virginia 23219
      804.774.7950 Phone
      804.381.4458 Fax
      dzemel@krudys.com
      *Counsel for Plaintiff*