**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DIVISION**
ABINGDON DIVISION

KYMBERLY HOBBS, ADMINISTRATOR
OF THE ESTATE OF CHARLES JAMES GIVENS,
DECEASED,

        Plaintiff,

v.

ANTHONY R. KELLY,

GREGORY S. PLUMMER,

JOSHUA C. JACKSON,

WILLIAM Z. MONTGOMERY,

SAMUEL D. OSBORNE,

TRAVIS S. POSTON, and

JEFFERY ARTRIP,

        Defendants.

Civil Action No.: 1:23-cv-00003

**JURY TRIAL DEMANDED**

**AMENDED COMPLAINT**

COMES NOW Plaintiff Kymberly Hobbs, Administrator of the Estate of Charles James Givens, Deceased, by counsel, and moves this Court for judgment against Defendants Anthony R. Kelly, Gregory S. Plummer, Joshua C. Jackson, William Z. Montgomery, Samuel D. Osborne, Travis S. Poston, and Jeffery Artrip, stating as follows:

**I.    SUMMARY**

1.    Charles J. Givens, a mentally disabled 52-year-old prisoner who had suffered a traumatic brain injury as a child, was savagely beaten and tortured by correctional officers ("COs") at Marion Correctional Treatment Center (hereinafter "Treatment Center" or "MCTC"). On February 5, 2022, Defendants Sergeant Kelly, and COs Plummer, Jackson, and Montgomery

attacked Mr. Givens in the shower room following Mr. Givens having accidentally defecated on himself; Mr. Givens suffered from Crohn's disease. During the attack, Defendants Jackson and Montgomery poured and/or threw ice-cold water on Mr. Givens, Defendant Plummer whipped Mr. Givens with wet towels, and Defendant Kelly brutally punched Mr. Givens in the side.  The gang of COs then returned Mr. Givens to his cell despite his pleas for medical help at the prison medical unit ("Medical") and his obvious distress and need for emergency medical treatment. Two hours passed.  During that time, Mr. Givens was left to languish.  No Defendant sought emergency medical care for Mr. Givens.  Defendant Osborne, who was responsible for "rounding" on Mr. Givens, stayed silent, both during and following the assault. Despite finding Mr. Givens breathing in a "labored manner" in his cell, Osborne did not call for help on his radio – instead he went to the bathroom in the middle of Mr. Givens' health crisis. Mr. Givens was later declared dead.

2.     The Assistant Chief Medical Examiner ("ME") determined that Mr. Givens suffered "blunt force trauma" to his torso and acute rib fractures, resulting in the laceration of his spleen and "massive associated internal bleeding."  Indicative of the regular physical abuse carried out by MCTC COs, the ME found **previously inflicted**, unhealed bruises in the same area where Mr. Givens was fatally punched by Defendant Kelly.  Indeed, a review of documents and statements of eyewitnesses indicate that the attack that resulted in Mr. Givens' death was the last of at least *15* instances of documented abuse carried out by MCTC COs upon Mr. Givens, some at the hands of the Defendant COs who assaulted him on February 5, 2022.  Two supervisors – Defendants Captain Poston and Warden Artrip – disregarded obvious physical evidence of repeated beatings and torture carried out by MCTC COs, including by Defendants Kelly, Plummer, Jackson, and Montgomery, upon Mr. Givens.  The indifference of these supervisors to CO violence and cruelty against Mr. Givens (and other prisoners) created an

2

environment of no accountability for such actions, which was no doubt seen as tacit approval, which directly resulted in Mr. Givens' death.

## II.     JURISDICTION

3.      Jurisdiction exists in this case pursuant to the Eighth and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 1331, 1343.  Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C.§ 1367 (a), over the state law claims, including claims alleged pursuant to Virginia Code § 8.01-50 *et seq*. (wrongful-death statute), or, alternatively, pursuant to Virginia Code § 8.01-25 *et seq*. (survival statute).  All relief available under the foregoing statutes is sought herein by Plaintiff.

## III.    VENUE

4.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

5.      Assignment to the Abingdon Division of the Western District of Virginia is proper pursuant to Western District of Virginia Local Rules 2(a)(3) and 2(b), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## IV.    PARTIES

6.      Plaintiff KYMBERLY HOBBS is, and was at all relevant times, a resident of Alabama.  On May 13, 2022, Mrs. Hobbs duly qualified as Administrator of the Estate of Charles James Givens, Deceased, in the Smyth County Circuit Court, under the applicable provisions of law.  A copy of the Certificate/Letter of Qualification is attached hereto, marked as **Exhibit A**.  Plaintiff brings this action in her capacity as ADMINISTRATOR OF THE ESTATE OF CHARLES JAMES GIVENS, DECEASED, pursuant to, among other statutes, Virginia Code § 8.01-50 *et seq.* (wrongful-death statute), and, alternatively, pursuant to Virginia Code §

8.01-25 *et seq*. (survival statute).  All relief available under the foregoing statutes is sought herein by Plaintiff.

7.     Defendant ANTHONY R. KELLY was, at all relevant times, an agent and/or employee of the Virginia Department of Corrections ("VDOC") working as a sergeant at the Treatment Center.  His supervisors had long considered Kelly to be a substandard CO, but Defendants Captain Poston and Warden Artrip nonetheless retained him.  On February 5, 2022, Kelly viciously punched Mr. Givens in his side, conduct which, the facts suggest, he had engaged in on previous occasions.  Following the attack on Mr. Givens, Defendant Kelly demoted himself, and then was finally fired.  At all relevant times, Defendant Kelly was acting within the scope of his employment and/or agency with VDOC and under color of state law. Defendant Kelly is sued in his individual capacity.

8.     Defendant GREGORY S. PLUMMER was, at all relevant times, an agent and/or employee of VDOC working as a "treatment officer" at the Treatment Center.  On February 5, 2022, Defendant Plummer repeatedly whipped Mr. Givens with a wet towel.  At all relevant times, Defendant Plummer was acting within the scope of his employment and/or agency with VDOC and under color of state law.  Defendant Plummer is sued in his individual capacity.

9.     Defendant JOSHUA C. JACKSON was, at all relevant times, an agent and/or employee of VDOC working as a "treatment officer" at the Treatment Center.  On February 5, 2022, Defendant Jackson tortured and disoriented Mr. Givens by throwing and/or dumping ice-cold water on him.  At all relevant times, Defendant Jackson was acting within the scope of his employment and/or agency with VDOC and under color of state law.  Defendant Jackson is sued in his individual capacity.

10.     Defendant WILLIAM Z. MONTGOMERY was, at all relevant times, an agent and/or employee of VDOC working as a correctional officer at the Treatment Center.  On the

morning of February 5, 2022, Defendant Osborne was assigned to Mr. Givens' cell area.  In the hours before Mr. Givens' death, Defendant Montgomery tortured and disoriented Mr. Givens by dumping and/or throwing cold water on him.  Following the attack, he failed to provide Mr. Givens access to emergency medical care. At all relevant times, Defendant Montgomery was acting within the scope of his employment and/or agency with VDOC and under color of state law.  Defendant Montgomery is sued in his individual capacity.

11.     Defendant SAMUEL D. OSBORNE was, at all relevant times, an agent and/or employee of VDOC working as a correctional officer at the Treatment Center.  On the morning of February 5, 2022, Defendant Osborne was assigned to Mr. Givens' cell area and was present during the brutal attack upon Mr. Givens in the shower room, but took no action to stop the assault, nor, thereafter, to provide Mr. Givens access to emergency medical care.  At all relevant times, Defendant Osborne was acting within the scope of his employment and/or agency with VDOC and under color of state law.  Defendant Osborne is sued in his individual capacity.

