## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DIVISION
## ABINGDON DIVISION

KYMBERLY HOBBS, ADMINISTRATOR
OF THE ESTATE OF CHARLES JAMES GIVENS,
DECEASED,

        Plaintiff,

                                             Civil Action No.: 1:23-cv-00003

**v.**

ANTHONY RAYMOND KELLY, et al.,

        Defendants.

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANTS ARTRIP AND POSTON'S PARTIAL MOTION TO DISMISS

Plaintiff Kymberly Hobbs, Administrator of the Estate of Charles James Givens, deceased, by counsel, and for her Memorandum in Opposition to Defendants Jeffrey Artrip and Travis Poston's Partial Motion to Dismiss, states:

## INTRODUCTION

Charles J. Givens was beaten to death on February 5, 2022, by correctional officers at the Marion Correctional Treatment Center ("Marion"). In the years he was held at Marion, Mr. Givens, and many of his fellow prisoners (who Marion calls "residents"), suffered persistent physical abuse at the hands of the Marion correctional officers. As an intellectually and developmentally disabled person, Mr. Givens became a favorite easy target of the officers. Mr. Givens and his fellow residents were beaten, subjected to freezing-cold showers during winter months, and intentionally given hypothermia through the opening of windows that the residents could not close. Much of this abuse took place in the showers at Marion—a place that Mr. Givens

learned to fear. Eventually, Mr. Givens was beaten to death in the showers by many of the same officers who had abused him for almost a decade.

The abuse of Mr. Givens and other residents was known to all who worked at Marion. This was especially true for Defendant Travis Poston, a Captain at Marion who routinely supervised the officers in Mr. Givens' area of Marion, and Defendant Jeffrey Artrip, the Warden at Marion who received reports each time Mr. Givens had to go to the hospital as a result of the officers torturing him. And there were many hospital visits, as detailed in the Amended Complaint. While those Defendants could not be bothered to take action to assist Mr. Givens or reprimand the officers torturing him while Mr. Givens was alive, once he had been murdered, they went into overdrive trying to cover up what happened. Now, they argue that the consistent torture Mr. Givens suffered has to be split up by the exact type of torture inflicted during each incident. According to them, only previous assaults that match the exact same type of assault that killed Mr. Givens qualify for supervisory liability. Contrary to that assertion, the different forms of excessive force cannot be split up and siloed in such a way. Further, even if they could be split up, the Defendants still read *Shaw* far too narrowly. The Defendants have not carried the heavy burden required to dismiss a question of fact, as *Shaw* is, at the pleadings stage. Their motion should be dismissed.

## RELEVANT FACTS FROM THE COMPLAINT[1]

Mr. Givens was incarcerated at Marion from February 2013 through his death on February 5, 2022. ¶ 15.[2] The intellectually disabled Mr. Givens needed assistance with daily activities and also suffered from Crohn's disease, causing an inability to control his bowels. ¶¶ 17-19. His time

---

[1] Because the Supervisory Defendants concede for the purposes of this Motion that a sufficient pattern of unconstitutional conduct existed and that they were aware of it, Plaintiff will not discuss each instance of abuse.

[2] All paragraph citations are to the Plaintiff's Amended Complaint, ECF 46.

at Marion consisted of constant torture at the hands of the correctional officers. Officers would hit him, subject him to frozen showers, intentionally give him hypothermia, and generally exert force on him for no penological reason. ¶¶ 23-47. The officers did not limit the abuse to Mr. Givens either. All residents were at risk of suffering the same torture as Mr. Givens. ¶¶ 27(c), 36, and 39.

A vast amount of the torture occurred in the shower room at Marion, where, conveniently, there were no cameras at the time. ¶ 27(c). Likely for that reason, the shower room became the favorite locale for correctional officers wanting to abuse prisoners. *Id*. It became so ubiquitous that the officers even had a term for it— "being taken to the office." *Id*. Either because of his inability to control his bowels, his inability to stand up for himself, or both, Mr. Givens suffered the brunt of this abuse in the shower room. Medical staff at Marion even noted that Mr. Givens did not want to go to the shower room. ¶ 29.

Correctional officers under the supervision of, in part, Defendants Poston and Artrip, used the shower room to exact cold-water torture on Mr. Givens and other prisoners as well. ¶ 36. In cold-weather months,[3] the officers would subject Mr. Givens and other prisoners to frigid showers in the evening. ¶ 36. The officers used their ability to control the water temperature in the showers to place prisoners under inescapable ice-cold water. ¶ 37. They would also open windows that the prisoners could not reach, lower the temperature in the building, and freeze the prisoners. ¶ 36.

