IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

Abingdon Division

| | |
|---|---|
| KYMBERLY HOBBS, Administrator *etc.*, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:23cv00003 |
| ) | |
| ANTHONY RAYMOND KELLY, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| / | |

ARTRIP'S & POSTON'S MEMORANDUM
IN SUPPORT OF THEIR MOTION TO EXCLUDE
OPINIONS & TESTIMONY OF DR. WILLIAM R. OLIVER

Pursuant to Federal Rules of Evidence 702, 401, and 403, Defendants Jeffery Artrip and Travis Poston state in support of their motion to exclude the opinions and testimony of Dr. William R. Oliver, who was retained by Plaintiff Kymberly Hobbs:

Factual Background

The parties do not dispute that Mr. Givens died as a result of blunt force trauma to his torso.  They do not dispute that Mr. Givens did not die of hypothermia.  They disagree, however, on what caused the blunt force trauma.  Plaintiff contends that it was the result of an attack by four of the defendants while a fifth failed to intervene.  Plaintiff also contends that Defendants Artrip and Poston, who were not present at Marion on the day of Mr. Givens' death, are secondarily liable for the other

five defendants' alleged conduct under a theory of supervisory liability. All five officer defendants have testified that Mr. Givens was not attacked. Additionally, Defendant Poston argues that none of these officers was his subordinate, and Defendants Artrip and Poston contend that there was not conduct at Marion that posed a pervasive and unreasonable risk of constitutional injury to Mr. Givens.

In an attempt to make her claims, Plaintiff contends that Artrip and Poston knew of prior instances of excessive use of force against Mr. Givens or instances where Marion officers were deliberately indifferent to Mr. Givens' serious medical needs. Instead of or in addition to presenting evidence of prior instances of excessive force or deliberate indifference, Plaintiff seeks to lump together diverse incidents and characterize them collectively through the testimony of Dr. Oliver as "torture" or "abuse." It is anticipated that Dr. Oliver will provide testimony that defines or describes torture in the context of its deployment in places such as Abu Ghraib, Kabul, and Guantanamo Bay and then try to place Mr. Givens' experiences at Marion under his broad labels of torture and abuse.

<u>Dr. Oliver's Proposed Testimony</u>

Dr. Oliver proposes to offer the following opinions, all of which Defendants Artrip and Poston seek to exclude:

1. The injuries Mr. Givens suffered on February 5, 2022, "are strongly suggestive of torture." (Report p.3).[1]

2. The rib fractures as seen during Mr. Givens' autopsy "are characteristic of torture in custody . . . and are not likely accidental. (Report p.3).

3. It "is appropriate to look at the general literature of abuse when looking at abuse and torture of detainees." (Report p.7).

4. Mr. Givens' "blunt impact trauma is suggestive of torture." (Report p.8).

5. "Hypothermia is an indicator of abuse/neglect." (Report p.9).

6. "Hypothermia is commonly applied in abuse and torture of prisoners." (Report p.9).

7. "Some antipsychotic drugs can contribute to hypothermia, but they do not negate the likelihood of neglect or abuse." (Report p.11).

8. "Scalding injuries are commonly seen in abuse." (Report p.11).

9. Mr. Givens' "mental illness made him more likely a victim of abuse." (Report p.11).

---

[1] Excerpts from the deposition testimony of Dr. Oliver are attached as **Exhibit 1**, and include a copy of Dr. Oliver's amended report as well as his curriculum vitae, which were marked, respectively, as Artrip Exhibits 7 and 8. Throughout this memorandum, citations to Dr. Oliver's amended report are made as "Report," followed by "p." and the page number of the referenced material.

10.     "The presence of injuries of varying ages is suggestive of abuse." (Report p.12).

11.     "[C]ases of torture and abuse must be viewed in light of the entire history and the whole constellation of injuries."  (Report p.12).

12.     Mr. Givens' injuries present at the time of his death, his burns in April 2018, his multiple episodes of hypothermia, his hospital "admissions for trauma," and his infections and laboratory abnormalities are "likely the result of recurrent abuse."  (Report p.13).

13.     "Mr. Givens' death was the culmination of a long history of abuse and neglect."  (Report p.13).

