## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

CLERKS OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

March 20, 2025

LAURA A. AUSTIN, CLERK
BY:  s/ FELICIA CLARK
DEPUTY CLERK

|  |  |  |
|---|---|---|
| **KYMBERLY HOBBS,** | ) | |
| **ADMINISTRATOR OF THE** | ) | |
| **ESTATE OF CHARLES JAMES** | ) | |
| **GIVENS, DECEASED,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:23CV00003 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **ANTHONY RAYMOND KELLY,** | ) | JUDGE JAMES P. JONES |
| **ET AL.,** | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

*Argued:  Mark J. Krudys, THE KRUDYS LAW FIRM, PLC, Richmond, Virginia, for Plaintiff; Cameron S. Bell, PENN, STUART & ESKRIDGE, Abingdon, Virginia, for Defendants Anthony R. Kelly, Gregory S. Plummer, Joshua R. Jackson, and William Z. Montgomery; Jeremy B. O'Quinn, THE O'QUINN LAW OFFICE, PLLC, Wise, Virginia, for Defendant Samuel Osborne; Nathan H. Schnetzler, FRITH ANDERSON + PEAKE, P.C., Roanoke, Virginia, and D. Patricia Wallace, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Defendants Jeffrey Artrip and Travis S. Poston.*

The plaintiff, the legal representative (and sister) of an inmate who died while incarcerated in a Virginia state prison, brought this action under 42 U.S.C. § 1983 and state law against employees of the Virginia Department of Corrections (VDOC). Some defendants are accused of attacking the inmate in a prison shower or witnessing the assaults and being deliberately indifferent to it, while other defendants were the supervisors of the officers involved.  In advance of trial, the

parties have submitted motions to sever, to exclude expert witnesses, and for partial or full summary judgment.  After careful review of the record presented, I will grant summary judgment in favor of the supervisory defendants, deny the other defendants' motions for summary judgment, and grant in part and deny in part the defendants' motions to exclude the plaintiff's expert testimony.  In addition, motions to sever will be denied as moot.

## I.  BACKGROUND.

Kymberly Hobbs seeks damages in this case for the death of her decedent, Charles James Givens, who died while incarcerated in a Virginia state prison. Givens was a 52-year-old man who as a child had suffered a traumatic brain injury and was mentally disabled.  It is alleged that while incarcerated at the Marion Correctional Treatment Center (Marion), a secure facility for mentally ill and intellectually disabled Virginia inmates, Givens was frequently subjected to physical abuse by staff members.  Defendant Jeffrey Artrip was the warden at Marion and defendant Travis C. Poston was a shift supervisor.  The other five defendants, Joshua C. Jackson, Anthony R. Kelly, William Z. Montgomery, Gregory S. Plummer, and Samuel D. Osborne were officers involved in an incident central to this case that occurred on February 5, 2022.

On February 5, 2022, Givens was escorted to the shower room by the five officers.  Hobbs alleges that the officers (excepting Osborne) then physically abused

Givens by snapping a wet towel on him, dumping cold water on him, and punching him in the torso. Osborne witnessed but did not attempt to prevent this abuse. According to a fellow inmate, Givens requested to be taken to the medical ward. He was not, and he died about two hours after the shower. An autopsy showed that Givens suffered blunt force trauma to his torso, fracturing his ribs and resulting in the laceration of his spleen and massive internal bleeding, causing his death.

Hobbs also alleges multiple other instances of abuse of Givens beginning in 2014. A recurring issue across most of these instances is Givens' repeated treatment and hospitalizations for hypothermia. It is contended that supervisory defendants Warden Artrip and Captain Poston are responsible for the February 5 conduct under a theory of supervisory liability.[1]

The defendants have filed multiple motions. All the defendants filed motions to exclude or limit the testimony of the plaintiff's two expert witnesses, and the non-supervisory defendants moved to sever the supervisory liability claim from the other seven counts. All the defendants filed full or partial motions for summary judgment. The motions have been fully briefed and orally argued and are now ripe for disposition.

---

[1] I previously denied Artrip's and Poston's motion to dismiss the supervisory liability count. *Hobbs v. Kelly*, No. 1:23CV00003, 2024 WL 4224956 (W.D. Va. Sept. 18, 2024).

Defendants Kelly, Plummer, Jackson, and Montgomery move for partial summary judgment on Count Three for the withholding of medical care and Count Six for conspiracy. Both counts stem from the incident on February 5, 2022. Defendant Osborne makes a separate motion for summary judgment on all the counts in which he is named. Because those counts include Counts Three and Six, I will analyze the motions for summary judgment on Counts Three and Six together.

## II. SUMMARY JUDGMENT.

### A. Local Rule 56(b).

As noted by the plaintiff, the briefs supporting summary judgment for the non-supervisory defendants do not include a separately captioned list of undisputed facts as required by Local Civil Rule 56(b). Under that Rule "[a]ny motion for summary judgment . . . must contain a separately captioned section setting forth with specificity the material facts claimed to be undisputed together with specific record citations in support thereof."[2] Furthermore, the "facts" section that the defendants produced is less than one page in length and does not contain any specific facts about what they contend occurred on February 5, 2022.

The non-supervisory defendants raise facts throughout their memoranda but do not provide consistent citations to the record to support them. Nor do they remedy

---

[2] Federal Rule of Civil Procedure 56(c)(1) permits local court discretion in the way a party must cite support in the record for its assertion that a fact is disputed or undisputed. Fed. R. Civ. P. 56, advisory committee's note to 2010 amendment.

this in their reply briefs. Attorneys practicing in this court are expected to know and obey the local rules, all of which are easily available on the court's website. The rule in question serves to promptly focus the attention of the parties on the crucial element of summary judgment. This saves resources of the parties and the court. While the plaintiff urges the court to sanction the defendants by not accepting any alleged undisputed fact used by them to support their arguments, I find that under the circumstances this sanction is not in the interest of justice. Plaintiffs' counsel was clearly able to extract and respond to the alleged undisputed facts asserted by defendants, even if it likely involved more time and effort.

### B. Standard of Review.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, the court must view "all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 958 (4th Cir. 2022).

A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for

that party." *Id.* at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

### C. Factual Background.

The plaintiff's allegations are supported largely by the affidavit of an alleged witness, inmate Ronald West. He was a "cadre" inmate assigned to clean different areas of the prison and that day was cleaning Givens' general area. Pl.'s Opp'n Mot. Partial Summ. J. Ex. 1, West Aff. 5, ECF No. 139-1. West was told to clean Givens' cell after Givens defecated on himself in the early morning of February 5, which is why Givens was being taken to the shower. West witnessed the alleged abuse because he was walking "back and forth through the shower room" to "retrieve cleaning supplies" for Givens' cell. *Id.* at 7.

According to West, shortly after 7 a.m. on February 5, the five non-supervisory defendants arrived at Givens' cell to escort him to the shower area. Givens expressed with "limited verbal capabilities" that he did not want to go. *Id.* at 6. The defendants appeared frustrated at Givens, and it took "some time" for him to leave his cell. *Id.* At the shower area, Plummer, Jackson, Montgomery, and Osborne took Givens into the shower room. Kelly stood outside in the hallway at

times, but then went in and out of the shower room. The shower rooms do not have cameras.

