UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

KYMBERLY HOBBS, ADMINISTRATOR
OF THE ESTATE OF CHARLES JAMES GIVENS,
DECEASED,

    Plaintiff,

v.

ANTHONY RAYMOND KELLY, et al.,

    Defendants.

Civil Action No.: 1:23-cv-00003

### AFFIDAVIT OF RONALD DANNY WEST, JR.

1. My name is Ronald Danny West, Jr. I am a resident of the Commonwealth of Virginia. I currently reside in Prince George County, Virginia.

2. I am over the age of 18 years old and competent to make this affidavit. I have personal knowledge of the statements made in this affidavit. This affidavit correctly and accurately reflects the events that I saw and heard. I was given complete authority to modify this affidavit.

3. I currently participate in a work release program at Riverside Regional Jail in Prince George County, Virginia. Five-and-a-half days a week I leave Riverside to work at a Petersburg, Virginia iron and metal company. I receive minimum wage for my work, and pay approximately $650 a month for room and board in the program. I anticipate being released from the program in November 2024.

4. I was confined at Marion Correctional Treatment Center ("MCTC") during the period from February 2018 to May 2022. During that period of time, and until his death on

HOBBS008555

February 5, 2022, I had personal contact with Charles J. Givens and/or regularly observed the actions of MCTC staff persons with regard to Mr. Givens and other inmates.

5. There were two groups of inmates confined at MCTC – i) mentally disabled inmates, like Mr. Givens, and ii) members of the "cadre," like myself. As cadre, we were tasked with cleaning up the treatment center building, as well as cleaning up after the mentally disabled inmates. Every day, I cleaned and otherwise passed through the treatment center building, where I observed and heard the matters noted in this affidavit. I was paid for my work. My goals at the time were to accumulate some earnings and to be charge free for an extended period of time in order to qualify for the type of work release program that I am presently in.

6. The correctional officers and correctional treatment officers at MCTC (both referred to as "COs" in this affidavit) appeared to do whatever they wanted to do. They acted in a manner, and made statements expressing that they were unbounded by any rules or supervision. This was especially true of the roughly two-thirds of COs who had worked many years at MCTC.

7. A substantial number of COs at MCTC physically abused inmates. The COs punched, beat, and tortured inmates.

8. COs Creeger, DeLong, and Parks (the shorter Parks (there were two) who worked in 1B), were especially violent with inmates, but again, many COs physically abused inmates.

9. Additionally, COs openly threatened MCTC inmates with physical harm, saying things like "we'll take you to the shower room and beat your ass."

10. I observed Captain Poston, Captain Russell, and Major Brown being privy to a great deal of correctional officer misconduct, including physical abuse of some inmates. The

2

HOBBS008556

actions of COs who reported to them were clear and obvious and I heard the COs and supervisors speaking about the actions.

11. Although COs and higher-ranking officers generally focused their abuse on the especially vulnerable mentally disabled inmates, some, such as Major Brown, regularly threated cadre also.

12. I believe that I first met Mr. Givens in 2019 or 2020. He was in wing 1C at the time. I gave haircuts to inmates, including Mr. Givens. Mr. Givens seemed to function on the level of an 8 to 10-year-old, and regularly asked me and others to be his friend. His mental acuity declined as time went on.

13. Most of the COs expressed and acted as though they were annoyed by and hated Mr. Givens.

14. Mr. Givens was both mentally slow and physically sluggish. He could not walk nor move as fast as the other inmates.

15. Mr. Givens also required assistance. Many or most of the COs stated, or acted in a manner that indicated, that providing such assistance to Mr. Givens was beyond the scope of their job. They openly resented having to assist Mr. Givens.

16. Mr. Givens frequently defecated on himself. At times, he wore a diaper. Mr. Givens lacked the ability to clean up after himself. Oftentimes, the COs would ask other inmates to clean up after Mr. Givens. But numerous times, COs would leave inmates, including Mr. Givens, in clothes that they had soiled with urine.

17. Because of their open hatred of him, MCTC COs would constantly move Mr. Givens to other cell areas so that they would not have to deal with him.

HOBBS008557

18. Also, Mr. Givens was oftentimes kept in "the hole" – B wing (there are also general population wings). As a result, he had very few privileges. While in the hole, Mr. Givens was required to stay in his cell almost all the time.

19. In or around April 2018, Mr. Givens suffered extreme burns. The injuries occurred while Mr. Givens was in CO Pickles' care. I specifically know of at least one other inmate who was subjected to hot-water torture at MCTC.

20. Indicative of torture conducted by the COs at MCTC – both with hot water, and as discussed below, with cold water – I found a mop handle suspended in the shower room with scratches to the handle of the mop caused by handcuffs. I discerned that the setup was used to handcuff inmates to the suspended mop handle to facilitate torture.