12.     Defendant TRAVIS S. POSTON was, at all relevant times, an agent and/or employee of VDOC working as a Captain at the Treatment Center.  On at least six occasions prior to the February 5, 2022 attack, Defendant Poston was the supervising officer to COs who assaulted Mr. Givens.  Those instances/injuries included: 1) December 2015 trauma to Mr. Givens head, 2) December 2015 laceration to the area above Mr. Givens' eye, 3) April 2018 scalding of Mr. Givens in the shower, 4) objects being thrown at Mr. Givens in the shower in December 2018, 5) and 6) two separate instances (in February 2021 and October 2021) of likely cold-water torture of Mr. Givens, resulting in hypothermia.  Indifferent to CO abuse of prisoners, Defendant Poston (and Defendant Artrip) did not discipline and, instead, retained the abusive officers. The abuse continued, and indeed, escalated as Mr. Givens became more mentally impaired, resulting in Mr. Givens' death.  At all relevant times, Defendant Poston was acting

within the scope of his employment and/or agency with VDOC and under color of state law. Defendant Poston is sued in his individual capacity.

13.     Defendant JEFFERY ARTRIP was an agent and/or employee of VDOC working as Warden at the Treatment Center during the period from April 2019 through at least Mr. Givens' death in February 2022.  He was Warden during five of the six times that Mr. Givens was hospitalized for hypothermia.  He was informed of each of the five hospitalizations and the cause of each, but did nothing in response. Defendant Artrip ambivalently observed, "we housed [Mr. Givens] back and forth from one of the B wings to Medical." Most of the time that Mr. Givens was housed in B wing he was kept in "the hole," a segregated cell used to punish prisoners.  At all relevant times, Defendant Artrip was acting within the scope of his employment and/or agency with VDOC and under color of state law.  Defendant Artrip is sued in his individual capacity.

14.     Defendants Kelly, Plummer, Jackson, Montgomery, Osborne, Poston, and Artrip are collectively referred to herein as "the Defendants."  As noted above, Defendants Kelly, Plummer, Jackson, Montgomery, and Osborne were working at the Treatment Center on the morning of February 5, 2022 and at other times.  Defendants Captain Poston and Warden Artrip are collectively referred to herein as the "Supervisory Defendants."

V.     **FACTS**

15.     In or around February 2013, Mr. Givens was transported to the Treatment Center, a state mental hospital in Marion (Smyth County), Virginia.

16.     The Treatment Center is located in a single two-story building surrounded by a security perimeter fence. In addition to incarcerating prisoners with mental-health issues and/or limited intellectual development, the Treatment Center houses general population prisoners who support the activities of the Treatment Center such as by working in the kitchen, assisting with

6

laundry, and providing maintenance services, among other tasks.  These prisoners are referred to as "cadre."

17.     Mr. Givens was housed at MCTC due to his limited intellectual capacity.  At age four or five, Mr. Givens suffered a traumatic brain injury after falling down a flight of stairs.  Mr. Givens was in a coma for an extended period of time after his fall.  Testing showed that Mr. Givens had suffered widespread, permanent damage to his brain.  His intellectual and emotional development would never exceed that of a 2nd or 3rd grade child.  These injuries permanently stunted Mr. Givens' cognitive trajectory and development, inhibiting, among other things, his communication skills, emotional intelligence, and executive functioning (the mental processes that enable people to plan, focus attention, remember instructions, and juggle multiple tasks).

18.     For the remainder of Mr. Givens' life, he would require some assistance and supervision with daily functioning and tasks.  By December 2021, Mr. Givens' ability to speak had been further curtailed and a nurse noted Mr. Givens' "rapid cognitive decline."

19.     In addition to his traumatic brain injury, Mr. Givens also suffered from Crohn's disease, a chronic form of inflammatory bowel disease that can cause debilitating abdominal pain and cramps, as well as continuing diarrhea.  Mr. Givens was prescribed medications to manage his symptoms, some of which caused loose, watery stools.  As a result of the foregoing, Mr. Givens at times defecated on himself.

20.     Some correctional officers asserted that Mr. Givens defecated on himself intentionally.  For example, in August 2015, Defendant Plummer attributed Mr. Givens' soiling himself due to his unwillingness to "get up and used (sic) the toilet."

21.     As a result of Mr. Givens' soiling himself and qualities related to his diminished intellectual capacity, such as sluggish motor skills and inability promptly to decipher and follow commands, COs retaliated against and abused him in a variety of demeaning ways.  For example,

7

on October 16, 2018, COs removed toilet paper from Mr. Givens, allegedly for "offender behavior." A supervisor was specifically notified of the action, but instead of reprimanding this behavior, he joined in the CO's retribution – one hour later, Mr. Givens was moved from Medical to "the hole."

22.    Medical testing substantiates that there were complex medical reasons for Mr. Givens soiling himself.  For instance, after Mr. Givens was found to have soiled himself on December 3, 2018, he was eventually referred to a local emergency department ("ED") where physicians initially discovered weakness, elevated lactic acid, and raised white blood count. Doctors diagnosed severe sepsis due to a perforated bowel with abscess formation. Mr. Givens would spend eight days in the hospital with that painful condition.

23.    COs under the supervision of Defendant Poston abused Mr. Givens for actions that he could not adequately control.  After being found soiled at approximately 4 a.m. on **December 3, 2018**, Mr. Givens was placed in the shower. Thereafter, Mr. Givens complained of being dizzy and "his sides hurting" – suggestive that on that morning he may have been pummeled in the ribs in the same manner that he was on the date of his death. A CO reported, "[h]e was moaning and saying ouch."  A large bruise was observed on his left hip. Mr. Givens was returned to his cell.  He was not taken to sick call until 11 a.m.

    a.    At sick call, a large bruise was noted on Mr. Givens' left buttock and his left fifth finger was bruised, "with dark discoloration of proximal nail bed."

    b.    A social worker recorded how Mr. Givens said that he received the injuries: "he told us that he had been hit by soap thrown by two officers the night before, when he 'messed' himself and had to go to the shower. He said that this caused the bruise on his butt." Foreshadowing the method that Mr. Givens would be attacked on the morning of his death, the social worker also noted, "they hit him in the groin with a rolled up towel, as well."

8

      c.    Mr. Givens' statements to Nurse Practitioner Tammy Jones were the same as his remarks to the social worker.  He reported, "it happened last night, the officers threw soap at me and hit me with a towel."

24.    At other times, COs simply ignored Mr. Givens' circumstances, causing him to go for hours in soiled clothes.  This indifference may have led to painful medical complications. For instance, in August 2015, COs noticed that while Mr. Givens was showering, there was blood on the washcloth that Mr. Givens was using to clean himself.  He was asked where he was bleeding and replied, "from where my skin is breaking down."

      a.    Then, on April 12, 2016, a significant abscess ulcer on Mr. Givens' left hip was observed.

      b.    These wounds may have been caused by Mr. Givens laying in his own urine and feces.  Indeed, on the date of counsel's inspection of relevant areas of MCTC (and smelled by witnesses at other times), the noticeable stench of uncleaned urine permeated the air.

25.    Despite being confined in a facility intended to ensure the safety and well-being of disabled prisoners, Mr. Givens was subject to regular, harsh physical and emotional abuse by the MCTC staff led by Defendant Poston, and the CO Defendants under his command. Tellingly, Mr. Givens' autopsy report shows **prior** bruising and, initially, unexplained red welts on Mr. Givens' arms and legs.  The prior bruising was caused by a previous attack(s) upon Mr. Givens by Treatment Center staff.  The red welts were from Defendant Plummer whipping Mr. Givens with a wet towel.

26.    In the weeks, months, and years preceding the coordinated attack upon Mr. Givens, and the delayed, indifferent response resulting in his death, MCTC records and those of the local Smyth County Community Hospital ED document CO abuse and/or neglect.  The records indicate that multiple times Mr. Givens was hospitalized following abuse inflicted by

COs supervised by Defendant Poston. Indeed, during the period from October 14, 2014 through the date of Mr. Givens' death, February 5, 2022, there are **over a dozen times** when documents indicate that Mr. Givens was, or may have been physically abused by COs, including Defendants Kelly, Plummer, Jackson, and Montgomery.  Those instances are noted below.