---

[3] *See* Average winter weather temperature in Wytheville, Virginia for 2021 according to the National Oceanic and Atmospheric Administration, attached as Exhibit A. Wytheville is approximately 25 miles from Marion. *See* Fed. R. Evid. 201(b)(2) (allowing courts to take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *United States v. Johnson*, 726 F.2d 1018, 1021 (4th Cir. 1984) ("[G]eographical information is especially appropriate for judicial notice."); *Henderson v. Wal-Mart Stores E., LP*, 2020 U.S. LEXIS 268509 (E.D. Va. Mar. 30, 2020) ("Courts routinely take judicial notice of weather reports from the National Oceanic and Atmospheric Administration.").

This abuse caused Mr. Givens, and other prisoners, to be hospitalized for hypothermia multiple times. *Id*. Each of these admissions had to be reported up the command structure at Marion, including to Defendants Poston and Artrip. ¶ 40. During one hospitalization, Mr. Givens had wounds on his wrist that could have come from the shackles placed on him during the ice-cold showers. ¶ 40.

The depravity of the abuse the Marion prisoners were subjected to can be demonstrated by Mr. Givens' medical records.[4] On one occasion, Mr. Givens' body temperature was so low that medical staff at Marion could not even register a body temperature. ¶ 42. When a temperature was finally recorded, it read 87.2 degrees Fahrenheit. *Id*. Another time, Mr. Givens was allegedly found unresponsive and "curled up in a ball on the floor." ¶ 44. His temperature registered a mere 89.4 degrees Fahrenheit that time. *Id*. The same temperature (89.4) would be found on another hospitalization. ¶ 47(b).

The records demonstrate a clear pattern. Mr. Givens soils himself due to his Crohn's disease, officers get angry at having to care for him, they subject him to punches, kicks, other attacks, and finally an ice-cold shower, and he ends up in the hospital with hypothermia. ¶ 46. This continued for years with the full knowledge of Defendants Poston and Artrip, yet neither took any action. This pattern would repeat itself one last time on February 5, 2022. Except this time, the officers took the use of force too far and murdered Mr. Givens. ¶ 51.

Defendant Travis Poston was a Captain at Marion and the supervising officer for at least six instances of assault perpetrated on Mr. Givens. ¶ 12. Defendant Jeffrey Artrip was the Warden at Marion from April 2019 through Mr. Givens' death. ¶ 13. And as noted above, both received

---

[4] Because of Defendant Poston's habit of improving the medical condition of prisoners before sending them out for medical care, the records do not even show the worst of it. ¶42(c).

reports of Mr. Givens' (and other prisoners') hospitalizations. Defendants Poston and Artrip were well aware of the torture Mr. Givens experienced during his time at Marion. ¶¶ 12-13. But neither of them took any action to reprimand the officers they supervised or otherwise in anyway responded to the horrible assaults on Mr. Givens and other residents at Marion.

Indicative of his knowledge of his wrongdoing, Defendant Artrip tried to hide the true nature of Mr. Givens' death. He lied to the Plaintiff, Mr. Givens' sister, and told her that she lost her brother to "natural causes." ¶ 66. Marion reported the same lie to the press. *Id*. Defendant Artrip, the Warden at Marion, then had a hand in charging those who had spoken out about Mr. Givens' death with bogus institutional offenses. ¶ 70. Charges that the Virginia State Police and Smyth County Commonwealth Attorney's office recognized as efforts to impede the investigation into Mr. Givens' death. ¶ 70. Defendant Artrip even chastised a witness for telling the truth to the Virginia State Police. ¶ 75. Despite the efforts to mislead her, Plaintiff was able to find out the truth about who killed her brother and what he endured in the years prior.

## ARGUMENT

### I.     Standard of Review

To satisfy Federal Rule of Civil Procedure 8(a)(2), a complaint simply must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A Rule 12(b)(6) motion "tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). To survive a motion to dismiss, a complaint must contain "sufficient factual matter…to state a claim to relief that is plausible on its face." *Acorn Land, LLC v. Balt. County,* 402 Fed. Appx. 809, 816 (4th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is plausible if the complaint contains "factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Smith v. Parker*, No. 7:19-cv-410, 2020 U.S. Dist. LEXIS 94831, at *3 (W.D. Va. May 31, 2020) (quoting *Ashcroft*, at 678).

## II.     The instances of excessive force against Mr. Givens and other residents cannot be separated based on the specific type of excessive force used.

Defendants Artrip and Poston have two related arguments – that the instances of Marion staff intentionally giving Mr. Givens hypothermia and torturing him with cold water can be separated from the more traditional uses of excessive force against him, including the beating that killed him. According to Defendants Artrip and Poston, this distinction means that Plaintiff cannot use the past instances of hypothermia and cold-water torture as evidence for his supervisory liability claim. Neither contention is true.