Standard for Allowing Expert Witness Testimony

Federal Rule of Evidence 702 allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise" if:

(a) the expert's scientific, technical, or other specialized knowledge ***will help the trier of fact to understand the evidence or to determine a fact in issue***;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

>   (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis added). Under Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), district courts must act as gatekeepers to ensure that expert testimony is both reliable and relevant. *See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (holding that the district court failed to satisfy the gatekeeping requirement). The proponent of an expert opinion must demonstrate that it is more likely than not that the proposed testimony will meet the admissibility requirements of Rule 702. *See* Fed. R. Civ. P. 702 advisory committee's note to 2023 amendment. This means that the proponent of the expert opinion must "come forward with evidence from which the court can determine that the proffered testimony is properly admissible." *Md. Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998).

Under Rule 702(a), a jury should not be presented with expert testimony that is not relevant to determining whether the elements of the claims at issue are met. *See United States v. Basham*, 561 F.3d 302, 327 (4th Cir. 2009). "Simply put, if an opinion is not relevant to a fact at issue," it must be excluded. *Sardis*, 10 F.4th at 281 (citing *Daubert*). Under Federal Rule of Evidence 401, evidence is relevant if "it has a tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." An expert

witness must add something to the jury's understanding, and "when an expert witness is not in a better position than the fact finder to render an opinion on the matter, it is not error to exclude that witness' testimony." *Noland v. French*, 134 F.3d 208, 217 (4th Cir. 1998). An expert's narrative of facts that the parties can establish using direct evidence does not serve the goal of assisting the jury. *See Eghanyem v. Boston Sci. Corp.*, 57 F. Supp. 3d 658, 699 (S.D.W. Va. 2014).

Even if expert evidence is relevant, it may nonetheless be excluded under Federal Rule of Evidence 403. Rule 403 provides that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. "[D]istrict courts have broad discretion in making such determinations, which [the Fourth Circuit] may overturn only under the most extraordinary circumstances, where that discretion has been plainly abused." *Steves & Sons, Inc. v. HELF-WEN, Inc.*, 988 F.3d 690, 713 (4th Cir. 2021) (internal quotation marks and citation omitted). Evidence is "unfairly prejudicial" under Rule 403 if it could "excite the jury to make a decision on the basis of a factor unrelated to the issues properly before it." *Shultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994) (internal quotation marks and citation omitted); *see also Jovan v. Pilgrim's Pride Corp.*, No. 1:05cv2443, 2007 U.S. Dist. LEXIS 86104, at *15-

6

16 (M.D. Pa. Nov. 20, 2007) (holding in an employment discrimination case that the probative value of testimony regarding plaintiff's torture years before trial was substantially outweighed by the danger of unfair prejudice).

## ARGUMENT

Under Federal Rules of Evidence 702, 401, and 403, the Court should preclude Dr. Oliver from offering testimony related to the 13 opinions listed above or otherwise testifying on torture or abuse, and he should be precluded from offering testimony related to hypothermia.

I.

### Dr. Oliver Should Be Precluded from Opining that Mr. Givens Was Tortured or Abused While Housed at Marion

Neither torture nor abuse is an element of the causes of action Plaintiff asserts here. This lawsuit is not a prosecution of the crime of torture under U.S.C. §2340A. It is not a case in which a jury must understand the meaning of "torture" or "abuse." With respect to Artrip and Poston, the jury must determine, among other things, whether a constitutional tort was committed against Mr. Givens on February 5, 2022, and whether either had knowledge of conduct engaged in by a subordinate where the conduct posed a pervasive and unreasonable risk of constitutional injury to Mr. Givens. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citing *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984), *cert. denied*, 470 U.S. 1035 (1985)). An expert's opinion on torture or abuse will not assist a jury in

7

determining these factual issues. Labeling conduct that the jury themselves may evaluate does not have a tendency to make facts of consequence in this case more or less probable than they would be without the opinion evidence. Because Dr. Oliver's opinions regarding torture and abuse are not relevant under Rule 401, they should not be admitted.

Even were Dr. Oliver's opinions relevant, they should be excluded because their probative value, if any, is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time. Here, there is little, if any, probative value of Dr. Oliver's opinions on torture or abuse, yet the danger of unfair prejudice is clear. Testimony about torture and abuse is likely to excite the jury to make a decision on the basis of the emotionally wrought specter of torture and abuse, neither of which is an issue before the court. Dr. Oliver's opinions are likely to appeal to animosity toward prisons generally and Marion in particular, an animosity that Plaintiff has sought to stoke by her frequent reports to local and national press through her agents.[2] Moreover, Dr. Oliver's testimony and