West states in his affidavit that once in the shower room, Givens was undressed. Then, Plummer "repeatedly snapped a wet towel at Mr. Givens, hitting his torso and genitals." *Id.* Givens exclaimed that it hurt and physically reacted in pain. West then saw Kelly "aggressively punch" Givens in his side. *Id.* At a time when West was then outside of the view of the shower room, he "heard the impact of three hard-impact punches on Mr. Given's [sic] body, as well as three of what sounded like slaps." *Id.* West attributed those hits to Jackson and Montgomery, because they were standing the closest to Givens "*immediately*" prior to the sounds. *Id.*

West then returned to the vicinity of the shower room. He saw Jackson and Montgomery "throw and dump ice-cold water on Mr. Givens as he sat on a plastic chair in the shower stall." *Id.* at 7. At no time did West see Givens act aggressively. When Givens was returned to his cell shortly before 7:40 a.m., West alleges that he "required assistance as he walked." *Id.* at 8. Video surveillance footage of the hallway, with a time stamp of 7:37 a.m., appears to show Givens being escorted from the shower area to his cell a few steps down the hall. Four men walk with Givens, some with their hands holding his arms, while two men remain in the background. Pl.'s Opp'n Mot. Partial Summ. J. Ex. 2, Surveillance Footage, ECF No. 139-2.

Some of the men escort Givens inside his cell.  West states in his affidavit that that was "unusual," because the officers would usually let go of the inmate at the entrance to his cell.  West Aff. 8, ECF No. 139-1.  However, details are unclear because the footage is grainy, has a distorted aspect ratio, and has a very low frame rate of one frame per second.

After returning Givens to his cell, Jackson, Plummer, and Kelly left the hallway.  Jackson and Plummer did not return to Givens' wing that day.  Around 9:26 a.m., Osborne walked past Givens' cell.  He noticed that Givens was looking at him and asked if Givens was alright.  Givens' mumbled response caused Osborne to call for medical.  Mem. Supp. Mot. Partial Summ. J. Ex. 5, Osborne Dep. 88–90, ECF No. 119-5.  Montgomery also observed that Givens was not communicating. *Id.* at Ex. 6, Montgomery Dep. 70, ECF No. 119-6.

Montgomery escorted prisoners to their cells to allow medical personnel to enter the wing.  *Id.*  The defendants claim that a Sergeant Nettles then arrived and gave Givens sternum rubs, but they do not cite to evidence in the record supporting this.  They also claim that the nursing staff arrived.  The defendants do not explain the following sequence of events, but at some time later that day, Givens died.  It is undisputed that Givens died from exsanguination from a rupture of his spleen caused by broken ribs.  Mem. Supp. Mot. Partial Summ. J. 5, ECF No. 119; Pl.'s Opp'n Mot. Partial Summ. J. 4, ECF No. 139.

D. Count Three: Withholding of Medical Care.

Kelly, Plummer, Jackson, and Montgomery jointly move for summary judgment on Count Three, which is a § 1983 claim for deprivation of medical care under the Eighth Amendment. Osborne also separately moves for summary judgment on this count.

"A prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A plaintiff alleging a deliberate indifference claim related to medical care must establish that the inmate's medical condition was objectively serious — that is, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (citation omitted). The plaintiff must also show that the defendant official subjectively knew of and disregarded an excessive risk to the inmate's health or safety. *Jackson*, 775 F.3d at 178.

"This deliberate indifference standard is not satisfied by a showing of mere negligence, a mere error of judgment or inadvertent failure to provide medical care, or mere disagreement concerning questions of medical judgment." *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013) (unpublished) (internal quotation

marks, citations, and alterations omitted). However, "[a] delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 734 (4th Cir. 2015) (unpublished) (citation omitted).

The video footage of Givens walking from the shower room to his cell, while low quality, appears to show multiple of the escorting officers with their hands on his arms to guide him. It also shows at least one of the officers entering Givens' cell. Another officer crosses the threshold, but the video cuts off before it can be seen whether that officer continues all the way inside. Inmate West watched the footage and identified the officers as Osborne and Montgomery. West Aff. 8, ECF No. 139-1. He also stated that escorting an inmate inside his cell, instead of merely to the entrance, is unusual, and furthermore that his impression was that Osborne and Montgomery were placing Givens in his bed. A reasonable jury could therefore find that the plaintiff has established the objective component of the claim for deprivation of medical care.

A reasonable jury could also find that the non-supervisory defendants were subjectively aware of and disregarded an excessive risk to Givens' life. They were the ones to escort Givens to his cell with their hands on his arms, and at least one of them entered Givens' cell with him. And, according to West, they allegedly caused

Givens' injuries.[3]  A reasonable jury could find that they were aware of Givens' injuries and that their failure to call for medical help "exacerbated the injury or unnecessarily prolonged [Givens'] pain." *Sharpe*, 621 F. App'x at 734.

The defendants argue that West's affidavit is contradicted by statements he made to the Virginia State Police, the Virginia Department of Corrections Special Investigation Unit, and the Smyth County Grand Jury.  However, they provide no details on this alleged contradiction and do not cite to any of these allegedly contradicting statements in the record.  Their contention is therefore not sufficient to eliminate a material dispute of fact at the summary judgment stage.

Because a reasonable jury could find, based on the evidence in the record, that (a) Givens' medical condition was objectively serious, and that (b) Kelly, Plummer, Jackson, Montgomery, and Osborne were subjectively aware of such condition but deliberately indifferent to it, I will deny the motions for summary judgment on Count Three.

### E.  Count Six: Conspiracy.

Kelly, Plummer, Jackson, Montgomery, and Osborne also move for summary judgment on Count Six, which is a state law conspiracy claim.

---

[3]  Neither Kelly, Plummer, Jackson, nor Montgomery move for summary judgment on the plaintiff's excessive force or state law battery claims stemming from the alleged incident in the shower.

"A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Country Vintner, Inc. v. Louis Latour, Inc.*, 634 S.E.2d 745, 751 (Va. 2006) (quoting *Com. Bus. Sys., Inc. v. BellSouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995). "Whether a conspiracy caused the alleged damage ordinarily is a question for a jury." *BellSouth*, *Id*. at 267.

The plaintiff presents sufficient evidence for the conspiracy claim to be presented to a jury. Inmate West's affidavit contains an allegation that correctional officers "openly threatened [Marion] inmates with physical harm, saying things like 'we'll take you to the shower room and beat your ass.'" West Aff. 2, ECF No. 139-1. While he does not allege that any of the named defendants did so, he stated that they "appeared frustrated and angry" at Givens when they were taking him to the shower on February 5 after he defecated on himself. *Id*. at 6. And, as the plaintiff argues, it is notable that five officers came to escort Givens from his cell to the shower room, which was a short walk down a single hallway. If the plaintiff's evidence is to be believed, they all waited to report the alleged attack until Osborne and Montgomery saw him unable to communicate in his cell around 9:30 a.m.

The defendants argue that the plaintiff has only made conclusory allegations but provided no specific evidence of an agreement. While interpreting the pleading requirements for a Sherman Act claim in *Twombly*, however, the Supreme Court

stated that sufficient allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). The evidence here raises such a suggestion to the extent that it would be appropriate for a jury to decide the claim.