21. Often there was no working heat in the cell areas of 1B. In the winter, COs would intentionally make the wing even colder by turning on the large fan at the end of the hallway.

22. Indicative of how cold the wings were kept, in the winters of 2021 and 2022, numerous times I observed a sheen of ice formed on the top of the toilet water in cells located in this part of the facility.

23. To intensify the cold, MCTC COs commonly punished inmates with cold showers, including Mr. Givens on multiple occasions. There are two shower stalls in the 1B shower room with meshed/grated doors that lock. Inmates would enter the shower stall, then the door/gate would be closed and locked. The COs controlled the temperature of the water; the faucets are outside of the shower stalls. There is very little room inside the showers to avoid the stream of water, especially for a sluggish, non-agile inmate like Mr. Givens.

24. On one occasion, the cold-water abuse was carried out by placing a large trash barrel filled with ice-cold water in the shower room.

25.  In connection with my cleaning duties, I walked past the MCTC infirmary and saw inmates, as a consequence of CO abuse, being treated by the medical staff for low body temperature using, among other things, medical warming blankets. But, most of the time, inmates were treated for cold exposure in the nurse's station adjacent to the day room. I estimate that in excess of 15 inmates were treated at MCTC for cold exposure.

26.  Some inmates, including Mr. Givens, were transported from MCTC to the hospital for cold exposure/hypothermia. More frequently, inmates were treated at MCTC with warming blankets for cold exposure. Again, I observed and heard comments concerning inmate cold exposure.

27.  On approximately February 3, 2022, CO Estep and an older CO with a beard (his name may have been Thomas) handled Mr. Givens roughly. Mr. Givens lost his toenail in the incident. I saw drops of blood down the hallway, as I was responsible for this area at the time. The circumstance was similar to the harsh treatment that Mr. Givens was subjected to for years at MCTC.

28.  On the morning of February 5, 2022, Mr. Givens was found to have defecated on himself.

29.  After 7:00 a.m. on that morning (February 5, 2022), Sergeant Kelly, Treatment Officers Plummer and Jackson, and Correctional Officers Montgomery and Osborne, escorted Mr. Givens to the shower area. COs Osborne and Montgomery were assigned to Mr. Givens' cell area. Officers Jackson and Plummer were the treatment officers assigned in the 1A- B areas.

30.  I was a "cadre" inmate and the houseman for Mr. Givens' area that day. That morning, I was assigned to clean Mr. Givens' cell after he defecated on himself, as well as that general area of the facility.

31. I witnessed the exchange between the COs and Mr. Givens that morning. I recall that Mr. Givens, despite his limited verbal capabilities, explicitly said that he did not want to be taken to the shower room – I perceived that as undoubtedly due to the abuse he routinely suffered there. In my view, Mr. Givens likely understood what was coming. He said that he wanted to see the nurse. It took some time for Mr. Givens to leave his cell. The COs appeared frustrated and angry at Mr. Givens.

32. Many times, I would be locked in the day room while COs abused inmates in their shower or cell, but that morning the circumstances fully unfolded in front of me.

33. COs Plummer, Jackson, Montgomery, and Osborne took Mr. Givens down the hallway and into the shower room.

34. The COs (and the inmates) knew that there were no cameras in the shower room.

35. Sgt. Kelly stood outside the shower room in the hallway at times, but then went back in and then out of the shower room.

36. While in the shower room, Mr. Givens was undressed. When Mr. Givens was naked, CO Plummer repeatedly snapped a wet towel at Mr. Givens, hitting his torso and genitals. Plummer would yell out "I got you." Mr. Givens cried out in pain, exclaiming "ow, that hurt," and winced and recoiled in pain.

37. I saw Sgt. Kelly aggressively punch Mr. Givens in the side.

38. At one point, as I was in the hallway just outside the view of the shower room, I heard the impact of three hard-impact punches on Mr. Given's body, as well as three of what sounded like slaps. I discerned that the body blows were delivered by COs Jackson and Montgomery, as *immediately* prior to hearing the blows both were standing near and closest to

Mr. Givens and had nothing in their hands. At the time, Osborne stood in the corner of the room and CO Plummer was coiling the wet towel.

39. Thereafter, when I returned to the shower room to obtain supplies from the back room, I saw COs Jackson and Montgomery throw and dump ice-cold water on Mr. Givens as he sat on a plastic chair in the shower stall. I also observed Mr. Givens' defenseless reaction to the cold water.

40. At no time did I see or hear Mr. Givens act aggressively toward these officers. I did hear Mr. Givens cry out and say, "Ow," "stop," and "I'm cold."