27.     On **October 29, 2014,** Mr. Givens complained that Sergeant R. Johnson had thrown him into a cement block wall causing bruising and swelling of his head.  Records confirm that on that day, Mr. Givens was escorted to the shower room by Sgt. Johnson and Officer Brewer.  A nurse documented Mr. Givens' injuries stating, "he does have bruising and swelling to the left side of his forehead."

a.     When interviewed by an investigator, Sgt. Johnson and CO Brewer contended that Mr. Givens was "disruptive" that morning, that they took him to the shower, and thereafter Brewer further "noticed a 'red spot' on Offender Givens head."

b.     The officers never explained why Mr. Givens' alleged disruptiveness required that he be taken to the shower room at 6 a.m.  As noted above, it was immediately after being taken to the shower that Mr. Givens' head injuries were first noted.

c.     Notably, at the time, there were no cameras in the shower area.  Former MCTC prisoners and cadre have stated that the shower room was a principal area in which prisoners were abused by COs.  The COs even had an expression for the practice; they called it "being taken to the office."

28.     On **April 24, 2018,** Mr. Givens was seriously scalded in the shower area by COs, under the command of Defendant Poston.  The incident occurred in the presence of COs, and, the circumstances suggest, with, at a minimum, the acquiescence of COs.  Mr. Givens said that another prisoner "got him down in the shower last night and sprayed him with scalding hot water."  But security footage showed two COs in or immediately outside of the shower area at

the time of the scalding.  Confirming his proximity to the attack, one of the officers asserted, "I

then heard a thud and he had fallen in the shower."  These circumstances, the extent and location

of the injuries, and the officers' failure to report the incident strongly indicate that the two COs

orchestrated or permitted the horrific scalding of Mr. Givens.  Mr. Givens suffered acute burns to

his scalp, abdomen, buttocks, right hand, thighs, penis, and scrotum.

        a.    The full extent and disturbing nature of Mr. Givens' burns were

documented on April 25, 2018 by the Medical staff.  The nurse wrote:

> "The area of concern was on the top right. The area appeared to be a burn. FNP Jones
> requested photos taken. While getting the camera. FNP Jones discovered other burns on
> the offender's body. 5 serious burns and multiple areas of minor burns to the body of the
> offender. Photos taken of all areas. The most serious burn was to the offender's penis.
> Multiple blisters noted to penis."

        b.    There is evidence of a cover up, or at the very least, a delayed response.

Although Mr. Givens was attacked on the evening of April 24, 2018, he was not taken to a local

ED until approximately at 6 p.m. the following evening.  An incident report indicates that

Defendant Captain Poston was assigned as one of the command staff at the relevant time.  When

questioned later by investigators, Officer Pickle, one of the officers in the shower area, blamed

Mr. Givens for his injury, stating, "[e]arlier during the day when I was making round I heard a

pounding coming from the back of the long side and I witnessed Givens laying on his bed

pushing himself back and hitting his head on the wall. This happened twice."  That response, of

course, sidesteps the scalding nature of Mr. Givens' injuries and is disturbingly suggestive of the

full horror to which Mr. Givens may have been subjected.

    29.    Because of the abuse that Mr. Givens regularly suffered in the shower, he

understandably became reticent to go to the shower.  **On January 3 and 4, 2022**, FNP Jones

noted that Mr. Givens did not want to go to the shower.  Later that day, Mr. Givens was seen in

Medical for evaluation of "Rt. Hand swollen x four days."  Mr. Givens presented "with hand in

partially close[d] fist and unable to open hand or tighten fingers." An x-ray was obtained on December 25, 2021 which showed deformities. According to the Medical staff, Mr. Givens was "unable to relate if he sustained any type of Injury to right hand." An injury was additionally noted on Mr. Given's right hand on January 25, 2022. In context, these unexplained injuries fall into the specter of more abuse by COs upon Mr. Givens carried out in the shower room.

30.      MCTC medical records note many other injuries suffered by Mr. Givens, the origins of which were never documented. On **December 16, 2015**, Mr. Givens sustained a laceration to, and/or a cut above his right eye. Blood was seen on Mr. Givens' face and chin. A nurse determined that Mr. Givens should be transported to the hospital to undergo a CT scan of his head. As was the case numerous times, Defendant Captain Poston was the supervising officer. He disciplined no one in connection with Mr. Givens' injuries.

31.      Just six days later, on **December 22, 2015**, Mr. Givens was taken to the local ED for a bruised eye. Mr. Givens asserted that a CO had kicked him. A note attributable to Mr. Givens states, "that he couldn't lie, he had been kicked in the head by an officer." The name of the relevant CO is not identified in any records provided in this matter.

32.      Then, on **January 8, 2016**, a red area, the size of a baseball, was noted on Mr. Givens' right hip.

33.      On **June 2, 2018**, Mr. Givens reported that his right knee was injured "as a result of his being forcefully taken down to the floor" by an officer.

34.      On **June 17, 2021**, Mr. Givens was finally seen in the Smyth County Community Hospital ED for right leg bruising, swelling, and pain. A Treatment Center physician called the ED to say that Mr. Givens had fallen about a week and a half ago. The circumstances of the alleged fall were not specified.

35.     Mr. Givens was an easy target for CO abuse.  COs knew that Mr. Givens would be unable to effectively advocate for himself.  Also, the above abuse often happened in the "hole," where CO conduct was less visible and less likely to be reported.  Because of the isolation of the prisoners and general unwillingness of supervisors to respond to prisoner complaints, no other prisoner was able to effectively obtain sustained help for Mr. Givens.  For instance, when other prisoners assisted Mr. Givens with removing his diaper and saw extensive red scabbing in his private areas, accompanied by a gross crusty, yellowish film, they were unable to obtain any effective assistance for Mr. Givens.

36.     Indicative of the abhorrent, abusive treatment of the mentally ill/intellectually disabled MCTC prisoner population by correctional officers, COs regularly subjected prisoners, including Mr. Givens, in cold-weather months, to frigid evening showers.  Additionally, COs, including those under the supervision of Defendants Poston and Artrip, pushed open windows (that were not accessible to the prisoners) and lowered the temperature in the building even in the coldest months.  **This led to Mr. Givens, as well as other prisoners, being hospitalized** *multiple times for hypothermia.*

37.     Hypothermia is a medical emergency that occurs when the body loses heat faster than it can produce heat, causing a dangerously low body temperature. Normal body temperature is around 98.6 F (37 C). Hypothermia occurs as body temperature falls below 95 F (35 C). When body temperature drops, the heart, nervous system and other organs can't work normally. Left untreated, hypothermia can lead to complete failure of the heart and respiratory system and eventually to death.  Hypothermia is often caused by exposure to cold weather or immersion in cold water.

38.     Indeed, Mr. Givens was hospitalized for hypothermia and then released back to his caretakers just days prior to his death.

39.    MCTC COs, including Defendants Montgomery, Plummer, and Kelly, who were regularly under the command of Defendants Artrip and Poston, abused Mr. Givens by placing him under ice-cold showers on numerous occasions.  According to witnesses, it was very common for COs to punish/abuse prisoners in this manner.  There are steel gates in the showers that facilitate the practice.  Indeed, the showers are mini cells with the faucet outside of the shower, which can only be controlled by the COs.  Prisoners oftentimes enter showers in handcuffs, the gate is then locked, and handcuffs are removed.  The COs then turn the water on – again, the COs control the temperature of the water.  Although there was some room for thin, agile prisoners to step to the side to avoid the stream of water, Mr. Givens moved slowly, and, if his handcuffs were still shackled, he would have been very vulnerable.  As noted below, on at least one hospitalization, bilateral wrist wounds, possibly caused by shackles, were documented by hospital staff.