Excessive force is excessive force. Whether by forcing cold-water showers on residents, intentionally freezing residents, or punching and kicking residents, the constitutional violation is still the same. Mr. Givens, and other residents like him, were subject to consistent uses of force (of varying types) for non-penological purposes.

An argument could be made that hypothermia and cold showers are better classified as conditions of confinement, not uses of excessive force. But that argument would overlook the intentional nature of the abuses Mr. Givens and other residents suffered. *Compare Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019) (deliberate indifference is the required mental state for Eighth Amendment conditions of confinement claims) *with Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021) (malice is the required mental state for Eighth Amendment excessive force claims). The Amended Complaint does not allege that residents lived in cold cells that Defendants Artrip and Poston failed to correct. Rather, it alleges that officers "pushed open windows (that were not accessible to the prisoners) and lowered the temperature in the building even in the coldest

months." ¶ 36.   And turning the water ice cold during showers to the point that it caused hypothermia. ¶¶ 39-40.   Those are intentional and malicious acts better classified under the excessive force rubric.

Even accepting the Defendants' mistakenly narrow view of the constitutional violation at issue here, as explained further in detail below, Plaintiff has still alleged a *Shaw* claim. Considering only the previous events related to forced hypothermia and freezing showers, Defendants responded to those abuses with deliberate indifference.   They took no action.   And a natural and probable consequence of that inaction was that the officers performing the abuse would continue to abuse residents, including the eventual death of Mr. Givens.

**III.     Defendants Artrip and Poston are liable under *Shaw* even if the previous events are separated.**

Supervisory liability in the Fourth Circuit is governed by *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994). Under *Shaw*, a plaintiff can establish supervisory liability by plausibly pleading:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Defendants Artrip and Poston have conceded for the sake of their current motion that Plaintiff has met the first prong of *Shaw*. *See* ECF 55, at 7.   That leaves only deliberate indifference and causation.   Plaintiff has adequately pled deliberate indifference and causation even considering only the hypothermia and cold shower assaults.   And were there any question of that, supervisory liability is an issue "of fact, not law," *Shaw*, 13 F.3d at 799, and not easily amenable to resolution on the pleadings.

A. **The Amended Complaint alleges sufficient facts to demonstrate the Defendants' deliberate indifference.**

The second element of the *Shaw* test "can be established 'by demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw*, 13 F.3d at 799). Defendants claim that their "inaction in response" to the freezing of residents and use of cold showers on them do not demonstrate "deliberate indifference to or tacit authorization of the alleged offensive practices—officers' striking an inmate in violation of VDOC policies and state law." ECF 55, at 7. This conclusion is about causation though, not deliberate indifference. As explained by the court in *Johnson v. Baltimore Police Department*: "Whether a supervisor was deliberately indifferent to a course of conduct that posed an unreasonable risk of constitutional harm to a *group of citizens* is a distinct question from whether that course of conduct is causally connected to the plaintiff's *particular* harm." 452 F. Supp. 3d 283, 306 (D. Md. 2020) (citing *Wilkins*, 751 F.3d at 226) (emphasis in original).

The Defendants here were clearly deliberately indifferent to the fact that the officers they supervised were intentionally giving the residents at Marion hypothermia and subjecting them to torture in the form of cold-water showers on cold nights. Their brief does not seem to even contest this conclusion. What the Defendants argue instead is that their deliberate indifference to this unconstitutional conduct was not "the legal cause of the *particular* constitutional harm [Mr. Givens] suffered." *Johnson*, 452 F. Supp. 3d at 306 (citing *Wilkins*, 751 F.3d at 226) (emphasis in original). In other words, their argument is really about causation. That argument must fail as well.

## B. Defendants' deliberate indifference was a proximate cause of Mr. Givens' death.

The gravamen of the Defendants' argument is that their deliberate indifference to the hypothermia and cold-water attacks did not cause Mr. Givens' death. Contrary to that assertion, officers beating Mr. Givens to death was a natural consequence of Defendants Artrip and Poston taking no action in response to the rampant uses of excessive force by staff at Marion. This conclusion is further borne out an examination of district court cases from within the Fourth Circuit. District courts within this circuit routinely allow *Shaw* claims to progress past the pleadings stage even when the previous instances of unconstitutional conduct that put the supervisor on notice are not exact matches for the unconstitutional conduct that caused that plaintiff's injury.