---

[2] For example, one of Plaintiff's attorneys repeatedly interpreted Mr. Givens' death for local television news. *See, e.g., They said her disabled brother died in prison naturally. A lawsuit alleges otherwise*, WFDD (June 24, 2023), *available at* https://www.wfdd.org/story/they-said-her-disabled-brother-died-prison-naturally-lawsuit-alleges-otherwise (last visited on Oct. 31, 2024); *Lawsuit accuses correctional officers in Marion of brutally beating inmate to death*, WCYB News (June 26, 2024), *available at* https://wcyb.com/news/local/lawsuit-accuses-correctional-officers-in-marion-of-brutally-beating-inmate-to-death-charles-james-givens-marion-correctional-treatment-center-smyth-county-community-hospital

8

                                      Pageid#: 1107

his experience will shift the focus from the concrete facts of the case to searing imagery of "torture by the Central Intelligence Agency in Abu Ghraib, Kabul, and Guantanamo Bay." (Oliver Report p.9). No amount of instructions would overcome the vividness of Dr. Oliver's imagery. Admission of his testimony would unfairly and irretrievably prejudice Artrip and Poston.

Dr. Oliver's definitions of torture and abuse, drawn from his experience in the military, are so broad that his labels will mislead or, at the very least, not assist the jury. Dr. Oliver defines torture as "[r]epeated inflicted trauma – over a period of time involving – involving someone who is in a position of authority over another. Or under the control of another, let's put it that way." (Tr. 22:15-19). Dr. Oliver draws his definition from how he used the term "torture" while in the military. (Tr. 23:21-24). He defines "abuse" as "abusing or inappropriately acting

---

(last visited on Oct. 31, 2024); *Attorney speaks about lawsuit accusing correctional officers in Marion of brutally beating inmate to death*, WCYB News (June 27, 2023), *available at* https://wcyb.com/news/local/theres-just-one-thing-after-another-attorney-speaks-about-lawsuit-accusing-correctional-officers-in-marion-of-brutally-beating-inmate-to-death (last visited on Oct. 31, 2024). An investigator working on behalf of Plaintiff released VDOC surveillance video, mischaracterized what it showed, and accused VDOC of a cover-up. *See Marion correctional officers accused in federal lawsuit of brutally beating inmate to death*, WCYB News, June 28, 2024, https://wcyb.com/news/local/marion-correctional-officers-accused-in-federal-lawsuit-of-brutally-beating-inmate-to-death-alleged-cover-up-follows (last visited on Oct. 31, 2024); *see also* KENDRA BUDD, *Private Investigator Uncovers Dark Prison Secrets*, (Feb. 1, 2024), *available at* https://workingpimag.com/2024/02/01/private-investigator-uncovers-dark-prison-secrets (last visited on Oct. 31, 2024).

with people in a way that is derogatory or painful." (Tr. 24:17-22). According to Dr. Oliver, "[t]orture is more frequently used [than "abuse"] in terms of people who are captured or detained or prisoners." (Tr. 25:2-4). With respect to Mr. Givens, Dr. Oliver says that "negligence is a component of torture." (Tr. 37:3-4). Under Dr. Oliver's definitions, anyone suffering trauma, regardless of the source, over an extended period of time while in custody or otherwise subordinate to another is a victim of torture. Confronted with these high-level labels from an expert, the jury is likely to be misled into inferring that all kinds of conduct—or even mere *allegations* of misconduct[3]—constituted "torture" or "abuse." Overly broad definitions drawn from military experience will not assist the jury, and, more likely than not, their use will unfairly prejudice Artrip and Poston.

In fact, the jury is in a better position than Dr. Oliver to evaluate whether the conduct Plaintiff alleges is sufficient to support a claim under §1983, and they will evaluate the evidence through their eyes as Defendants' peers, not through the jaundiced perspective of one who has spent extensive time investigating and studying torture. The jury will determine for themselves whether the incidents and allegations that Dr. Oliver lumps together as torture or abuse—without having determined whether they occurred—constituted unconstitutional conduct.

---

[3] Dr. Oliver relied on mere allegations of conduct as supporting his theory that "Mr. Givens' death was the culmination of a long history of abuse and neglect." (Report p.13).

10

Dr. Oliver's opinions on abuse and torture will also waste time through examination and cross-examination of an expert on issues that are easily presented and understood through direct evidence. Plaintiff's burden is to show that Artrip and Poston had knowledge of conduct engaged in by a subordinate where the conduct posed a pervasive and unreasonable risk of constitutional injury to Mr. Givens. With or without Dr. Oliver's testimony, Plaintiff will have to present evidence of such conduct. Dr. Oliver's testimony will serve only to repackage that direct evidence and serve it up in a form favorable to Plaintiff, all at the expense of the Court's time.