Therefore, I will deny the motions for summary judgment on Count Six.

## F. Defendant Osborne's Motion for Summary Judgment.

Defendant Osborne moves for summary judgment on all the counts that name him. This includes Counts Three and Six, which I denied summary judgment on above. I will also deny summary judgment on Count Two, for failure to intervene under § 1983; Count Seven, for gross negligence; and Count Eight, for willful and wanton negligence.

## G. Count Two: Failure to Intervene.

The plaintiff alleges that Osborne failed to stop the other four non-supervisory defendants from assaulting Givens.

"The Fourth Circuit addresses a failure to intervene claim as a theory of 'bystander liability' wherein there is 'an omission to act ... coupled with a duty to act.'" *Jarvis v. Securitas Sec. Servs. USA, Inc.*, No. 11-CV-00654-AW, 2012 WL 527597, at *6 (D. Md. Feb. 16, 2012) (quoting *Randall v. Prince George's Cnty.*, 302 F.3d 188, 203 (4th Cir. 2002)), *aff'd*, 474 F. App'x 271 (4th Cir. 2012)

(unpublished). To succeed on a bystander liability claim, a plaintiff must show that the officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall*, 302 F.3d at 204 (footnote omitted).

The plaintiff presents genuine issues of material fact on whether Osborne had a "reasonable opportunity" to stop the other officers from allegedly abusing Givens. *Id.* Osborne argues that he did not because "the alleged assault occurred during a matter of seconds and he was standing in the corner of the room, not near the showers where the alleged assault occurred." Osborne Mem. Supp. Mot. Summ. J. 10, ECF No. 127. However, West alleges that Givens was hit with a wet towel, hit or punched three or four times, and had cold water dumped on him. It is an issue for the jury to decide whether these events happened, and whether they happened within an amount of time that would have provided Osborne a "reasonable opportunity" to intervene. *Randall*, 302 F.3d at 204. As a result, I will deny summary judgment on Count Two.

### H. Counts Seven and Eight: Gross Negligence and Willful and Wanton Negligence.

Osborne also moves for summary judgment on Count Seven, for gross negligence, and Count Eight, for willful and wanton negligence.

I previously ruled that the plaintiff had sufficiently pleaded that Osborne had a duty to protect and prevent harm to Givens. *Hobbs v. Kelly*, 2023 WL 3563010, at *3. The evidence in the summary judgment record supports my earlier ruling that

Osborne was present during the alleged assault and therefore should have known the other officers would injure Givens if he did not act.

However, Osborne's summary judgment argument on the negligence counts reiterates his argument on the failure to intervene count. He contends that he was not able to intervene because the alleged attack happened in a matter of seconds. For the same reason as above, I find that a triable issue of fact exists as to whether Osborne is culpable. I will therefore deny his motion for summary judgment on Counts Seven and Eight.

## I.  Defendant Artrip's Motion for Summary Judgment.

Jeffrey Artrip was the warden at Marion beginning in April 2019. Along with Poston, Artrip is named only in Count Four for supervisory liability. The plaintiff alleges that Artrip was deliberately indifferent to beatings and torture carried out by corrections officers on Givens. Artrip moves for summary judgment on that count.

The plaintiff supports her supervisory liability claim with allegations of two different kinds of abuse. She alleges that Givens was physically abused since 2014, but also was intentionally given hypothermia multiple times.

On the general allegations of abuse, Artrip argues that he cannot be held accountable for incidents that happened multiple years before he joined Marion. He became the warden at Marion in April 2019, continuing in the job through Givens' death in February 2022. He states in his deposition that when he first became

warden, he performed a "brief" review of Givens' records at Marion, reviewing no further than about 2018.[4]  Pl.'s Opp'n Poston Mot. Summ. J. Ex. 6, Artrip Dep. 38, ECF No. 143-6.

In addition to the general allegations of abuse, the plaintiff claims that Artrip did nothing in response to Givens' multiple hospitalizations for hypothermia. Givens was hospitalized six times, and Artrip was the warden for five of them.  The plaintiff alleges that the cause of these hospitalizations was Marion officials intentionally keeping the facility too cold and pouring cold water on inmates.  Artrip, however, provides evidence supporting his contention that Givens' traumatic brain injury affected his body's ability to regulate his temperature.  One of Givens' doctors, Anne Horst, advised Artrip of this, and states in a declaration that Givens' psychiatric medicines carried a side effect of hypothermia.  Mem. Supp. Poston Mot. Summ. J. Ex. 5, Horst Decl. 4, ECF No. 129-5.  Dr. Horst saw no evidence that suggested his hypothermic episodes were the result of abuse or neglect by staff at Marion.  *Id.*

---

[4]  The plaintiff disputes Artrip's contention that he only reviewed files back to 2018. She argues that his deposition does not support that contention.  In his deposition, however, Artrip was asked, "How far did you go back [in your review of records]?"  He replied, "I started in 2019.  So 2018, maybe.  I was, you know, just brief, what I could find on [the computer program that contains inmate records]."  Artrip Dep. 36, ECF No. 143-6.  The deposition therefore supports Artrip's contention that he performed a brief review of records going back to about 2018.

West states in his affidavit that the Marion facility was so cold in the winter that ice formed in the water in the toilets. West Aff. 4, ECF No. 139-1. Logbook records, however, show the temperature in the wings where Givens was located on or shortly after the dates he received treatment for hypothermia in February, October, and December 2021. These temperatures ranged from 65 to 73 degrees Fahrenheit. Mem. Supp. Poston Mot. Summ. J. Ex. 15, Logbook Records 245, 282, 283, ECF No. 129-15. And Artrip states that in December 2021, he "would have ordered" extra blankets, clothes, and long johns for Givens. *Id.* at Ex. 14, Artrip Dep. 99–100, ECF No. 129-14. Dr. Horst further states that Artrip granted the medical staff's requests that they give Givens extra blankets and lift the requirement that he be restrained while in the medical wing to lower his hypothermia risk. Horst Decl. 4, ECF No. 129-5. Givens continued to receive medical treatment and preventative care for hypothermic episodes until his death in 2022. *Id.* at Ex. 1, Givens Additional Medical Recs. 33, ECF No. 129-1.

### J.  Statute of Limitations.

Artrip and Poston both argue that the statute of limitations bars the supervisory liability claim. Both were added as defendants to this suit on January 14, 2024. They argue that the plaintiff cannot use any incidents before January 14, 2022, as a stand-alone basis for the supervisory liability claim. This is because the statute of limitations for a § 1983 claim is two years, according to Virginia's personal injury

statute of limitations period.  However, they seem to concede that if those incidents are "merely referenced as circumstantial evidence to support Plaintiff's claim," then there is no statute of limitations issue. Mem. Supp. Artrip Mot. Summ. J.  24, ECF No. 131.  The plaintiff agrees that "[t]hose prior acts do not form the basis of the lawsuit," which "would be the murder of Mr. Givens."  Pl.'s Opp'n Artrip Mot. Summ. J. 13, ECF No. 144.

The plaintiff further argues that the supervisory liability claim accrued when Givens died in February 2022, and that she complied with the statute of limitations because she sued within two years.  She contends that she must discuss the prior acts that put Artrip and Poston on notice as part of her supervisory liability claim.  I agree. As a threshold matter, the supervisory liability claim is not barred by the statute of limitations.