41. Based on what I saw and heard, of the five, only Osborne did not take part in the abuse. Sgt. Kelly and the other three COs chided Osborne for not joining in the abuse, at one point telling him he would make a good treatment officer someday.

42. Osborne did not act to protect Mr. Givens from the attacks of the others.

43. I observed and heard all of the foregoing as I, on numerous occasions, walked back and forth past and through the shower room, in order to, among other things, retrieve cleaning supplies.

44. I mopped Mr. Givens' cell with a wet mop, with two towels using my feet, and finally with a dry mop. When I finished, the floor in his cell was dry. The entire cell was not mopped, as only the bed area of the cell needed to be cleaned.

45. There was no "fall risk" sign on Mr. Givens' cell door while I was working that day. (I don't recall a fall risk sign every having been placed on his cell door.)

46. I never saw Mr. Givens fall that morning, nor did any of the five COs say that he had.

47. When Mr. Givens was returned to his cell some 20 minutes later, he required assistance as he walked. At times, the COs grabbed the underside of his arms in order to move Mr. Givens back to his cell.

48. I heard Mr. Givens gasping for air as he was substantially assisted down the hall back to his cell.

49. I was shown the video of Mr. Givens being placed into the back portion of his cell by COs Osborne and Montgomery. That was unusual. Normally COs would let go of an inmate at the entrance to his cell, but the video shows the COs fully entering into the back portion of the cell (their shadows on the floor show how far they walk into the cell). It is my impression that Mr. Givens was placed on his bed by COs Osborne and Montgomery.

50. I later learned that Mr. Givens had died. I was told by inmate Catron and I conveyed to him some of the circumstances that I had seen.

51. Days following Mr. Givens' death, I was called to the Warden's office. I walked past Warden Artrip, Major Brown, Captain Russell, and Grimstead to meet with state police investigator SA Seagle and VDOC investigator Agent O'Der.

52. Initially, I was questioned about a call placed from MCTC concerning Mr. Givens' death. The investigators thought that I had made the call, but learned that I had not.

53. I told SA Seagle and Agent O'Der that I could not talk with them about the circumstances. I told Seagle and O'Der that I had to work and live at MCTC. I was concerned that MCTC staff would retaliate against me if I said anything against their interests.

54. Soon after my interview with Seagle and O'Der, Warden Artrip repeated to me some of the exact words that I had said to Seagle and O'Der in my interview, and chastised me for my comments to them. (There were two laptops open in the room when I met with Seagle

8
HOBBS008562

and O'Der and I surmised that the interview may have been recorded or that Artrip may have listened at the door.) Major Brown and Warden Artrip stated in a matter-of-fact manner that "we know that nothing happened."

55. Under the direction of the Virginia State Police, I was later removed from the Treatment Center and moved to Bland Correctional Center. At the time, I was not informed of the reason for my relocation.

56. Without advance notice of any kind, on May 10, 2022, VSP transported me from Bland Correctional Center to VSP Headquarters in Wytheville, where I was questioned about the circumstances of Mr. Givens' death.

57. At the time, I agreed to submit to a polygraph examination. In my examination, I identified the five above-named officers who escorted Mr. Givens to the shower. I identified the actions of each as noted above.

58. On this day, I did not know the medical examiner's determination of Mr. Givens' cause of death.

59. I told SA Seagle that a picture of Mr. Givens' body after his death was circulated among COs on their cell phones, with indecent drawings imposed over Mr. Givens' body. At an angle, I saw and heard CO Sauer's (or Sower's) partner show and narrate to him a photo of Mr. Givens as he was found lying on his bed with a penis drawn in his mouth.

60. After abusing an inmate, like what was done to Mr. Givens, the COs would often congregate in the day room.

61. I, Ronald Danny West, Jr., swear under penalty of perjury that the statements in this Affidavit are true and correct to the best of my knowledge and belief.

HOBBS008563

*[signature: Ronald West]*
Ronald Danny West, Jr.

COMMONWEALTH OF VIRGINIA            )
                                    )  to wit
COUNTY OF Prince George County )

I, Claire Chesney, a Notary Public in and for the State and County or City aforesaid, do hereby certify that on February 5, 2024, RONALD DANNY WEST, JR., personally appeared before me in my jurisdiction aforesaid, and, having proved to me through documentary evidence his identity, and after being duly sworn, acknowledged that the information contained in the foregoing Affidavit is true and correct to the best of his knowledge and belief and signed the same before me.

WITNESS under my hand and official seal:

*[signature]*
(notary signature)

My Commission Expires: 12/31/2026

My Notary Registration No.: 8027980

*[Notary Seal: CLAIRE ELLEN CHESNEY, NOTARY PUBLIC, REG. #8027980, My Comm. Exp. Dec 31, 2026, COMMONWEALTH OF VIRGINIA]*

10
HOBBS008564