40.    The numerous instances of cold-shower torture caused, on *six* occasions, Mr. Givens to be sent to the hospital for hypothermia.  Every time, his hospital admission was reported up the entire command structure, to include Defendants Captain Poston and Warden Artrip.  Thus, all senior officers would have been aware of the torture to which MCTC staff, including the Defendants, were subjecting Mr. Givens.

41.    On **October 15, 2018,** at 7:18 p.m., Mr. Givens was evaluated at Smyth County Community Hospital ED for chest pain and hypothermia. The chest pain reportedly started the day earlier.  Hypothermia in circumstances not involving outdoor exposure is a very uncommon condition.  Also, the very low body temperatures recorded, and, on some occasions, too low to register a temperature on medical equipment, indicate the barbarism of cold-water torture carried out by COs under Defendants Poston and Artrip's command.

42.     On **February 5, 2021**, Mr. Givens was brought to the Smyth County Community Hospital ED for "hypothermia" and "hypothermic shock."  Initially, Mr. Givens was so cold that MCTC Medical staff were again unable to obtain a temperature reading on their equipment. When an initial temperature was registered, it read 87.2 degrees.  Mr. Givens' blood pressure was 60/46, an exceedingly low level.

a.     The story of how Mr. Givens was found is inconsistent. One version is that Mr. Givens was found unresponsive on a cold floor at MCTC.  Another was that he was found on a bare metal bed with his mattress on the cell floor.  (One cadre reports having previously observed Mr. Givens lying on his metal bed with his mattress pulled over top of his body in an attempt to keep warm.)

b.     Records reflect that on February 5, 2021, Defendants Montgomery and Plummer were assigned to the relevant area. The supervising sergeant at the relevant time was Defendant Kelly. The supervising officers included Defendant Shift Commander Poston.

c.     Defendant Poston was slow in responding to Mr. Givens' acute condition. One insider said that this was because Poston did not want to reveal to outsiders the effects of internal misdeeds and would try to "prop up" or improve the medical condition of prisoners before sending them out for medical care.

d.     Mr. Givens' hospital course was rough.  In addition to hypothermic shock, Mr. Givens was diagnosed with sepsis, septic shock, with altered mental status, protein and albumin levels low.  On February 6, hospital records state, "[p]atient acutely worsened overnight with respiratory failure and what sounds to be pulmonary edema likely secondary to high volume of IVF. Patient had choking episodes with his medications so there was concern for aspiration pneumonia"; "the patient initially improved with treatment however then began to worsen again.

A CT chest scan was done, which showed no blood clots.  However, a chest x-ray showed a right lung obstruction, which raised concerns for pneumonia.

   e. On the morning of February 8, 2021, Mr. Givens was transferred to Johnston Memorial hospital in Abingdon, Virginia, where he was treated for hypothermia, acute respiratory failure, epoxy, pneumonia, and altered mental status until being released back to MCTC on February 15, 2021.

   f. As was the case in almost all of the foregoing instances of abuse, no discipline or additional training of COs appears to have been ordered by Defendants Poston or Artrip. Again, Defendant Artrip acknowledges being informed of all of Mr. Givens' hospitalizations occurring in April 2019 and later.

   43. On **March 13, 2021**, Mr. Givens arrived at Smyth County Community Hospital's ED by ambulance with a body temperature of 94 degrees.  At 2:55 a.m., CO Brian Harrington allegedly observed Mr. Givens lying on his back on the cell floor.  Mr. Givens said that he needed help but was simply put back in his bed.  Thereafter, Mr. Givens was observed "shaking while seated in the TV area." An AED was applied, but no shock was advised.  CPR compressions continued for two minutes.  Mr. Givens recovered from the incident.  No discipline or additional training of COs appears to have been ordered by Defendants Poston or Artrip as a result of the incident.

   44. On **October 26, 2021**, Mr. Givens was once again taken to the Smyth County Community Hospital ED for hypothermia and "cold exposure."  His rectal temperature was 89.4 degrees.  COs allegedly found Mr. Givens unresponsive, in an altered mental state, "curled up in a ball on floor."  Their explanation that Mr. Givens would allegedly "stay that way for hours" more so implicates their supervision of him rather than explains his medical condition. According to CO Tolbert, at 11:30 a.m. Mr. Givens "did not get up to go to cell for count."

Tolbert recorded, "I asked several times I/M would say going to go to hospital.  Sgt. Cullop came to wing to talk to Givens."

a.      Two hours later, Mr. Givens was taken to Medical where staff were unable to obtain Mr. Givens' body temperature with temporal, tympanic, or oral thermometers.  A rectal thermometer registered 89.4 degrees.  Medical staff placed Mr. Givens under a Bair Hugger™ heating system for an hour, but his rectal temperature only rose to 89.6 degrees. He was then sent to the hospital for "further evaluation & tx of hypothermia AMS [altered mental status]." Mr. Givens was released from the hospital in the early morning hours of October 27, 2021.

b.      No CO discipline or additional training appears to have been ordered by Defendants Poston or Artrip as a result of the incident.

45.      One day later, on **October 28, 2021** at 11:45 p.m., Mr. Givens was, once again, taken to the Smyth County Community Hospital ED for hypothermia, as well as shortness of breath. The ED physician recorded "increased acuity of illness and likely septic."  Also noted were hypoxia, hypotension, cold exposure, an abnormally low body temperature, sepsis with acute hypoxic respiratory failure, shock, and skin wound "underneath shackle left ankle." Immediately before he was taken to the ED, COs under the command of Defendants Poston and Artrip twice put Mr. Givens in the shower – first at 1:12 p.m. and then at 4:15 p.m. The second shower was allegedly in response to Mr. Givens "us[ing] the bathroom on his(sic) self."

46.      The regular convergence of the events – CO anger/resentment at Mr. Givens having soiled himself, followed by an ice-cold shower (with the water temperature controlled by the COs), resulting in severely low body temperatures – is abundantly clear.  The involvement of the same group of COs and/or supervisors is also apparent to include Sgt. "Kell" and Defendant Shift Commander Poston.  On this occasion, Mr. Givens remained at the ED for three days. No

discipline or training appears to have been ordered by Defendants Poston or Artrip as a result of the incident.

47.     Approximately one month later, on **December 1, 2021**, Mr. Givens was once again – this time for the **sixth** time – taken to the Smyth County Community Hospital ED for cold exposure/hypothermia.

      a.     At 9:30 a.m., MCTC Medical staff noted, "[b]rought to [MCTC] medical via wheelchair – staff report. He became weak and shaky on the wings and was slow respond to instructions. He presents – alert, but doesn't make eye contact or attempt to answer questions or follow verbal commands. Skin cool to touch. Tympanic and oral thermometer will not register temp."

      b.     On a cold December morning with Mr. Givens suffering from cold exposure/hypothermia, Mr. Givens' MCTC caretakers opted to transport him to the hospital in a t-shirt.  The ED recorded Mr. Givens' body temperature as 89.4 degrees.

      c.     The next day, an MCTC staff member called Mr. Givens' sister, Plaintiff Kym Hobbs, and told her that Mr. Givens was at Smyth County Community Hospital with "serious illness."  Mrs. Hobbs requested permission to visit her brother at the hospital.  This information was passed along to senior MCTC officers for approval, including Defendant Warden Artrip.

      d.     No discipline or training appears to have been ordered by Defendants Poston or Artrip as a result of this incident.

48.     In addition to the six preceding hospitalizations, all of which would have been reported to the senior command officers to include the Supervising Defendants, Mr. Givens was also hospitalized from April 29, 2021 through May 6, 2021 for acute respiratory failure with

hypoxia aspiration and pneumonia. On the date of transportation to the hospital, bilateral wrist wounds, likely caused by shackles were discovered.

49.     The specifics and magnitude of CO abuse of Mr. Givens was abundantly clear to the Supervisory Defendants (Captain Poston and Warden Artrip).  Among other things, Mr. Givens was sent multiple times to hospitals for hypothermia, circumstances that were highly indicative of abuse.  Further, Mr. Givens was almost continuously placed in the "hole"– B wing (there are also general population wings) as an alleged disciplinary device.  He also regularly suffered wounds that were highly suggestive of abuse.