In *Johnson v. Baltimore Police Department*, multiple supervisors in the Baltimore Police Department were sued after an officer-instigated high-speed chase killed Elbert Davis and left the passenger of his vehicle severely injured. 452 F. Supp. 3d 283, 290 (D. Md. 2020). The district court in *Johnson* ruled that the crash constituted a violation of the Due Process Clause of the Fourteenth Amendment. *Id*. at 299. In their complaint, the plaintiffs in *Johnson* also laid out an extensive history of "unlawful arrests, allowing informants to keep illicit controlled substances, excessive use of force, and fabrication of evidence" by the officers who killed the plaintiff. *Id*. at 305. The defendants in *Johnson*, just like the Defendants here, argued that because the previous violations were not ones related to substantive due process rights, their deliberate indifference could not have caused the death of the plaintiff. The court rejected that argument because the "supervising officers are liable for any constitutional harm that is the 'natural consequence[]' of – or, in other words, proximately caused by – the supervising officer's deliberate indifference." *Id*. at 307 (quoting *Shaw*, 13 F.3d at 799). The court went on to note that:

Defendants have not cited to, nor could the Court independently discern, any precedent to support the notion that a supervising officer can evade § 1983 liability because the pattern of misconduct he has been deliberately indifferent to caused a different kind of constitutional harm than it typically does, even though that constitutional harm was reasonably foreseeable from his subordinate's course of conduct.

*Id*.

The same conclusion was reached in a related case – *Burley v. Baltimore Police Department*. Mr. Burley had been one of the individuals being chased by the BPD who then crashed into Elbert Davis. Mr. Burley had been fleeing from plainclothes officers wearing masks who had jumped out at him (and his companion) with guns drawn. 422 F. Supp. 3d 986, 995-96 (D. Md. 2019). After the crash, drugs were planted on Mr. Burley, and he ended up being convicted of significant charges before those convictions were vacated years later. *Id*. at 996. Like the Estate of Elbert Davis, Mr. Burley brought numerous claims against the officers who framed him, as well the supervisors who allowed those officers to flagrantly violate the constitution for years without pushback. *Id*. Like in *Johnson*, the previous misconduct – assaults, illegal searches, breaking and entering, and fatal shootings – were not identical to the harm suffered by Mr. Burley. The district court nonetheless found that the complaint stated a claim under *Shaw*.

Similarly, in *Hall v. Putman County Commissioners*, a supervisor's failure to discipline a deputy after that deputy violated a woman's Fourth Amendment rights adequately stated a *Shaw* claim against that supervisor for the later First Amendment retaliation and further Fourth Amendment violations perpetrated by that deputy and others. 637 F. Supp. 3d 381, 400 (S.D.W.V. 2022). And in *Lee v. Queen Anne's County Office of the Sheriff*, prior incidents of sexual assault, improper vehicle searches, and unconstitutional shootings were sufficient for a *Shaw* claim stemming from Fourth Amendment violations after a traffic stop and subsequent prosecution. No. RDB-13-672, 2014 U.S. Dist. LEXIS 15225, *29-34 (D. Md. Feb. 6, 2014).

As these cases demonstrate, the traditional rules of proximate cause apply in this context. For the purposes of a *Shaw* claim, Plaintiff does not need to demonstrate that the exact same type of excessive force had been used in prior incidents was used to kill her brother on February 5, 2022. She merely needs to show that Defendants Artrip and Poston's deliberate indifference to the constant torture her brother and other residents endured was a proximate cause of her brother's death. The Amended Complaint states sufficient facts to make that conclusion likely, and certainly more than plausible.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully asks this Court to deny Defendants Artrip and Poston's partial motion to dismiss.

Respectfully submitted,

By: _____/s/ Danny Zemel_____
Counsel

Mark J. Krudys (VSB No. 30718)
Danny Zemel (VSB No. 95073)
THE KRUDYS LAW FIRM, PLC
919 East Main Street, Suite 2020
Richmond, Virginia 23219
Phone: (804) 774.7950
Fax: (804) 381.4458
Email mkrudys@krudys.com; dzemel@krudys.com

C. Paul Stanley, III (VSB No. 36789)
C. PAUL STANLEY ATTORNEY AT LAW, PC
390 West Spring Street
Wytheville, VA 24382
Phone: (276) 228-4003
Fax: (276) 276-228-2984
Email: cpst3d@gmail.com

Thomas M. Jackson, Jr. (VSB No. 21804)
THE JACKSON LAW GROUP, PLLC
P.O. Box 845

Wytheville, VA 24382
Phone: (276) 228-2323
Fax: (276) 625-0614
Email: tom.jackson@tomjacksonlaw.com

*Counsel for Plaintiff Kymberly Hobbs, Administrator of the Estate of Charles James Givens, Deceased*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of March 2024, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing all counsel of record.

_____/s/ Danny Zemel_____
Danny Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC
919 East Main Street, Suite 2020
Richmond, Virginia 23219
804.774.7950 Phone
804.381.4458 Fax
dzemel@krudys.com
*Counsel for Plaintiff*