For these reasons, Dr. Oliver should be precluded from offering testimony related to the 13 opinions listed above or otherwise testifying on torture or abuse.

II.

Dr. Oliver Should Be Precluded from Opining that
Hypothermia is a Tool of Torture or an Indicator of Abuse/Neglect

Dr. Oliver should not be allowed to offer testimony regarding hypothermia for the reasons stated above in connection with torture and abuse generally. The testimony is not relevant, and, even if it were, its probative value, if any, is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time. Because Dr. Oliver's report singles out and extensively addresses hypothermia, Defendants Artrip and Poston explain why expert testimony regarding hypothermia in particular should be excluded.

None of Dr. Oliver's opinions on hypothermia is relevant to Plaintiff's claims because Mr. Givens did not die as a result of hypothermia or suffer it at the time of his death. There is no requisite causal link between hypothermia and the injuries he suffered on February 5, 2022.[4] Whether Mr. Givens suffered hypothermia in the past is not relevant to the injuries and death he suffered on February 5, 2022, or the issue of whether Artrip or Poston had knowledge of conduct engaged in by a subordinate which conduct posed a pervasive and unreasonable risk of constitutional injury to Mr. Givens.

Even more remote from the factual issues at stake in this lawsuit are Dr. Oliver's opinions that "[h]ypothermia is commonly applied in abuse and torture of prisoners," "hypothermia is a frequently used tool" of torture, and "[h]ypothermia is an indicator of abuse/neglect." (Report p.9; Tr. 40:9-13; *see also* Tr. 41:8-10). Whether hypothermia is a tool of torture does not have a tendency to make any fact of consequence more or less probable than it would be without the opinion evidence. It should be excluded as irrelevant.

Further, the circumstances of Mr. Givens' hypothermia are so remote from

---

[4] It is well-settled that all "constitutional torts . . . require a demonstration of both but-for and proximate causation" and "intervening acts of other[s]" may insulate a defendant from liability. *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012). With respect to supervisory liability in particular, there must be "an affirmative causal link between the supervisor's inaction and *the particular constitutional injury suffered by the plaintiff*." *Shaw*, 13 F.3d at 799 (emphasis added).

12

the instances of hypothermia discussed by Dr. Oliver that his opinions simply do not fit the facts of this case.  When Mr. Givens was diagnosed with hypothermia, he was promptly provided onsite healthcare and, if that was unsuccessful, evacuated to the local hospital.  He had multiple comorbidities that made him more susceptible to hypothermia.  Additionally, unlike the torture victims in the research cited by Dr. Oliver, Mr. Givens was *not* shackled nude to a cold concrete floor; he was *not* kept awake with music, yelling, loud white noise, or brief opportunities to stand; he was *not* subjected to 80 hours of nearly continuous interrogation; he was *not* hooded; he was *not* shackled in an upright or horizontal position; and he was *not* waterboarded.  (Tr. 54:17-55:8).  Mr. Givens was *not* incarcerated at Guantanamo, Abu Ghraib, Kabul, or a comparable "enhanced interrogation" center.  The Marion security officers, treatment officers, and medical personnel around him were not CIA investigators.

Against Marion's undramatic factual backdrop, Dr. Oliver overlays a lengthy and inflammatory discussion of the horrors of using forced cold air to extract information about terrorism plots against the United States.  Based on his military experience, Dr. Oliver says that hypothermia is "a hallmark of abuse in the context of detention, most famously used as a tool for torture by the Central Intelligence Agency in Abu Ghraib, Kabul, and Guantanamo Bay."  (Report p.9).  He quotes extensively from a study of Guantanamo Bay, including:

13

> For eleven days, beginning November 23, al-Qahtani was interrogated for twenty hours each day be interrogators working in shifts. He was kept awake with music, yelling, lout white noise or brief opportunities to stand. He then was subjected to eighty hours of nearly continuous interrogation until what was intended to be a 24-hour "recuperation." This recuperation was entirely occupied by a hospitalization for hypothermia that had resulted from deliberately abusive use of an air conditioner.