## K. Supervisory Liability.

A claim under § 1983 requires that Artrip and Poston, "through [their] own individual actions . . . violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676.  In other words, under § 1983, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a under a theory of respondeat superior." *Id.* at 676.  However, "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their

subordinates." *Shaw ex rel. Bowen v. Stroud*, 13 F.3d 791,798 (4th Cir. 1994). To

establish supervisory liability under § 1983, the plaintiff must show

> (1) that the supervisor had actual or constructive knowledge that his
> subordinate was engaged in conduct that posed a pervasive and
> unreasonable risk of constitutional injury to citizens like the plaintiff;
> (2) that the supervisor's response to that knowledge was so inadequate
> as to show deliberate indifference to or tacit authorization of the alleged
> offensive practices; and (3) that there was an affirmative causal link
> between the supervisor's inaction and the particular constitutional
> injury suffered by the plaintiff.

*Id.* at 799 (internal quotation marks and citations omitted).

In his motion for summary judgment, Artrip argues that most of the incidents

of alleged abuse cited in the Amended Complaint occurred before he joined Marion

and therefore cannot serve as a basis for holding him liable. He also argues that the

remaining incidents were unsubstantiated after an investigation or involved medical

care and decision making beyond his control.

The summary judgment record does not establish that Artrip "had actual or

constructive knowledge that his subordinate was engaged in conduct that posed a

pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff."

*Id.* (internal quotation marks and citations omitted).

The summary judgment record does not show Artrip had actual or

constructive knowledge resulting from the allegations of general abuse.

As a threshold matter, the parties disagree over how many allegations of

physical abuse by officers occurred while Artrip was warden. Artrip contends there

were only two, and that neither of them put him on sufficient notice to establish supervisory liability. Even considering the additional incidents that the plaintiff puts forth, however, does not establish Artrip's knowledge.

The first incident that Artrip discusses is from June 2021. Givens reported to medical providers that he injured his knee the previous week after hitting it against furniture, but the next day told Marion staff he hurt his knee when he was forcefully pushed down to the floor be handcuffed. Givens received treatment for his injured knee. Artrip states that Givens also had an injured right hand in January 2022, but did not report to any staff that he injured it.[5]

The plaintiff argues that there were additional incidents of abuse from May 2021 to February 2022.

However, all these incidents were either investigated and determined to be unfounded, or Givens did not allege that they were the result of abuse at all. The investigation into the June 2021 incident found that Givens was confused about his previous allegation that his knee injury was caused by being forcefully taken down

---

[5] Artrip cites only one document — named Exhibit 71 — to support the descriptions of these two alleged incidents. Mem. Supp. Artrip Mot. Summ. J. 19, ECF No. 131. However, there is not an Exhibit 71 in the docket. It appears to be a typo for Exhibit 1, ECF No. 129-1, which is a collection of some of Givens' medical records. But they are not complete and do not reflect any January 2022 treatment for Givens' right hand. They do contain a record for that treatment at the end of December 2021. Because the parties do not cite to evidence in the record for a second injury to Givens' hand in January 2022, I will consider the December 2021 incident to be the only relevant injury to Givens' right hand.

to the floor.  During an interview, he could not provide any details, including names, dates, or times, related to his previous allegation.  After reviewing video footage and interviewing three correctional officers, the investigator concluded that Givens' previous allegation was unfounded.  Pl.'s Opp'n Poston Mot. Summ. J. Ex. 3, Alleged Prior Abuses 2–4, ECF No. 143-3.

For the May 2021 incident in which Givens had injured wrists, the plaintiff submits only inpatient notes written by a nurse describing that Givens had "wounds" to his wrists and his wrist shackles were released to perform wound care.  *Id.* at Ex. 7, Givens Medical Records 47, ECF No. 143-7.  The notes do not indicate that Givens, the nurse, or any other person reported that the wounds were the result of abuse.  For the December 2021 incident in which Givens' right hand was allegedly injured, the plaintiff again cites only notes from a medical provider's encounter with him.  The notes show that Givens was evaluated for a swollen right hand with a "deformity at [his] 4th DiP joint," but that Givens was "unable to relate if he sustained any type of injury to [his right] hand."  Givens Additional Med. Recs. 37, ECF No. 129-1.

Lastly, the February 2022 incident in which Givens injured his toe is described by inmate West in his affidavit.  West states that two correctional officers "handled Mr. Givens roughly," causing him to lose his toenail.  West Aff. 5, ECF No. 139-1.

But the plaintiff does not cite any evidence that this alleged incident was reported by Givens or West, or that Artrip knew about it before Givens died two days later.

Taken together, these incidents are not of "a quantity and a quality sufficient to put [Artrip] on notice of the pervasive and unreasonable risk" of constitutional injury posed by his subordinates. *Addison v. Brinkman*, No. 3:10-CV-182, 2011 WL 587005, at *12 (E.D. Va. Feb. 8, 2011). And when Givens reported that he had been intentionally abused while Artrip was the warden, the reports were investigated. Of course, as the plaintiff argues, rubber-stamp investigations cannot be allowed to eliminate legitimate supervisory liability claims. *Chapman v. Jarrell*, No. 2:04-0605, 2005 WL 3088422 at *6 (S.D.W. Va. Nov. 17, 2005). But the fact that an investigation does not substantiate wrongdoing likewise cannot, on its own, be proof that the investigation was merely performative. The June 2021 investigation into Givens' knee injury, for example, reviewed surveillance footage and interviewed all the involved parties. The plaintiff does not put forth evidence beyond conclusory allegations that the investigations here were not legitimate. As a result, Artrip was entitled to rely on the outcomes of the investigations.

The plaintiff raises an April 2018 incident in which Givens was severely burned in the shower by another prisoner at Marion. An officer had escorted Givens to the shower with the other inmate and left them alone for two minutes. The officer was terminated for gross negligence and the other inmate was charged for assault.

Mem. Supp. Poston Mot. Summ. J. 8–9, ECF No. 129.  Artrip admits that he was aware of this incident, even though it happened before he became warden.  But this incident did not give Artrip "knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury" to Givens, because the "subordinate" was terminated before he joined Marion.  *Shaw*, 13 F.3d at 799.  And the incidents that happened after Artrip became warden were not of a "quantity and quality sufficient" to put Artrip on notice.  *Addison*, 2011 WL 587005, at *12.

Even combining these allegations of abuse with the plaintiff's allegations that inmates at Marion regularly were abused in the showers does not survive Artrip's motion.  The evidence cited by the plaintiff on this point consists of a collection of internal reports detailing incidents that occurred in the showers at Marion in 2018 and 2021.  She alleges that the reports show that "[t]he abuse in the showers was so bad that both Mr. Givens and another prisoner became afraid to go there."  Pl.'s Opp'n Artrip Mot. Summ. J. 15, ECF No. 144.  The report from that other prisoner notes that when an inmate was taken to the entrance of the showers in February 2021, the inmate repeated loudly, "NO. NO. NO." [sic].  Pl.'s Opp'n Poston Mot. Summ. J. Ex. 12, Other Alleged Instances of Abuse 2, ECF No. 143-12.  But a single incident of an inmate being unwilling to go to the showers for an unexplained reason

did not put Artrip on notice of an alleged practice of abuse by the correctional officers in the showers.