50.     But no material changes took place and the cycle of violence continued unabated. COs under the supervision of Defendants Poston and Artrip who abused Mr. Givens were not disciplined, nor reassigned, nor fired.  Their indifference emboldened COs to continue, and others to join, the cycle of abuse. New officers and prisoners to the facility would sometimes try to help Mr. Givens.  But, over time, initially well-meaning COs (and prisoners) were indoctrinated into the callous and abusive conduct towards Mr. Givens.

51.     Free to do whatever they wanted to do, on **February 5, 2022**, Defendants Kelly, Plummer, Jackson, and Montgomery beat and ultimately murdered Mr. Givens.  That morning, Mr. Givens was found to have defecated on himself as a result of his chronic, and at times, acute gastrointestinal problems.

52.     At 7:19 a.m. on February 5, 2022, the five Defendants – Sergeant Kelly, Treatment Officers Plummer and Jackson, and Correctional Officers Montgomery and Osborne – escorted Mr. Givens to the shower area.  These officers came from throughout the Treatment Center to accompany Mr. Givens to the shower.  Only two of the Defendants, Officers Osborne and Montgomery, were assigned to Mr. Givens' cell area.

53.     This show of force was unusual.  Normally, just one or two officers would escort a prisoner to the shower.  Also, Mr. Givens was a "low risk" prisoner who did not require shackles.  Moreover, Mr. Givens was still recovering from having just been released from the hospital for hypothermia.  Further still, the shower area in question was a mere five cells away from Mr. Givens' – a very short walk.

54.     A "cadre" prisoner (hereinafter, "Cadre 01") was assigned to clean Mr. Givens' cell after his accident.  He witnessed the exchange between the five Defendants and Mr. Givens, and recalls that Mr. Givens, despite his limited verbal capabilities, explicitly said that he did **not** want to be taken to the shower room – undoubtedly due to the abuse he routinely suffered there. Mr. Givens likely understood what was coming.  It took four and a half minutes for a reluctant Mr. Givens to leave his cell.

55.     Grainy, marginal-quality video footage captures Mr. Givens being escorted by the five Defendants from his cell area to the shower area.  Cadre 01 is seen in the video watching the group approach the shower while he retrieves mops and a bucket from the closet.

56.     Upon arrival at the shower room, video footage shows Defendants Plummer, Jackson, Montgomery, and Osborne take Mr. Givens into the off-camera shower room.  The COs knew that there were no cameras in the shower room.  Defendant Sgt. Kelly can be seen standing outside the shower room in the hallway at times, but then going in and out of the shower room.

57.     While in the shower room, Defendant Plummer repeatedly snapped a wet towel at Mr. Givens, inflicting pain on his torso and genitals.  Meanwhile, Defendants Jackson and Montgomery threw/dumped ice-cold water at Mr. Givens.  Then, on multiple occasions, Defendant Sergeant Kelly entered the shower room and violently punched Mr. Givens in the midsection.  All of this was witnessed by Cadre 01.

58.     Defendant COs Plummer, Jackson, Montgomery, and Osborne did not intervene to stop Sgt. Kelly's violent blows, nor the barbaric actions of the others.  Of the five, only Osborne declined to take part in the abuse.  The others chided Osborne for not joining in the abuse.  But Osborne did not act to protect Mr. Givens from the attacks of the others.  And Defendant COs Plummer, Jackson, and Montgomery did not try to protect Mr. Givens from Defendant Kelly's ferocious punches to Mr. Givens' side.

59.     During this time, Cadre 01, the member of the "cadre" prisoner work crew assigned to clean Mr. Givens' cell, walked back and forth past and through the shower room, in order to, among other things, retrieve cleaning supplies.  He witnessed the foregoing.

60.     Despite their violent, abusive conduct, the Defendants later prepared false written statements indicating that nothing out of the ordinary occurred in the shower room*, and that Mr. Givens appeared to be normal when he was returned to his cell, where he remained by himself until he was found unresponsive.

61.     But contrary to that characterization, and indicative of the abuse that he suffered at the hands of the Defendant COs, video footage shows Mr. Givens with a **different, hunched-over** posture as he returned to his cell some 20 minutes later (at approximately 7:40 a.m.).  Defendant Kelly reported that Mr. Givens asked to be taken to MCTC's Medical ward, but his plea was refused.

62.     According to log entries, Defendant Osborne conducted at least one surveillance round where he passed by Mr. Givens' cell, but noted nothing with regards to Mr. Givens.  However, a little less than two hours later, prison officials report that Defendant Osborne found Mr. Givens unresponsive, lying face up in his bed, with both feet off the side of the bed on the floor.

63.     Video footage at or about 9:26 a.m. shows Defendant Osborne stopping to peer into Mr. Givens' cell in a manner different than how he passed the other cells.  He stands at the cell door and watches Mr. Givens for 21 seconds.  At 9:30 a.m. Osborne stops again at Mr. Givens' cell door and peers through the window for 40 seconds. Osborne's actions indicate his understanding at the time that Mr. Givens was badly injured.

64.     According to his Incident Report, Defendant Osborne notified Sgt. Nettles and Medical at 9:36 a.m. that Mr. Givens was lying on his back with his feet on the floor, breathing hard, and not responding to knocks on the door.  Thereafter, Sgt. Kelly, Sgt. Nettles, and Medical arrived. Defendants Kelly, Plummer, Jackson, Montgomery, and Osborne were noted in the Incident Reports with the supervising officers to include Shift Commander Poston.

65.     Mr. Givens was declared dead at Smyth County Community Hospital at 10:26 a.m. on February 5, 2022.

66.     On February 5, 2022, at approximately 11:30 a.m., Kym Hobbs was contacted by MCTC staff.  Defendant Warden Artrip told Mrs. Hobbs that her brother had passed away due to "natural causes."  MCTC publicly reported the death with the same falsehood.

67.     On February 12, 2022, Mrs. Hobbs was called by a woman who was a friend of another Treatment Center prisoner, Cadre 02.  She said that she had been told by Cadre 02 that Mr. Givens was beaten to death by COs in the shower room, and that Cadre 02 and another prisoner, Cadre 01, knew of, and/or had witnessed, the beating.

68.     The friend of Cadre 02 told Mrs. Hobbs that Mr. Givens was savagely beaten in the torso area.  This particularity indicates that the source of the information, indeed, had first-hand knowledge of the incident.  At the time, no autopsy report had been prepared or generated.

69.     In fact, prior to this conversation, the friend of Cadre 02 did not know Mrs. Hobbs, but was so upset by the events disclosed to her by her prisoner friend that she paid for an internet search to locate a telephone number in hopes of contacting Mrs. Hobbs.

70.     Soon after the February 5, 2022 assault upon Mr. Givens, the prisoner who reported the beating of Mr. Givens' death (Cadre 02), was dubiously and conveniently charged by MCTC staff with committing institutional offenses.  Notably, the charged events had transpired nearly one year prior without complaint or even investigation by MCTC staff.  The charges appear to have been brought to punish Cadre 2's reporting of the incident and to discourage or suppress any cooperation by any cadre with the investigation of Mr. Givens' death. These bogus charges were later recognized by the Virginia State Police and the Smyth County Commonwealth Attorney's office for the foregoing – an attempt to impede the cooperation of both cadres in the investigation.  Indeed, following a VDOC investigation over a year after Mr. Givens' death, the charges and punishment against Cadre 02 were rescinded.

71.     Mrs. Hobbs contacted Virginia State Police (sometimes referred to as "VSP") with the information provided by the friend of Cadre 02.  Mrs. Hobbs also discussed the autopsy report with Assistant Chief Medical Examiner Eli Goodman, MD, who considered the death suspicious. However, at the time, Dr. Goodman felt that he lacked sufficient proof to rule the death a homicide.  Dr. Goodman did, however, state in his report, "...opinions expressed herein are amenable to change should new, reliable and pertinent information come to light in the future." As noted above, the cause of death was explained as blunt force trauma to Mr. Givens' torso, resulting in laceration of the spleen and massive associated internal bleeding.