(Report p.10) (quoting S.H. Miles, *Medical ethics and the interrogation of Guantanamo 063*, THE AMER. J. OF BIOETHICS (2007). Dr. Oliver includes in his report a table of guidelines on "Physical Pressure" of the CIA's Office of Medical Services. (Report p.10). The guidelines include stripping, diapering, hooding, isolation, white noise, continuous use of light or darkness, uncomfortably cool environment, water dousing, sleep deprivation, attention grasp, facial hold, insult slap, abdominal slap, stress positions, walling, cramped confinement, and waterboard. (Report p.10). Dr. Oliver also states that "[i]n the torture of Gul Rahman, CIA officers shackled a nude inmate to a cold concrete floor to induce hypothermia." (Report p.10). Dr. Oliver, however, does not claim that these atrocities happened to Mr. Givens. He cannot. All this information is not relevant to Plaintiff's claims.

Even when Dr. Oliver tries to connect Guantanamo to Mr. Givens, he only further exposes the gap between his professional experiences and the circumstances of Mr. Givens' incarceration. Instead of accounting for the differences between the carceral conditions of enhanced interrogation at

14

Guantanamo and the conditions at state prisons holding people convicted of crime, Dr. Oliver simply lays down a series of dubiously related statements. He begins by saying, "[a]mong other inmates [i.e., inmates other than Gul Rahman] in prison, death from hypothermia can occur when the victim is placed in solitary confinement without adequate clothing or bedding." (Report p.10). From this assertion, Dr. Oliver associates the degradation of placing someone in solitary confinement without adequate clothing—not hypothermia—to increasing the risk of suicide ideation or attempt. (Report. p.10). Dr. Oliver then jumps to Mr. Givens' hypothermia by saying that "the risk of suicide ideation or attempt" was "noted with Mr. Givens," and "Mr. Givens had six hospitalizations for hypothermia." (Report p.10). According to Dr. Oliver, because Mr. Givens had experienced a risk of suicide ideation or attempt (at some unspecified time) and because he had five[5] hospitalizations for hypothermia (which Dr. Oliver does not connect to the time Mr. Givens experienced a risk of suicide), Mr. Givens must be like the prisoners at Guantanamo and his hypothermia must be the result of torture. (Report p.10). Essentially, Dr. Oliver says that the circumstances of Mr. Givens'

---

[5] Dr. Oliver incorrectly states that "Mr. Givens had six hospitalizations for hypothermia." (Report p.10). He incorrectly states that "Mr. Givens suffered his first episode of hypothermia on October 15, 2018. (Report p.2). Givens was transported to the hospital on October 15, 2018, for chest pain and to rule out hypothermia. Hospital notes show that Mr. Givens was not diagnosed with hypothermia, that critical care was not applicable, and that Mr. Givens was discharged within less than two hours of arrival at the hospital.

15

hypothermia are like those at CIA interrogation centers because he says they are. This is not a sufficient basis for admitting his testimony. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elect. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Dr. Oliver's opinions regarding hypothermia should be excluded.

Dr. Oliver's extensive discussion of torture and hypothermia also make it obvious that his testimony, even if relevant, should be excluded under Rule 403. The factual details of torture that is so remote in circumstances cannot but excite the jury to make a decision on the basis of their knowledge and attitudes toward the detention and enhanced interrogations of people incarcerated at Guantanamo, Abu Ghraib, and Kabul. Allowing Dr. Oliver to testify on hypothermia will unfairly prejudice Artrip and Poston.

For these reasons, Dr. Oliver should be precluded from offering testimony related to hypothermia.

Conclusion

For these reasons, Dr. Oliver should be precluded from offering testimony related to the 13 opinions listed above or otherwise testifying on torture or abuse, and he should be precluded from offering testimony related to hypothermia.

Respectfully submitted,

/s/ D. Patricia Wallace
D. Patricia Wallace, SAAG, VSB #92964
Office of the Attorney General
Criminal Justice & Public Safety Division
202 North 9th Street
Richmond, Virginia 23219
Tel.: 804-786-2912; Fax: -4239
E-mail: pwallace@oag.state.va.us
*(Counsel for Defendants Artrip & Poston)*

Nathan H. Schnetzler (VSB #: 86437)
FRITH ANDERSON + PEAKE, P.C.
29 Franklin Road, SW
P.O. Box 1240
Roanoke, Virginia 24006-1240
Phone: 540/772-4600
Fax: 540/772-9167
Email: nschnetzler@faplawfirm.com
*(Counsel for Defendants Artrip & Poston)*

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel for Plaintiff and Defendants.

s/ D. Patricia Wallace  
D. Patricia Wallace, VSB #92964  
Assistant Attorney General