The summary judgment record shows that a reasonable jury could not find that Artrip had actual or constructive knowledge of a pervasive risk of constitutional injury to Givens because of these general abuse allegations.

Besides the general allegations of abuse, the plaintiff also argues that Artrip was deliberately indifferent to Givens' multiple episodes of hypothermia.

"An official acts with deliberate indifference if he had actual knowledge of the prisoner's serious medical needs and the related risks, but nevertheless disregarded them." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018). The record shows that Artrip did not disregard Givens' hypothermia and took action to prevent it from happening in the future. Dr. Horst states that Artrip granted requests to give Givens extra blankets and clothing. Despite inmate West's affidavit that he saw ice in the toilets in the winter, the logbook records show that the lowest temperature on the wing when Givens needed treatment was 65 degrees.

The plaintiff argues on this point that she "is not asserting that Mr. Givens and other residents at Marion became hypothermic due to poor medical care. She is asserting that intentional actions by staff at Marion . . . made Mr. Givens hypothermic." Pl.'s Opp'n Artrip Mot. Summ. J. 17, ECF No. 144. There are not

sufficient facts in the summary judgment record, however, for a reasonable jury to find in favor of the plaintiff.

Hobbs cites the affidavit of inmate West to support her contention that inmates were often punished with cold water showers, and that those showers contributed to Givens' hypothermia. West Aff. 16, ECF No. 139-1. But there are no dates or times identified to enable connecting these allegations to the dates Givens was treated for hypothermia. The plaintiff claims that Givens had cold water dumped on him and was hit with a broom on March 29, 2015. She cites an email by a prison recreation therapist recounting that Givens reported this incident to her, although Givens did not say who was responsible. Alleged Prior Abuses 6, ECF No. 143-3.

The record shows, however, that Marion officials then opened an investigation into the allegation. Givens told the investigator that he "[did] not remember telling" the employee who reported his claim that he "had a bucket of cold water dumped on [his] head." Mem. Supp. Artrip & Poston Mot. Summ. J. Ex. 21, Investigative Rep., ECF No. 159-4. Following the interview with Givens, the investigator concluded that there was no basis to find the incident actually occurred. *Id.* And the plaintiff does not cite any evidence in the record showing that Givens was treated for hypothermia, or any cold-related ailment, on or around March 29, 2015.

The plaintiff cites an expert's report and additional instances of Givens' treatment for hypothermia to argue that they were caused by intentional abuse instead of his medication. These instances are mostly alleged by inmate West in his affidavit.[6]   West Aff. 16–17, ECF No. 139-1.   But the record does not contain evidence sufficient for a reasonable jury to find in Givens' favor on this issue. Artrip was entitled to rely on the professional judgment of Givens' medical team, and the plaintiff presents no evidence that the medical staff reported to him that they believed the episodes were the result of officers lowering the temperature or dumping cold water on Givens.   Furthermore, Artrip provides evidence showing the temperature recorded in the wing at the relevant times.   The plaintiff refutes the logbooks only with a speculative assertion that they are inaccurate.

I therefore find that Artrip is entitled to summary judgment on the supervisory liability claim.

### L.   Defendant Poston's Motion for Summary Judgment.

Poston was a shift supervisor at Marion during the relevant period.   He also moves for summary judgment on the supervisory liability claim.   I will grant his motion for summary judgment.

---

[6] The plaintiff also cites West's grand jury testimony to support the claim that prison officers would intentionally punish inmates with cold showers. But West does not make any mention of cold showers, or any abuse that would lead to hypothermia, in the portion of the testimony that plaintiff produced. Pl.'s Opp'n Poston Mot. Summ. J. Ex. 13, West Grand Jury Test., ECF No. 143-13.

1. Background.

Poston began working at Marion in 1995.  He became a captain on February 10, 2015.  He held that role until his retirement in 2023.  As a captain, he served as a shift commander.

Poston's memorandum provides VDOC documents that describe some of the alleged incidents of abuse involving Givens.  These incidents were cited in the Amended Complaint to argue that Poston supervised correctional officers who abused Givens.  Poston contends that the incidents from October 2014 to February 2021 fail to show any wrongdoing by him.  Givens either received treatment for medical issues that he did not himself attribute to abuse, or he made accusations of abuse that were inconsistent with previous claims he made about the incident.  A medical report states in December 2014 that Givens "has had a history of stating false information."  Givens Additional Med. Recs. 26, ECF No. 129-1.

The main exception is the April 24, 2018, incident in which another inmate severely burned Givens with hot water in the shower.  But Poston submitted a VDOC roster showing that he was not on duty as a shift commander at the time and started his shift for the day after the assault ended.  Mem. Supp. Poston Mot. Summ. J. Ex. 7, Poston Decl. 5, ECF No. 129-7; *Id.* at Ex. 10, VDOC Roster 4, ECF No. 129-10. The plaintiff disputes that Poston was not there, but her cited evidence does not support that claim.  The logbook she cites does not make any mention of Poston's

presence until April 25, 2018.  Pl.'s Opp'n Poston Mot. Summ. J. Ex. 4, Logbooks

3, ECF No. 143-4.

Poston was not at the facility at the time of Givens' death on February 5, 2022,

nor was he a shift commander then.  VDOC Roster 10, ECF No. 129-10.  It is unclear

if the plaintiff disputes this.  She states at one point that she does not.  Pl.'s Opp'n

Poston Mot. Summ. J. 10, ECF No. 143.  However, she goes on to state that "Mr.

Givens was beaten to death in the shower at a time when Defendant Poston was on

duty as a supervisor."  *Id.* at 13–14.  Ultimately, she does not cite to evidence in the

record demonstrating this.

### 2.  Statute of Limitations.

As described above, Poston makes the same argument as Artrip on the statute

of limitations, and the plaintiff makes the same counterargument.  For the same

reasons, the statute of limitations does not bar the supervisory liability claim.

### 3.  Supervisory Liability.

Poston argues that he cannot be shown to have been aware of or deliberately

indifferent to widespread abuses at Marion.

On the knowledge factor, the plaintiff alleges that Poston knew of different

incidents of abuse whether they happened when he was on duty or off duty.

Assuming without deciding that Poston was aware of all the allegations of abuse whether they happened during his shifts or not, the evidence in the record is not enough for a reasonable jury to find that Poston was deliberately indifferent.

### 4. Deliberate Indifference.

The record does not contain sufficient evidence to support a jury finding that Poston was deliberately indifferent to the alleged abuse.

Poston's role as a shift commander carried the responsibility to do certain things but not others in response to misconduct. His description of his role is not disputed. Mem. Supp. Poston Mot. Summ. J. ¶¶ 14–17, ECF No. 129; Pl.'s Opp'n Poston Mot. Summ. J. ¶¶ 14–17, ECF No. 143. Poston did not have the authority to investigate any misconduct, whether it happened during his shift or not. He could not decide if an officer should be disciplined for misconduct. Poston's responsibility was limited to a requirement that he report serious incidents that occurred during his shift to the Administrative Duty Officer (ADO). An investigation could then be opened into the report, but he was not involved in that investigation, except to serve as a potential witness. If he believed that someone should have been disciplined, he had to report the incident to Marion's chief of security or an investigator. While he could write officers up for misconduct, he could not terminate anyone under his command or decide whether or how an officer should be disciplined.