72.     In an apparent attempt to bring the disturbing and "unnatural cause" of Mr. Givens' death to his sister's attention, an employee of Bradley's Funeral Home in Marion,

Virginia, who had accepted Mr. Givens' body, sent Mrs. Hobbs a copy of the death certificate with "blunt force trauma" highlighted.

73.     The autopsy report prepared by Dr. Goodman and dated March 29, 2022 found fractures to Mr. Givens' ribs (ribs numbered 8, 9, 10, 11), which caused laceration to Mr. Givens' spleen and massive associated internal bleeding, leading to death.  The Assistant Chief Medical Examiner found **prior, unhealed contusions** in the same area with where Mr. Givens was punched by Sergeant Kelly.

74.     At the outset of his investigation, VSP Special Agent ("SA") Seagle met with Cadre 01 at the Treatment Center, but Cadre 01 would not provide information about what had happened to Mr. Givens.  Cadre 01 stated that he could not talk to SA Seagle about the circumstances.  Cadre 01's reticence is exceedingly understandable considering that the foregoing conversation was not conducted in a secure or private area, and that the Treatment Center personnel had recently levied institutional charges against Cadre 02 in hopes of curtailing all cooperation in the investigation.  Notably, Cadre 01 did not deny knowledge of the events – he only said that he could not discuss the incident.

75.     Revealingly, after VSP SA Seagle completed his interview of Cadre 01, Defendant Warden Artrip chastised Cadre 01 for his comments to SA Seagle, imploring, "why didn't you say you didn't see anything?"

76.     Under the direction of the Virginia State Police, Cadre 01 was later removed from Treatment Center and moved to Bland Correctional Center without Cadre 01 being informed of the reason for his relocation.  In an unannounced, rare extraction, the VSP later took Cadre 01 from Bland Correctional Center to VSP Headquarters in Wytheville where he was questioned about the circumstances of Mr. Givens' death.  Cadre 01 agreed to submit to a polygraph examination. All interviews were preserved by audio/video recording.  Examiner Travis Sykes

reported that Cadre 01 had achieved the second highest truthfulness score ever obtained at that facility.

77.     In his examination, Cadre 01 identified the Defendants as the five officers who escorted Mr. Givens to the shower.  He specifically identified the actions of each as noted above: Defendant Plummer snapped a rolled-up wet towel at Mr. Givens' genitals and other parts of his body; Defendants Jackson and Montgomery threw/dumped ice-cold water at/over Mr. Givens; and on multiple occasions, Defendant Sgt. Kelly entered the shower room and violently punched Mr. Givens in the ribs and torso area.

78.     Indicative of his veracity at the time of his interview, Cadre 01 did not know the medical examiner's determination of Mr. Givens' cause of death.

79.     Cadre 01 stated that a picture of Mr. Givens' body after his death was circulated among COs on their cell phones, with indecent "drawings" imposed over Mr. Givens' body.

80.     Following the polygraph examination of Cadre 01, SA Seagle quickly contacted the Office of the Chief Medical Examiner and learned that Dr. Goodman was no longer employed there, as he had left along with several other doctors.  SA Seagle requested contact information for Dr. Goodman so that he could update him regarding the new information surrounding highly suspicious death of Mr. Givens, but he was told that the office could not provide him with the information.

81.     The Assistant Chief Medical Examiner who took over Mr. Givens' case was Dr. Amy Tharp.  On several occasions, she advised SA Seagle and Mrs. Hobbs that she was unable to amend or change Dr. Goodman's report/findings without "overwhelming evidence."  She asserted that new information from Cadre 01's interview, verified by video, polygraph, and physical evidence, was insufficient to change Dr. Goodman's original report.

82.     Counsel hired a private investigator to locate Dr. Goodman.  Thereafter, counsel called Dr. Goodman and was told that the "policy" as explained by his successor Dr. Tharp was incorrect.  He stated he would immediately call SA Seagle and the Commonwealth's Attorney Office in Smyth County.

83.     Weeks prior to the Smyth County Special Grand Jury, an inquiry reluctantly instituted by the Smyth County Commonwealth's Attorney to investigate Mr. Givens' death, SA Seagle interviewed Defendant Osborne.  Osborne denied that anything of note occurred and stated that he was not in the area of the shower very long and was, instead, doing paperwork in the office.  However, video evidence refutes this, showing Defendant Osborne in and around the shower room for almost the entirety of the incident.

84.     In their written reports, the Defendants all denied that anything out of the ordinary happened.  All described the process before, during, and after Mr. Givens' shower as uneventful. None, for example, said that Mr. Givens fell in the shower or his cell.

85.     Some of the Defendants stated that water could not be dumped on Mr. Givens from above the shower stall due to lack of clearance between it and the ceiling.  However, SA Seagle took photographs of the area and found their statements to be patently false regarding insufficient clearance above the stall.  Certain Defendants also stated that there were no buckets that could be used to dump cold water as the custodian had reported, but SA Seagle's photographs included mop buckets in the shower room area.

86.     To date, the Office of the Chief Medical Examiner has not updated or changed Dr. Goodman's original report.

26

## VI.    COUNTS

### COUNT I

### EXCESSIVE FORCE / 42 U.S.C. § 1983

#### (Against Defendants Kelly, Plummer, Jackson, and Montgomery)

87.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

88.    Defendants Kelly, Plummer, Jackson, and Montgomery's (the "Foregoing Defendants" in this count only) acts and/or omissions were conducted within the scope of their duties and employment and under color of state law.

89.    The Foregoing Defendants' actions alleged in the foregoing paragraphs of this Amended Complaint constitute the use of excessive force against Mr. Givens in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

90.    The Foregoing Defendants applied force to Mr. Givens maliciously and sadistically for the very purpose of causing harm, rather than in a good-faith effort to maintain or restore discipline.

91.    As a direct and proximate result of the Foregoing Defendants' conduct, Mr. Givens was injured  in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of Foregoing Defendants' actions.

92.    The Foregoing Defendants' conduct directly and proximately caused Mr. Givens' death.

93.    The Foregoing Defendants' actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Mr. Givens' rights, by reason of which Plaintiff is entitled to recover punitive damages.

94.     The Foregoing Defendants' violations of the Eighth Amendment, as incorporated by the Fourteenth Amendment, establish causes of action pursuant to 42 U.S.C. § 1983 for monetary relief consisting of compensatory damages, punitive damages, and costs (including attorneys' fees) to the Plaintiff.

## COUNT II

### FAILURE TO INTERVENE / 42 U.S.C. § 1983

### (Against Defendant Osborne)

95.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

96.     Defendant Osborne's acts and/or omissions were conducted within the scope of his duties and employment and under color of state law.

97.     On February 5, 2022, Defendant Osborne witnessed his colleagues' ongoing illegal acts, including Kelly's punches to Mr. Givens' abdomen and other vicious assaults against Mr. Givens.  Defendant Osborne had an obligation to stop the assaults, but failed to make any effort to do so.  This violates the Eighth Amendment's prohibition against cruel and unusual punishment.

98.     As a direct and proximate result of the failure to intervene by Defendant Osborne, Mr. Givens sustained the injuries and damages previously described in this Amended Complaint and died.

99.      Defendant Osborne's failure to intervene to prevent the use of excessive force against Mr. Givens violates the Eighth Amendment to the U.S. Constitution, as incorporated against the states by the Fourteenth Amendment. That violation establishes a cause of action pursuant to 42 U.S.C. § 1983 for monetary relief consisting of compensatory damages, punitive damages, and costs (including attorneys' fees) to the Plaintiff.