Ultimately, however, the plaintiff's allegation is not that Poston violated policy in relation to the incidents raised. She contends that finding Poston not liable unless he could fire or officially discipline subordinates would be a more restrictive causation standard than the law requires. *Id*. at 18. Instead, his response to the incidents was allegedly deliberately indifferent because he failed to take "any action at all regarding the actions of his subordinates." *Id.* at 22. He "took no action of any kind to discipline, train, correct, or otherwise try to stop his subordinates from acting in an unconstitutional manner towards Mr. Givens." *Id.* There are two reasons why the plaintiff's argument fails.

First, "[d]eliberate indifference is 'a very high standard.'" *Fletcher v. LeFevers*, No. 7:21-CV-00231, 2022 WL 2654981, at *2 (W.D. Va. July 8, 2022) (quoting *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999)). It can be shown "by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." *Shaw*, 13 F.3d at 799 (internal quotation marks and citation omitted). Poston was not continuously inactive.

For a December 2015 incident in which Givens injured his head and later alleged that officers had kicked him, Poston filed an incident report describing Givens' injury. The report shows that an ADO was notified about Givens needing to go the hospital less than an hour after the fall happened. Mem. Supp. Poston Mot. Summ. J. Ex. 9, Internal Incident Reports 7, ECF No. 129-9.

For a December 2018 incident in which Givens was evaluated for bruising on his finger and left buttock, Poston signed off on an incident report.  Givens alleged that "the officers threw soap on me and hit me with a towel."  *Id*. at Ex. 13, Additional Incident Reports 4, ECF No. 129-13.  The residential program coordinator at Marion also reported this allegation to two investigators.  Alleged Prior Abuses 9, ECF No. 143-3.  The coordinator described Givens' subsequent medical treatment, including his hospitalization and surgery for an intestinal problem, in that email.  The plaintiff contends that the subsequent investigation's conclusion — that the allegation was unfounded — was inaccurate.  Pl.'s Opp'n Poston Mot. Summ. J. 6, ECF No. 143.  But as the plaintiff agrees, Poston was not responsible for the outcome of investigations.

For the June 2021 incident in which Givens suffered injuries to his knee, an investigator concluded that Givens' allegations were unfounded.  This incident is further described in relation to Artrip's motion for summary judgment.  While neither party submits evidence showing Poston prepared or signed off on a report of this incident, Givens had reported the cause of his injury to a nurse about a week after it happened.  He had not reported it previously.

The plaintiff raises multiple other incidents spanning years to argue that Poston was deliberately indifferent.  For most of them, however, a report was made. Investigators either chose not to look into the incident further or concluded that the

abuse allegations were unfounded. The main exception is the April 2018 incident in which Givens was scalded by another inmate. For that incident, the plaintiff presents no evidence showing that Poston was the shift commander at the time Givens was injured.[7] Considering all the evidence provided, the record cannot support a reasonable jury finding that Poston continuously failed to report incidents involving other officers and Givens when he was required to do so.

The plaintiff's argument on Poston's responsibilities to Givens fail for a second reason. Deliberate indifference implicitly requires that defendants had the authority to act against officers who violated inmates' constitutional rights. *Wood v. Yancey*, No. 1:23CV462 (RDA/JFA), 2024 WL 646356, at *3 n.4 (E.D. Va. Feb. 14, 2024) (noting that if a defendant did not have the authority to act, "[t]he most that can be said is that [the defendant] 'did nothing, when she might have gone beyond the requirements of her job,' which is insufficient to show deliberate indifference) (quoting *Flournoy v. Schomig*, 418 F. App'x 528, 531-32 (7th Cir. 2011) (unpublished)); *Jennings v. Univ. of N. C.*, 482 F.3d 686, 701 (4th Cir. 2007)

---

[7] The plaintiff does dispute that Poston was not a shift commander on April 24 and 25, 2018. However, the evidence she cites does not support that Poston was the shift commander on April 24, when Givens was hurt. She cites a logbook showing the captain for different shifts and the schedule of events, such as roll call and mealtimes. Poston's name does not appear on any pages of the logbook that the plaintiff cites that describe April 24, 2018. Logbooks 2–3, ECF No. 143-4. Instead, his name first appears for an entry labeled "4-25-18." Therefore, the logbook indicates that Poston was not a shift commander on the day Givens was burned by another inmate.

(denying summary judgment to an administrative official who specifically had "authority to take action" but was deliberately indifferent regarding allegations of sexual harassment against a university soccer coach).

Contrary to the plaintiff's argument, *Shaw* does not hold differently. There, the Fourth Circuit denied a supervisor's motion for summary judgment because a reasonable jury could find that he acted with deliberate indifference and that a causal link existed to a victim's death. Evidence demonstrating the supervisor's deliberate indifference included three witnesses alleging that, "when they notified [the supervisor] of assaults by [a subordinate police officer], he responded callously and with apparent amusement." *Shaw*, 13 F.3d at 800. He did not return phone calls to a man who had possibly been a victim of the officer's abuse. And he laughed at and refused to listen to another victim as he was escorting the victim to a jail. Here, however, the plaintiff does not allege any similar behavior on Poston's part, and the record does not show any.[8]

Furthermore, the Fourth Circuit found in *Shaw* that the death of the victim central to the case "was a natural and foreseeable consequence of [the supervisor]'s

---

[8] The plaintiff does submit phone call recordings of another inmate at Marion. In one call, the inmate states, "They tortured that son of a bitch ever since he's been here," referring to Givens. Pl.'s Opp'n Poston Mot. Summ. J. Ex. 11, Phone Call, ECF No. 143-11. However, the inmate never mentions Poston or describes a specific individual who could be Poston.

failure to investigate, or even to address, the pervasive violent propensities of one of his officers." *Id.* But here, as the plaintiff agrees, Poston did not have the authority to investigate the allegations found in the reports he signed off on. He also could not discipline officers who engaged in misconduct. Nor did he have the responsibility to report incidents that occurred when he was not on duty.[9]

The policy was for Poston to report incidents so that prison officials could examine the situation. Then they would decide whether to open an investigation. The results of the investigation could conclude that the report of abuse was unfounded, which happened at times. Or it could conclude that misconduct did take place, like the April 2018 incident. It was up to other officials, and not Poston, to decide how to discipline officers involved in such abuse. The evidence is not sufficient to enable a reasonable jury to find Poston liable for failing to do something he was not authorized to do.

The plaintiff again argues that it would "eviscerate supervisory liability claims" if defendants could avoid liability by pointing to sham investigation findings. Pl.'s Opp'n Poston Mot. Summ. J. 22, ECF No. 143. Again, however, an investigation's conclusion that allegations were unfounded is not, without more, proof of it being illegitimate. Furthermore, investigations finding misconduct cannot

---

[9] These incidents include the April 24 incident. It also includes February 5, 2022, the day that Givens died, because it is undisputed that Poston was not a shift commander that day. The parties also agree that Poston also was not at the facility at the time.

be subject to a blanket assumption that their conclusions were false. There is not sufficient evidence to support a jury finding that the investigation reports were tainted by bias or otherwise not of a sufficient depth to provide reliable answers.