**COUNT III**

**DEPRIVATION OF CIVIL RIGHTS –**
**EIGHTH AMENDMENT / 42 U.S.C. § 1983**

**(DENIAL, DELAY, AND WITHHOLDING OF MEDICAL CARE)**

**(Against Defendants Kelly, Plummer, Jackson, Montgomery, and Osborne)**

100.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

101.    Defendants Kelly, Plummer, Jackson, Montgomery, and Osborne's (the "Foregoing Defendants" in this count only) acts and/or omissions were conducted within the scope of their duties and employment and under color of state law.

102.    The Eighth Amendment to  the  U.S.  Constitution protects prisoners from cruel and unusual punishment and affords to prisoners the right to receive treatment for serious medical needs.

103.    As described in the Amended Complaint, the Foregoing Defendants failed to provide access to medical care, to include medical treatment, in response to obvious, serious medical needs.

104.    The Foregoing Defendants engaged in this injurious conduct with deliberate indifference to Mr. Givens' health and safety, thereby placing him in substantial risk of serious harm.

105.    On the morning of February 5, 2022, the Foregoing Defendants witnessed and/or carried out the brutal attack on Mr. Givens, including the vicious punches by Defendant Kelly, and, accordingly, knew that there was a substantial risk that Mr. Givens serious medical needs were not being met. Indeed, Mr. Givens requested to be taken to Medical.  Despite such knowledge, the Foregoing Defendants failed to respond.

29

106. As a direct and proximate result of the Foregoing Defendants' conduct, Mr. Givens was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Foregoing Defendants' actions, all attributable to the deprivation of his constitutional rights guaranteed by the Eighth Amendment of the U.S. Constitution.

107. As a direct and proximate result of the Foregoing Defendants' conduct, Mr. Givens died.

108. The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Mr. Givens' constitutional rights, by reason of which Plaintiff is entitled to recover punitive damages.

109. The Foregoing Defendants' violations of the Eighth Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, establish a cause of action pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, and costs (including attorneys' fees) to the Estate of Mr. Givens.

## COUNT IV

### DEPRIVATION OF CIVIL RIGHTS –
### EIGHTH AMENDMENT / 42 U.S.C. § 1983

### (SUPERVISORY LIABILITY)

### (Against Defendants Poston and Artrip)

110. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

111. Through their actions and omissions set forth above, and while acting under color of state law, and in their individual capacities, Defendants Poston and Artrip (the "Foregoing Defendants" in this count only), acted in a manner that was deliberately indifferent to Mr. Givens' Eighth Amendment rights.

112.    The Foregoing Defendants had actual knowledge that their subordinates, including, but not limited to, Defendants Kelly, Plummer, Jackson, and Montgomery, were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Mr. Givens.

113.    As noted above, Defendants Poston and Artrip were informed of Defendants Kelly, Plummer, Jackson, and Montgomery and others' regular abuse of Mr. Givens, including cold-water torture in the shower on at least five occasions – February 5, 2021, March 13, 2021, October 26, 2021, October 28, 2021, and December 1, 2021.  Indeed, Defendant Artrip admitted that he was notified every time a prisoner was taken to the hospital and the reasons for such.  On at least six occasions, Defendant Poston was the supervising officer to COs who assaulted Mr. Givens.  Those instances/injuries included: 1) December 2015 trauma to Mr. Givens' head, 2) December 2015 laceration to the area above Mr. Givens' eye, 3) April 2018 scalding of Mr. Givens in the shower, 4) objects being thrown at Mr. Givens in the shower in December 2018, 5) and 6) two separate instances (in February 2021 and October 2021) of Mr. Givens being found hypothermic in his cell (likely from subjecting Mr. Givens to cold-water torture). The ongoing abuse, and history of abuse, of Mr. Givens by MCTC COs, which was documented in incident reports, certainly would have been reported to Defendant Artrip, and would have provided context to Mr. Givens' five hospitalizations for hypothermia in 2021, as well as his constant, merciless detention in the "hole."  Defendant Poston told an investigator following Mr. Givens' death that he had received numerous behavioral reports allegedly substantiating Mr. Givens' continual placement in the "hole."

114.    In addition to the instances noted elsewhere in this pleading, there were numerous other instances of prisoner abuse being carried out by COs, **specifically in the 1B shower room** – the shower room closest to the "hole" – that were disregarded by Defendants Poston and/or

Artrip.  These instances further substantiate reports by former MCTC prisoners and cadre that that the shower room was a principal area in which prisoners were physically abused by COs. *See* ¶ 27. c. regarding the practice of "being taken to the office."

      a.      Several prisoners reported being violently assaulted in the 1B shower room by COs during the relevant time period, some after they were forcibly removed from their cells.  Documents refer to several incidents of alleged staff misconduct and physical abuse of prisoners. For example, after March 2018 "use of force" by COs in the 1B shower room, prisoner "EP" was found by medical staff to have "[r]ed marks, in the shape of the shower cage door" noted on his mid-forehead with abrasions throughout the same area.  Also, a prepared, but unsigned document refers to multiple prisoners being abused by COs, including a prisoner being "brutalized" in the 1B shower area upon admission to MCTC.

      b.      Detailed prisoner grievances concerning the CO attacks were generally rejected by MCTC staff as being "unfounded," oftentimes with very scant explanation. Also, at times, unremarkable hallway video was cited as the basis for excluding claims even though the alleged assaults occurred in the shower room and/or cells, which were areas that were <u>not</u> covered by wall-mounted cameras.

      c.      In January 2019, prisoner "BF" stated that an attack on him was captured on a hand-held camera, but that COs had bragged to him that they would destroy the relevant videotape.  The COs also allegedly told the prisoner that they would falsely state that they had entered the shower to prevent the prisoner from harming himself.  The prisoner stated that he had made several complaints to MCTC supervisors concerning the COs, but that the abuse of him by the same COs went unabated.  According to the prisoner, the COs were never reassigned.

d.      In November 2019, prisoner "HS" alleged that two COs "assaulted him in the shower room on 1B, injuring his right eye and right lip, and that they kept him locked up until it healed."  HS said that the COs assaulted him in retaliation for a report that he had made against them.

e.      In April 2021, prisoner "AL" made an official Written Complaint to Warden Artrip stating that he was "scared for my life from [a particular officer]," but there is no indication in the records produced in this matter that the officer was ever reassigned, or that any disciplinary action was ever taken by the Supervisory Defendants, or any other MCTC supervisor, in response.  The same CO was involved in at least one other appreciable use of force upon a prisoner.

115.    Defendants Poston and Artrip knew that their subordinates, including Kelly, Plummer, Jackson, and Montgomery were abusing Mr. Givens (and other prisoners), but did nothing to halt the abuse.

116.    The Foregoing Defendants' response to that knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices. Time and time again, the Foregoing Defendants failed to act on their knowledge, failed to carry out *their own obligations* properly to supervise their subordinates and/or intervene on Mr. Givens' behalf, and failed to prevent continual abuse to Mr. Givens. Revealingly, Defendant Warden Artrip blasted Cadre 01 for his comments to Special Agent Seagle, remarking, "why didn't you say you didn't see anything?"

117.    There was an affirmative causal link between the Foregoing Defendants' inaction and the murder of Mr. Givens.  Specifically, as a result of the Foregoing Defendants' deliberate indifference to the abuse being perpetrated on those in their care, including Mr. Givens, Mr. Givens was brutally tortured in the shower area and then left to die in his cell.

33

118.     The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Mr. Givens' constitutional rights, by reason of which Plaintiff is entitled to recover punitive damages.

119.     The Foregoing Defendants' violations of the Eighth Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, establish a cause of action pursuant to 42 U.S.C. § 1983 for monetary relief consisting of compensatory damages and punitive damages, and costs (including attorneys' fees) to the Estate.