The plaintiff also contends that the investigations' findings are not dispositive. Even if they are not dispositive, the record would not permit a reasonable jury to conclude that Poston was deliberately indifferent to any potential risk of constitutional injury to inmates like Givens. This also applies to incidents that occurred while Poston was not on duty because he had no authority or supervisory responsibilities to staff involved in incidents that did not occur during his shifts. Mem. Supp. Poston Mot. Summ. J. 4–5, ECF No. 129.

Lastly, the plaintiff makes the same allegations regarding Givens' hypothermia episodes against Poston as she does with Artrip. For the same reasons as with Artrip, however, the plaintiff does not provide evidence sufficient for a reasonable jury to find that officers whom Poston supervised caused any inmates hypothermia or that Poston was aware of and deliberately indifferent to officers causing Givens' hypothermia. Therefore, I will grant Poston's motion for summary judgment on Count Four.

### 5. Qualified Immunity.

Both Artrip and Poston assert qualified immunity from the claims against them. In determining qualified immunity, the court must decide (1) whether a

-35-

constitutional right has been violated; and (2) whether that right was clearly established at the time of the violation. *Bland v. Roberts,* 730 F.3d 368, 391 (4th Cir. 2013). Moreover, "judges of the district courts and the courts of appeals [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). In the present case, I find that an initial determination of whether a constitutional violation has been shown "will best facilitate the fair and efficient disposition of [this case]." *Id.* at 242.

As I have held, the plaintiff has not shown that Artrip or Poston violated the constitutional rights of Givens under the Eighth Amendment. Accordingly, they are entitled to immunity. *See Wilson v. Layne,* 526 U.S. 603, 609 (1999).

### III. DEFENDANTS' MOTIONS TO SEVER.

The defendants move to sever the supervisory liability claim against Poston and Artrip from the remaining seven claims against them.[10] Because I will grant Poston and Artrip's motions for summary judgment, the motion to sever will be terminated as moot.

---

[10] Osborne filed a motion to join the other non-supervisory defendants' motion to sever. Osborne Mot. Join Mot. Sever, ECF No. 124. Poston and Artrip joined the motion, as well. Poston and Artrip Notice to Join Mot. Sever, ECF No. 164.

IV.    MOTIONS TO EXCLUDE THE TESTIMONY
OF PLAINTIFF'S EXPERTS.

The defendants move to exclude the testimony of the plaintiff's two proposed expert witnesses.  For the reasons that follow, I will grant in part and deny in part the motions.

A. Legal Standard.

*Daubert*[11] provides the basic analytical framework for determining the admissibility of expert testimony.  Under *Daubert*, the court acts as a gatekeeper by ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Id.* at 589.  "[T]he trial judge's general 'gatekeeping' obligation [] applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citation omitted).  The trial court's inquiry into admissibility is "a flexible one" and the court's analysis will "depend[ ] on the nature of the issue, the expert's particular expertise, and the subject of his testimony."  *Id.* at 150 (internal quotation marks and citation omitted).  More generally, cases after *Daubert* have shown that "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702 (advisory committee's note to 2000 amendment).

---

[11]    *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

The principles of *Daubert* and its progeny are reflected in the Federal Rules of Evidence, which allow expert evidence under certain circumstances:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . .
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and
>
> (d)   the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.   As stated by the advisory committee:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts.  The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed. R. Evid. 702, advisory committee's note to 2000 amendment.  The reality is that "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."  *Id.* (quoting *United States v. 14.38 Acres*, 80 F.3d 1074, 1078 (5th Cir. 1996)).  As noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596.

### B. Testimony by Dr. Oliver.

The defendants move to exclude the testimony of the plaintiff's proposed expert witness, William Oliver, M.D. Dr. Oliver is a forensic pathologist whose testimony is offered to support the plaintiff's claim that Givens died from injuries caused by physical abuse, not an accident, and suffered abuse previously during his incarceration. That previous abuse includes hypothermia that correctional officers allegedly intentionally caused.

The defendants take issue with Dr. Oliver's proposed testimony.[12]    They argue that the methods he used to come to his conclusions are not admissible because they conflate correlation and causation; rely on comparisons to dissimilar conditions at Abu Ghraib and Guantanamo Bay; and speculate whether Givens could have been successfully treated on February 5, 2022. They also take issue with Dr. Oliver's testimony that Givens was "tortured," and that the cause of Givens' broken ribs was from abuse and not an accidental fall. Mem. Supp. Mot. Partial Summ. J. Ex. 1, Pl.'s Expert Disclosures 37, ECF No. 119-1.

---

[12] Defendants Artrip and Poston also move to exclude testimony by Dr. Oliver on torture, abuse, and hypothermia. However, their arguments stem from substantially the same points of dispute as the non-supervisory defendants. They are also moot because I will grant their motions for summary judgment. I will therefore not separately address their arguments with respect to Dr. Oliver's testimony.

On the issues of Dr. Oliver's reference to the word "torture" and to Abu Ghraib and Guantanamo Bay, the plaintiff makes several concessions. She agrees to instruct Dr. Oliver not to mention Abu Ghraib or Guantanamo Bay or make any other CIA reference. The plaintiff also represents that she would be willing to instruct him not to use the phrase "torture," and to only use the word "abuse." Lastly, in response to an argument made by the defendants, she states that it is not Dr. Oliver but their other witness Dr. Shriki who will testify on whether Givens could have been successfully treated after his spleen ruptured on February 5. I will accept the plaintiff's concessions and Dr. Oliver's testimony will be so limited.

Lastly, the defendants argue that because the incidents prior to February 2022 did not involve them, Dr. Oliver cannot tie liability for those incidents to them. They also argue that any testimony by Dr. Oliver as to hypothermia is irrelevant, because Givens did not suffer from hypothermia on February 5, 2022. However, while hypothermia was more frequently referenced in relation to the supervisory liability claim — on which I will grant summary judgment for Artrip and Poston — the plaintiff does allege a connection to some of the non-supervisory defendants.

In the Amended Complaint it is alleged that Montgomery, Plummer, and Kelly abused Givens by placing him in "ice-cold showers on numerous occasions." Am. Compl. ¶ 39; ¶ 42(b), ECF No. 46. The plaintiff also alleges that there was a routine involving Givens. First, there would be "CO anger/resent at Mr.

Givens having soiled himself, followed by an ice-cold shower (with the water temperature controlled by the COs), resulting in severely low body temperatures." *Id.* ¶ 46. This pattern allegedly continued the day Givens died. In her summary judgment briefing, the plaintiff cites inmate West's affidavit that he saw Jackson and Montgomery "throw and dump ice-cold water on Mr. Givens as he sat on a plastic chair in the shower stall" on February 5. West Aff. ¶ 39, ECF No. 139-1. As a result, Dr. Oliver's testimony on hypothermia likely is relevant.

As a result, I will grant in part and deny in part the motion to exclude Dr. Oliver's testimony. He will not be permitted to use the phrase "torture" or make references to CIA practices or similar practices, or to the conditions at Abu Ghraib, Guantanamo Bay, or similar sites. He will also not be permitted to testify to whether Givens could have been successfully treated for a ruptured spleen.