**COUNT V**

**STATE LAW BATTERY**

**(Against Defendants Kelly, Plummer, Jackson, and Montgomery)**

120.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

121.     Defendants Kelly, Plummer, Jackson, and Montgomery's (the "Foregoing Defendants" in this count only) actions alleged in the foregoing paragraphs of this Amended Complaint on or about the morning of February 5, 2022 constituted and caused an intentional, unlawful, unwanted and harmful touching (and/or touchings), without legal justification, which constitutes a battery.

122.     As a direct and proximate result of the battery by the Foregoing Defendants, Mr. Givens sustained the injuries and damages previously described in this Complaint and died.

123.     As a direct and proximate cause of the battery by the Foregoing Defendants, which contributed to and was the proximate cause of Mr. Given's injuries and death, the Estate of Mr. Givens has sustained damages, including, but not limited to: sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent.

124.    As a direct and proximate cause of the battery by the Foregoing Defendants, which was the proximate cause of Mr. Given's injuries and death, the Estate of Mr. Givens sustained damages, including, but not limited:

        a.    Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

        b.    Reasonable funeral/cremation expenses.

125.    The Foregoing Defendants' battery establishes a cause of action for monetary relief consisting of compensatory damages, punitive damages, and costs to the Plaintiff.

## COUNT VI

## STATE LAW CONSPIRACY

### (Against Defendants Kelly, Plummer, Jackson, Montgomery, and Osborne)

126.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

127.    On or about the morning of February 5, 2022, Defendants Kelly, Plummer, Jackson, and Montgomery combined, agreed, and conspired to beat and torture Mr. Givens – an unlawful purpose carried out by unlawful means.  After the four brutally whipped, tortured, and beat Mr. Givens, Defendants Kelly, Plummer, Jackson, Montgomery, and Osborne combined, agreed, and conspired – in contravention of their duties otherwise – not to report the attack to anyone.  This latter action, designed to cover up the attack, left Mr. Givens to lay dying in his cell for approximately two hours without any intervention. Then, it resulted in a lackluster, slow response when Mr. Givens was found breathing in a labored manner in his cell.  Thereafter, Defendants Kelly, Plummer, Jackson, Montgomery, and Osborne lied to investigators about what they did and saw on the morning of February 5, 2022.  They continue to lie about the events to this day.

128.     As a direct and proximate cause of the foregoing, Mr. Givens sustained the injuries and damages previously described in this Complaint and died.

129.     As a direct and proximate cause of the foregoing, which contributed to and was a proximate cause of Mr. Given's injuries and death, the Estate of Mr. Givens has sustained damages, including, but not limited to: sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent.

130.     As a direct and proximate cause of the conspiracy among and between Defendants Kelly, Plummer, Jackson, Montgomery, and/or Osborne, which was a proximate cause of Mr. Given's injuries and death, the Estate of Mr. Givens sustained damages, including, but not limited:

     a.     Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

     b.     Reasonable funeral/cremation expenses.

131.     The foregoing establishes a cause of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

### COUNT VII

### GROSS NEGLIGENCE

### (Against Defendant Osborne)

132.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

133.     On or about the morning of February 5, 2022, Defendant Osborne, in violation of the duties he owed to Mr. Givens, allowed Defendants Kelly, Plummer, Jackson, and Montgomery to savagely beat Mr. Givens.  Defendant Osborne's failure to act to assist Mr.

Givens would shock fair minded people and demonstrates a lack of even some degree of care being exhibited towards Mr. Givens.

134.    As a direct and proximate cause of Defendant Osborne's gross negligence, Mr. Givens sustained the injuries and damages previously described in this Amended Complaint and died.

135.    As a direct and proximate cause of the Defendant Osborne's gross negligence, which contributed to and was a proximate cause of Mr. Given's injuries and death, the Estate of Mr. Givens has sustained damages, including, but not limited to: sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent.

136.    As a direct and proximate cause of the Defendant Osborne's gross negligence, which was a proximate cause of Mr. Given's injuries and death, the Estate of Mr. Givens sustained damages, including, but not limited:

      a.    Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

      b.    Reasonable funeral/cremation expenses.

137.    Defendant Osborne's gross negligence establishes a cause of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

## COUNT VIII

## WILLFUL AND WANTON NEGLIGENCE

### (Against Defendant Osborne)

138.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

139.    On or about the morning of February 5, 2022, Defendant Osborne, in violation of the duties he owed to Mr. Givens, allowed Defendants Kelly, Plummer, Jackson, and Montgomery to savagely torture and beat Mr. Givens.

140.    Due to the prolonged nature of the abuse and Defendant Osborne's knowledge of Mr. Givens' circumstances and history, Defendant Osborne knew that his failure to stop, or attempt to stop, the beating of Mr. Givens would cause great harm to Mr. Givens.  His failure to take any action constitutes willful and wanton negligence and entitles the Plaintiff to recover punitive damages.

141.    As a direct and proximate cause of Defendant Osborne's willful and wanton negligence, Mr. Givens sustained the injuries and damages previously described in this Amended Complaint and died.

142.    As a direct and proximate cause of the Defendant Osborne's willful and wanton negligence, which contributed to and was a proximate cause of Mr. Given's injuries and death, the Estate of Mr. Givens has sustained damages, including, but not limited to: sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent.

143.    As a direct and proximate cause of the Defendant Osborne's willful and wanton negligence, which was a proximate cause of Mr. Given's injuries and death, the Estate of Mr. Givens has sustained damages, including, but not limited:

    a.    Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

    b.    Reasonable funeral/cremation expenses.

144.     Defendant Osborne's willful and wanton negligence establishes a cause of action for monetary relief consisting of compensatory damages, punitive damages, and costs to the Plaintiff.

## VII.   JURY TRIAL DEMANDED

145.     Plaintiff demands a trial by jury.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants Anthony R. Kelly, Gregory S. Plummer, Joshua C. Jackson, William Z. Montgomery, Samuel D. Osborne, Travis S. Poston, and Jeffery Artrip in the amount of $15 million, or in such greater amount to be determined at trial, costs, pre-judgment interest, attorneys' fees (in connection with the federal civil rights claims), punitive damages in an amount to be determined at trial (in connection with the federal civil rights claims and the state battery and willful and wanton negligence claims asserted herein) and grant such other and further relief that the Court may deem appropriate.

**TRIAL BY JURY IS DEMANDED.**

KYMBERLY HOBBS, ADMINISTRATOR OF THE
ESTATE OF CHARLES JAMES GIVENS, DECEASED,

By:  _____/s/ Mark J. Krudys_
Counsel

| | | |
|---|---|---|
| C. Paul Stanley, III | Thomas M. Jackson, Jr. | Mark J. Krudys |
| VSB# 36789 | VSB# 21804 | VSB# 30718 |
| C. PAUL STANLEY ATTORNEY AT LAW | THE JACKSON LAW GROUP, PLLC | Danny Zemel |
| 390 West Spring Street | P.O. Box 845 | VSB# 95073 |
| Wytheville, VA 24382 | Wytheville, VA 24382 | THE KRUDYS LAW FIRM, PLC |
| Phone: (276) 228-4003 | Phone: (276) 228-2323 | 919 East Main Street, Suite 2020 |
| Fax: (276) 276-228-2984 | Fax: (276) 625-0613 | Richmond, VA  23219 |
| Email: cpst3d@gmail.com | Email: | Phone: (804) 774-7950 |
| | tom.jackson@tomjacksonlaw.com | Fax: (804) 381-4458 |
| | | Email: mkrudys@krudys.com; |
| | | dzemel@krudys.com |

*Counsel for Plaintiff Kymberly Hobbs, Administrator of the Estate of Charles James Givens, Deceased*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of January 2024, I will electronically file the

foregoing with the Clerk of the Court using the CM/ECF system, which will then send a

notification of such filing to all counsel of record.

/s/ Mark J. Krudys
Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
919 East Main Street, Suite 2020
Richmond, Virginia 23219
804.774.7950 Phone
804.381.4458 Fax
dzemel@krudys.com
*Counsel for Plaintiff*

40