### C. Testimony by Dr. Shriki.

All the defendants also move to exclude the testimony of Jesse Shriki, D.O. Dr. Shriki is an emergency physician whose testimony is offered to support Count Three, that the non-supervisory defendants withheld medical care from Givens. His testimony is also offered to support the claim that Givens' instances of hypothermia were caused in part by the environmental conditions at Marion rather than entirely by his medications.

The non-supervisory defendants take issue with multiple opinions of Dr. Shriki's. The first source of their objections involves his interpretation of disputed facts. One example is his opinion that Givens was abused in the shower on February 5. The defendants argue that this opinion could only be formed by Dr. Shriki making a credibility determination in favor of a witness who testified that Givens was attacked by the officers. They also argue that because Dr. Shriki testified during his deposition that he did not know when specifically Givens' spleen was ruptured, he should not be able to testify as to whether Givens could have been successfully treated. Similarly, since Dr. Shriki did not know where Givens could have been taken for treatment, he also could not know whether that facility would have the staffing or equipment to treat Givens. Lastly, the defendants contend that his testimony is inadmissible because Dr. Shriki did not know if the non-supervisory defendants had the authority to order that Givens be taken to a hospital, given their responsibilities and that Givens had a Do Not Resuscitate (DNR) order in effect at the time of his death.

"To determine whether an opinion of an expert witness satisfies *Daubert* scrutiny, courts may not evaluate the expert witness' conclusion itself, but only the opinion's underlying methodology." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017). "[Q]uestions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility of the witness' assessment, not its

admissibility." *Id.* (internal quotation and citation omitted).  These arguments go to credibility.   The timing of potential treatment, the knowledge that the non-supervisory defendants had of Givens' condition, and their authority to order medical treatment are "factual underpinnings" from the record.  *Id.*  They do not reach Dr. Shriki's methodology and are not a reason to exclude his testimony.

The defendants also seek to prohibit Dr. Shriki from testifying on legal conclusions regarding Virginia law on DNR orders.  Legal conclusions are beyond the proper role of an expert witness and would supplant the jury's role in evaluating and determining the facts. *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) (noting that "[e]xpert testimony that merely states a legal conclusion is less likely to assist the jury in its determination").  However, the plaintiff concedes that the issue of whether Givens would have survived with different medical care is different from whether the defendants had a legal duty to provide that to him.  She represents that Dr. Shriki is not concerned with the second issue.  I will not permit Dr. Shriki to testify as to any legal conclusions.

The defendants also contend that Dr. Shriki should not be permitted to testify as to whether correctional officers should have a lower threshold for providing medical care to inmates with developmental delay issues because of their "impaired ability to communicate effectively."  Pl.'s Expert Disclosures 53, ECF No. 119-1. They argue that this is another legal conclusion he may not draw, this time involving

the delay in medical care claim. Plaintiff's counsel agreed, however, to instruct Dr. Shriki not to bring up the issue of Givens' intellectual disability lowering the threshold for when correctional officers should have provided him with care. He will therefore not be permitted to testify on this issue.

Lastly, the defendants argue that in his deposition, Dr. Shriki admitted that certain allegations here — including Givens being struck by a wet towel or having cold water poured on him — could not have been Givens' cause of death. Therefore, Dr. Shriki should "not be allowed to testify that the defendants collectively caused Givens' death." Defs.' Mem. Supp. Mot. Exclude Expert Test. 17, ECF No. 117. The plaintiff argues that this contention is irrelevant because, aside from testimony about hypothermia, Dr. Shriki is only going to testify as to whether "prompt medical intervention after the blunt force trauma [alleged in Givens' autopsy report] would have saved Mr. Givens." Mem. Opp'n Mot. Exclude Shriki Test. 12, ECF No. 138. Because the plaintiff represents that Dr. Shriki will not be asked to testify as to Givens' cause of death, I will not decide this issue now.

Defendants Artrip and Poston take issue with Dr. Shriki's proposed testimony on hypothermia. Although I will grant Artrip's and Poston's motions for summary judgment, I will still address their objections to Dr. Shriki's testimony. This is because I will permit Dr. Shriki to testify on Givens' hypothermia episodes for the same reasons as Dr. Oliver. For both, their testimony on hypothermia would be

appropriate to the extent that evidence presented at trial shows it is relevant to the claims against the non-supervisory defendants.

Artrip and Poston argue that Dr. Shriki is not qualified to testify on the causes of hypothermia; that he did not have a reliable methodology in coming to his opinion; and that his testimony on hypothermia is not relevant, because Givens did not die because of hypothermia. But "questions about [an expert]'s credentials and opinions" — such as those raised by the defendants — are "ideal fodder for vigorous cross examination." *United States v. Hassan*, 742 F.3d 104, 131 (4th Cir. 2014) (citation omitted). Dr. Shriki is a medical doctor who is board-certified in emergency medicine and critical care, and he stated at his deposition that hypothermia is a condition that he must treat as part of his work. Mem. Opp'n Mot. Exclude Shriki Test. Ex. 1, Shriki Dep. 80, ECF No. 138-1. He has met *Daubert*'s qualification requirements.

Dr. Shriki's methodology was also sufficient to permit him to testify. The defendants disagree with how he came to his conclusions, but that is not enough to exclude an expert's testimony. Dr. Shriki evaluated medical records about Givens' treatment for hypothermia, in addition to referencing what he described as "medical case series" about patients with hypothermia. *Id*. at 102–04. That he testified to a lack of specific experience treating patients with hypothermia or did not consider as

many potential causes of Givens' hypothermia as the defendants would have liked is a point that defendants may raise in front of the jury.

Lastly, Artrip and Poston argue that Dr. Shriki's testimony is irrelevant to the case because Givens did not die of hypothermia. Again, however, his testimony on hypothermia could be relevant for the same reason as Dr. Oliver's testimony.

### D. Holdings as to Expert Testimony.

I will grant in part and deny in part the non-supervisory defendants' motion to exclude the expert testimony offered by Dr. Oliver and Dr. Shriki. Dr. Oliver may not (a) use the phrase "torture" or make references to CIA practices or similar practices, or to the conditions at Abu Ghraib, Guantanamo Bay, or similar sites; or (b) testify on whether Givens could have been successfully treated for a ruptured spleen. Dr. Shriki may not testify as to his own legal conclusions, including on Virginia law on DNR orders and the effect of Givens' intellectual disability on a threshold for providing him with medical care.

### V.   CONCLUSION.

It is accordingly **ORDERED** as follows:

1. The Motions to Exclude the Expert Testimony of Dr. William Oliver and Dr. Jesse Shriki, ECF Nos. 116, 120, 122, and 125, are GRANTED in part and DENIED in part;

2. The Motion for Partial Summary Judgment on Counts Three and Six by Kelly, Plummer, Jackson, and Montgomery, ECF No. 118, is DENIED;

3. The Motion for Summary Judgment by Osborne, ECF No. 126, is DENIED;

4. Poston's Motion for Summary Judgment, ECF No. 128, is GRANTED;

5. Artrip's Motion for Summary Judgment, ECF No. 130, is GRANTED;

6. The Motions to Sever, ECF Nos. 114, 124, and 164, are TERMINATED as moot; and

7. The Clerk shall terminate defendants Artrip and Poston on the docket.


ENTER:   March 20, 2025

/s/  JAMES P. JONES
Senior United States District Judge